**No. 24-1367**

# United States Court Of Appeals For The Tenth Circuit

ZACH PACKARD; AMANDA BLASINGAME; JOE DERAS; JACQUELYN
PARKINS; SARA FITOURI; ELISABETH EPPS; HOLLIS LYMAN; CLAIRE
SANNIER; MAYA ROTHLEIN; KELSEY TAYLOR; STANFORD SMITH;
ASHLEE WEDGEWORTH,

*Plaintiffs–Appellees,*

– and –

CIDNEY FISK,

*Plaintiff,*

v.

CITY AND COUNTY OF DENVER,

*Defendant–Appellant,*

– and –

CORY BUDAJ; PATRICIO SERRANT; DAVID MCNAMEE; CITY OF
AURORA; JONATHAN CHRISTIAN; KEITH VALENTINE; MATTHEW
BRUKBACHER; TIMOTHY DREITH; ANTHONY HAMILTON,

*Defendants.*

_____

On Appeal from the United States District Court for the District of Colorado
(Civ. No. 1:20-cv-01878-RBJ) (The Hon. R. Brooke Jackson)
_____

### BRIEF OF APPELLANT
### CITY AND COUNTY OF DENVER
_____

*Oral Argument Requested*

Frederick R. Yarger (#39479)
William D. Hauptman (#51168)
Miranda B. Worthington (#55135)
Wheeler Trigg O'Donnell LLP
370 17th St., Ste. 4500, Denver, CO 80202
Telephone: (303) 244-1800
E-mail: yarger@wtotrial.com
hauptman@wtotrial.com
worthington@wtotrial.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iv

STATEMENT OF PRIOR OR RELATED APPEALS............................................1

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF ISSUES ON APPEAL ..............................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE.....................................................................5

    A.    The Summer 2020 George Floyd Protest.............................................5

    B.    This Lawsuit. ...............................................................8

SUMMARY OF THE ARGUMENT ...................................................................12

ARGUMENT .....................................................................................13

I.    Retrial is required due to instructional errors that impermissibly lessened Plaintiffs' burden of proof. ...................................................13

    A.    Preservation and standard of review. ..................................................13

    B.    The district court erroneously omitted the key legal requirement of deliberate indifference from Plaintiffs' "official policy, practice, or custom," "failure to supervise," and "ratification" theories, lessening Plaintiffs' burden of proof. ...................................15

    C.    The district court's failure to instruct the jury that an officer's decision to take action against a plaintiff must be "substantially motivated" by the plaintiff's participation in a protected activity impermissibly reduced Plaintiffs' burden of proof on their First Amendment claim. ...................................18

II.    The district court's erroneous admission of evidence from the Office of the Independent Monitor—which Plaintiffs used as a centerpiece of their case—warrants a new trial. ...................................21

    A.    Preservation and standard of review. ..................................................21

B.     Mitchell, Denver's former Independent Monitor, testified about his after-the-fact investigation of Denver's response to the protest and opinions he reached based on that investigation. .............23

C.     The district court should have excluded Mitchell's testimony under Rules 701, 407, and 403, and its admission of that testimony was not harmless....................................................27

     1.     Mitchell's opinions strayed beyond what Rule 701 permits and were never subjected to the protections of Rule 702. ...................................................27

     2.     Mitchell's testimony impermissibly implicated subsequent remedial measures.................................30

     3.     Mitchell's testimony was unfairly prejudicial under Rule 403. ...................................................32

III.     The district court erred in denying Denver's motion for judgment as a matter of law. ........................................................34

A.     Preservation and standard of review. ..................................34

B.     Plaintiffs' "official policy, practice, or custom" theory under *Monell* relies on policies that cannot give rise to liability as a matter of law and was not supported by sufficient evidence of causation. ...........................................................35

     1.     A policy permitting officers to exercise discretion cannot itself establish *Monell* liability, nor can a single incident establish a pattern or practice amounting to an actionable "custom.".....................................................36

     2.     The other policies Plaintiffs relied on are unsupported by sufficient evidence of causation................................41

C.     Plaintiffs' "failure to train" and "failure to supervise" theories are unsupported by sufficient evidence of deliberate indifference.........................................................46

D.     Plaintiffs' "ratification" theory is unsupported by sufficient evidence that a Denver policymaker knew the reasons for and approved of any act causing a constitutional violation. ....................49

IV.   Remittitur is required because the evidence does not support Plaintiffs' excessive and largely identical compensatory damages awards. ......................................................................................................53

    A.   Preservation and standard of review. ..................................................53

    B.   Plaintiffs introduced evidence of physical and emotional injury that significantly varied in nature and extent yet received largely identical compensatory damages awards. ...............................54

    C.   The evidence does not support Plaintiffs' compensatory damages awards, and those awards must be remitted. ........................56

CONCLUSION ..................................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ...........................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................61

CERTIFICATE OF HARD COPY SUBMISSION ...............................................61

ATTACHMENTS

    Attachment Index..........................................................................................Ai

    Excerpts from the Transcript of Oral Ruling on "Substantial or Motivating" in First Amendment Jury Instruction (Feb. 23, 2022) .............A1

    Excerpts from the Transcript of Oral Ruling on "Deliberate Indifference" in *Monell* Jury Instructions (Feb. 23, 2022) .....................................................A6

    Excerpts from the Transcript of Oral Rulings on Nicholas Mitchell's Testimony (Mar. 17, 2022)..........................................................................A10

    Excerpts from the Transcript of Oral Ruling on Defendants' Rule 50(a) Motion for Judgment as a Matter of Law (Mar. 21, 2022) ........................A20

    Order on the Motions for Judgment as a Matter of Law, New Trial, or Remittitur as to Defendants Denver and Jonathan Christian, filed Sept. 19, 2022 ......................................................................................A31

    Amended Final Judgment Pursuant to Rule 58, filed Aug. 29, 2024.........A56

# TABLE OF AUTHORITIES

## CASES

*Advanced Recovery Sys. v. Am. Agencies*,
    923 F.3d 819 (10th Cir. 2019) .................................................................... 17, 21

*AFL-CIO v. City of Miami*,
    637 F.3d 1178 (11th Cir. 2011) ............................................................. 17

*Andrews v. Fowler*,
    98 F.3d 1069 (8th Cir. 1996) ........................................................... 39, 40

*Arnold v. City of Olathe*,
    35 F.4th 778 (10th Cir. 2022) .............................................................. 16

*Barney v. Pulsipher*,
    143 F.3d 1299 (10th Cir. 1998) ................................................. 15, 47, 48, 49

*Bd. of Cnty. Comm'rs v. Brown*,
    520 U.S. 397 (1997) ......................................................... 41, 42, 48

*Bell v. Williams*,
    108 F.4th 809 (9th Cir. 2024) ................................................. 56, 57

*Bjelland v. City & Cnty. of Denver*,
    No. 22-cv-01338-SKC-SBP, 2024 WL 4165428
    (D. Colo. Sept. 12, 2024) .............................................................. 52

*Bohanon v. City of Indianapolis*,
    46 F.4th 669 (7th Cir. 2022) ................................................. 16, 17

*Brown v. Gray*,
    227 F.3d 1278 (10th Cir. 2000) ................................. 35, 37, 41, 49, 53

*Bryson v. City of Oklahoma City*,
    627 F.3d 784 (10th Cir. 2010) ................................................. 50, 52

*Burke v. Regalado*,
    935 F.3d 960 (10th Cir. 2019) ................................................. 14, 35

*Carney v. City & Cnty. of Denver*,
    534 F.3d 1269 (10th Cir. 2008) .......................................................... 39

*Christensen v. Park City Mun. Corp.*,
554 F.3d 1271 (10th Cir. 2009)...........................................37

*City of Canton v. Harris*,
489 U.S. 378 (1989) ...........................................47

*City of Oklahoma City v. Tuttle*,
471 U.S. 808 (1985) ........................................... 39, 41, 42, 44

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........................................... 37, 43

*Connick v. Thompson*,
563 U.S. 51 (2011) ...........................................47

*Cordova v. Aragon*,
569 F.3d 1183 (10th Cir. 2009)...........................................50

*Cousik v. City & Cnty. of Denver*,
No. 22-cv-01213-NYW-KAS, 2024 WL 896755
(D. Colo. Mar. 1, 2024) ........................................... 17, 45, 52

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...........................................32

*Dennis v. City & Cnty. of Denver*,
No. 22-cv-0608-WJM-KAS, 2023 WL 5864117
(D. Colo. Sept. 11, 2023)...........................................17

*Finch v. Rapp*,
38 F.4th 1234 (10th Cir. 2022)........................................... 12, 15, 16

*Fresquez v. BNSF Ry. Co.*,
52 F.4th 1280 (10th Cir. 2022)...........................................53

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) ...........................................53

*George v. Beaver Cnty.*,
32 F.4th 1246 (10th Cir. 2022)........................................... 15, 33

*Hartman v. Moore*,
547 U.S. 250 (2006) ...........................................20

*Hernandez v. City & Cnty. of Denver,*
    No. 21-cv-01538-PAB-MEH, 2022 WL 3597452
    (D. Colo. Aug. 23, 2022) ...................................................................50

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs,*
    962 F.3d 1204 (10th Cir. 2020) ...........................................................16

*James River Ins. Co. v. Rapid Funding, LLC,*
    658 F.3d 1207 (10th Cir. 2011) ............................................... 23, 28, 29

*James v. Harris Cnty.,*
    577 F.3d 612 (5th Cir. 2009) ........................................................ 16, 17

*Karnes v. SCI Colo. Funeral Servs., Inc.,*
    162 F.3d 1077 (10th Cir. 1998) ..................................................... 15, 18

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) ..........................................................................29

*Lackey v. Cnty. of Bernalillo,*
    166 F.3d 1221 (Table), 1999 WL 2461
    (10th Cir. Jan. 5, 1999) .....................................................................18

*Lankford v. City of Hobart,*
    73 F.3d 283 (10th Cir. 1996) ..................................................... 38, 39, 41

*Lederman v. Frontier Fire Prot., Inc.,*
    685 F.3d 1151 (10th Cir. 2012) .................................................... 14, 18

*Lippoldt v. Cole,*
    468 F.3d 1204 (10th Cir. 2006) ...........................................................56

*Lozman v. City of Riviera Beach,*
    585 U.S. 87 (2018) ............................................................................19

*Makin v. Colo. Dep't of Corr.,*
    183 F.3d 1205 (10th Cir. 1999) ...........................................................56

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978) ... 1, 2, 3, 4, 12, 13, 16, 17, 31, 35, 36, 37, 39, 41, 42, 43, 46,
    57, 58

*Mt. Healthy Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ................................................................19

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ......................................................... 19, 20

*Osterhout v. Bd. of Cnty. Comm'rs*,
   10 F.4th 978 (10th Cir. 2021).................................................53

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) ................................................................36

*Peterson v. City of Fort Worth*,
   588 F.3d 838 (5th Cir. 2009)............................................ 39, 40

*Prager v. Campbell Cnty. Mem'l Hosp.*,
   731 F.3d 1046 (10th Cir. 2013)....................................... 22, 23

*Pryor v. Sch. Dist. No. 1*,
   99 F.4th 1243 (10th Cir. 2024)........................................ 18, 19

*Rocky Mtn. Helicopters, Inc. v. Bell Helicopters Textron*,
   805 F.2d 907 (10th Cir. 1986)......................................... 30, 31

*Schneider v. City of Grand Junction Police Dep't*,
   717 F.3d 760 (10th Cir. 2013)................................................16

*Sheehan v. City & Cnty. of San Francisco*,
   743 F.3d 1211 (9th Cir. 2014),
   *rev'd in part on other grounds*,
   575 U.S. 600 (2015) ......................................................... 50, 52

*Simmons v. Uintah Health Care Special Serv. Dist.*,
   506 F.3d 1281 (10th Cir. 2007)..............................................42

*Sims v. Great Am. Life Ins. Co.*,
   469 F.3d 870 (10th Cir. 2006)..................................... 23, 31, 34

*Snyder v. Trepagnier*,
   142 F.3d 791 (5th Cir. 1998).................................................16

*Stortroen v. Beneficial Fin. Co.*,
   736 P.2d 391 (Colo. 1987) ....................................................45

*Stump v. Gates*,
    211 F.3d 527 (10th Cir. 2000)..............................................................30

*United States v. Bindues*,
    __ F. Supp. 3d __, No. CR 22-0466 JB, 2024 WL 3488301
    (D.N.M. 2024) ....................................................................................32

*United States v. Bush*,
    405 F.3d 909 (10th Cir. 2005)..............................................................27

*United States v. Johnson*,
    617 F.3d 286 (4th Cir. 2010)................................................................28

*United States v. Kalu*,
    791 F.3d 1194 (10th Cir. 2015)............................................................18

*United States v. Magleby*,
    241 F.3d 1306 (10th Cir. 2001)............................................................22

*United States v. McVeigh*,
    153 F.3d 1166 (10th Cir. 1998)............................................................32

*United States v. Peoples*,
    250 F.3d 630 (8th Cir. 2001)................................................................28

*Vincent v. Nelson*,
    51 F.4th 1200 (10th Cir. 2022).............................................................23

*Waller v. City & Cnty. of Denver*,
    932 F.3d 1277 (10th Cir. 2019)................................... 16, 39, 47, 48, 49

*Wankier v. Crown Equip. Corp.*,
    353 F.3d 862 (10th Cir. 2003)..............................................................15

*Webb v. ABF Freight Sys., Inc.*,
    155 F.3d 1230 (10th Cir. 1998)................................................... 14, 15

*Wooden v. City of Philadelphia*,
    No. 19-1054, 2022 WL 17724423
    (E.D. Penn. Dec. 15, 2022)..................................................................43

*Worrell v. Henry*,
    219 F.3d 1197 (10th Cir. 2000)................................................ 12, 18, 19

**STATUTES**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

**RULES**

Fed. R. Evid. 403 ................................................................................32

Fed. R. Evid. 407 ................................................................................30

Fed. R. Evid. 701 ................................................................................27

## STATEMENT OF PRIOR OR RELATED APPEALS

There is one related appeal: *Epps v. Christian*, No. 24-1371 (10th Cir.).

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. The district court properly exercised federal-question jurisdiction under 28 U.S.C. § 1331. It entered an amended final judgment on August 29, 2024, App.Vol.12_104,[1] and this appeal was timely filed September 16, 2024, App.Vol.12_109.

## STATEMENT OF ISSUES ON APPEAL

I. Whether two instructional errors that lessened Plaintiffs' burden of proof require reversal: (1) the district court's failure to instruct the jury that Plaintiffs were required to prove the key element of "deliberate indifference" for *all* of Plaintiffs' municipal liability theories under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and (2) the district court's failure to instruct the jury that, to prevail on their First Amendment claims, Plaintiffs were required to prove that participation in protected First Amendment activity was a ***"substantially motivating factor"***—not a "substantial *or* motivating factor"—for police officers' asserted violations of Plaintiffs' constitutional rights.

---

[1] Citations to the Joint Appendix use the following format: App.Vol.[Volume #]_[Page #], and include transcript line numbers where necessary. For example: App.Vol.18_5:17-6:3. Citations to multimedia files admitted at trial are to the placeholders in the Joint Appendix. Denver submits the multimedia files separately.

II. Whether the district court reversibly erred by admitting testimony from Nicholas Mitchell, Denver's former Independent Monitor who conducted an after-the-fact assessment of Denver's response to the protest and opined the response was deficient in several respects, where: (1) Mitchell's opinions exceeded the scope of permissible lay opinion and he was never qualified as an expert, (2) Mitchell's testimony impermissibly concerned subsequent remedial measures, and (3) Mitchell's testimony was unfairly prejudicial.

III. Whether the district court erred in denying Denver's motion for judgment as a matter of law on Plaintiffs' *Monell* theories because those theories either cannot establish municipal liability as a matter of law or were unsupported by sufficient evidence.

IV. Whether remittitur is required because the evidence does not support Plaintiffs' excessive compensatory damages awards, which the jury awarded in precisely equal amounts for ten of the twelve Plaintiffs.

## INTRODUCTION

"[A] municipality cannot be held liable under [42 U.S.C.] § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Plaintiffs' claims in this case blur, and ultimately transgress, the line distinguishing municipal from vicarious liability.

In summer 2020, following the death of George Floyd, a multi-day protest of unprecedented violence and destruction erupted in Denver. Twelve people who attended the protest and sustained injuries from less-lethal munitions deployed by police officers sued the City and County of Denver for municipal liability under *Monell*, alleging the City's policies, practices, and customs; failure to train and supervise; and ratification of officers' conduct caused their injuries. But the evidence they introduced—largely, inflammatory videos showing uses of force against ***other*** people who are not parties to this litigation—did not, and could not, prove that Denver itself can be subject to *Monell* liability.

Four reversible errors contributed to the verdict for Plaintiffs:

***First***, the district court made two key instructional errors: (1) it failed to uniformly instruct the jury that Plaintiffs were required to prove the key element of "deliberate indifference" for ***all***, not some, of their various theories of municipal liability; and (2) it instructed the jury to apply an incorrect, relaxed legal standard in deciding Plaintiffs' First Amendment claim. These two errors lessened Plaintiffs' burden of proof, requiring reversal and retrial on all of Plaintiffs' claims.

***Second***, the district court erroneously admitted testimony from Nicholas Mitchell, Denver's former Independent Monitor who conducted a post-incident assessment of Denver's protest response and offered his own opinions, based on that post-hoc assessment, as to whether Denver's response was deficient. This

testimony became a centerpiece of Plaintiffs' case. Plaintiff characterized Mitchell's opinions as being highly reliable and cloaked in authority because Mitchell was *the* Denver official tasked with assessing the protest response. Yet Mitchell's opinions—unlike those of Plaintiffs' two experts on policing and crowd management—were never subject to expert disclosures or the rigors of Rule 702. Mitchell's opinions should never have been admitted. They exceeded the bounds of permissible lay opinion, were impermissibly directed to subsequent remedial measures, and were unfairly prejudicial.

*Third*, the district court declined to enter judgment as a matter of law in Denver's favor on Plaintiffs' *Monell* theories. Certain of those theories cannot give rise to municipal liability as a matter of law, and others are not supported by sufficient evidence. If this Court vacates the judgment and orders a new trial, any *Monell* theories that are not viable or were unsupported by sufficient evidence should be excluded from retrial.

*Fourth*, the district court declined to remit Plaintiffs' excessive compensatory damages awards, despite a record showing that Plaintiffs' injuries were modest and temporary.

## STATEMENT OF THE CASE

### A.    The Summer 2020 George Floyd Protest.

Two days after the death of George Floyd in Minneapolis, on May 27, 2020, the Denver Police Department (the "Department") learned there would be a protest in Denver the following day. App.Vol.17_103:6-12; App.Vol.21_112:10-19. The Department anticipated the protest would start at 5:00 p.m. and end at 7:00 p.m. App.Vol.21_113:8-12; App.Vol.21_117:7-14. Commander Patrick Phelan served as the Incident Commander who was in charge of the police response to the protest. App.Vol.21_7:12-18. From a command post with representatives from other law-enforcement agencies and emergency responders, he provided briefings and gave rules of engagement and direction on how to respond to the protest. App.Vol.21_165:19-166:9; App.Vol.28_27:12-18; App.Vol.28_29:4-30:1.

But the George Floyd protest was far different from what the Department anticipated. Although prior protests in Denver ordinarily followed a path and had set start and end times, App.Vol.23_128:11-25, this protest was spontaneous and formless; had different groups moving throughout different parts of downtown; lasted several days (in fact, some protested for weeks, App.Vol.18_196:4-7; App.Vol.24_63:9-11); went into the early morning hours; and was much larger, with reports of about 10,000 protesters, App.Vol.23_129:2-130:5; App.Vol.23_132:1-6.

The destruction and violence directed at police officers was unprecedented. Downtown Denver experienced an estimated $4 million in property damage. App.Vol.25_124:4-6. At the time of trial, Denver had incurred $953,000 repairing City buildings alone. App.Vol.26_142:20-23. Seventy-three officer injuries were reported between May 28 and June 2, 2022. App.Vol.27_129:23-130:3. Officers reported being struck by rocks, bottles, bricks, fireworks, and other explosive devices. App.Vol.27_133:21-134:2; App.Vol.27_136:9-11. One officer was required to medically retire after a person drove a car into him and other officers. App.Vol.27_135:3-25. And it could have been much worse: throughout the protest, police recovered 25 firearms and 50 to 60 other weapons, including hatchets, machetes, and slingshots. App.Vol.21_152:20-25.

The number of agitators engaged in violent criminal behavior made it challenging for the Department to balance protecting the attendees' right to protest with maintaining public safety and order. App.Vol.28_41:23-42:9. This is especially so because, while the protest generally was peaceful at daytime, it became leaderless and violent at night. App.Vol.28_43:14-44:3. Based on his judgment that other tactics (such as using batons against individuals) posed too great a risk of confrontation and injury to officers, Commander Phelan authorized area commanders on the ground to order the use of less-lethal munitions, including CS gas (*i.e.*, tear gas), pepper balls, and flash-bang grenades. App.Vol.21_26:11-

28:12. And although his operations plans directed supervising officers to give (and then document) a dispersal order before these less-lethal munitions were deployed, the Department does not have written documentation that dispersal orders were given. App.Vol.21_30:11-31:9; App.Vol.21_32:19-34:22. *But see* App.Vol.21_34:17-35:22 (Phelan also discussed giving dispersal orders with officers over the radio and phone). The protest was fluid, dynamic, and unlike anything Commander Phelan had encountered in his 40-year career. App.Vol.21_31:17-23; App.Vol.21_33:12-13.

On the second day of the protest, the Department determined it needed assistance and requested "mutual aid" from law-enforcement agencies in other nearby jurisdictions. App.Vol.28_47:20-49:17. Denver did not have written agreements with these "mutual-aid jurisdictions," App.Vol.16_71:4-7, and Denver's policy was to allow them to use their own use-of-force policies and weapons, App.Vol.21_15:10-17. Although Commander Phelan sat atop the chain of command for all agencies responding to the protest, App.Vol.21_8:24-9:4, and all agencies generally acted under his direction, App.Vol.21_13:1-3, each mutual-aid jurisdiction brought its own command structure, App.Vol.21_13:8-13, and decisions by individual officers from those jurisdictions to use weapons were made according to those jurisdictions' own policies, App.Vol.21_169:24-170:16. Some munitions that officers of mutual-aid jurisdictions deployed, such as bean-bag

shotguns, were weapons Denver itself did not deploy or have in its inventory. App.Vol.43_30(59:25-60:12) (Denver's Rule 30(b)(6) testimony). When Commander Phelan learned that at least one mutual-aid jurisdiction brought less-lethal shotgun rounds, he stopped it. App.Vol.21_170:17-171:14.

## B.    This Lawsuit.

This sprawling lawsuit was filed while the protest was ongoing. Plaintiffs–Appellees are twelve people who attended the protest for one or more of its first five days, between May 28 and June 2, 2020; did not engage in violence against police officers or destroy property; and were injured by less-lethal munitions. Seven of them initiated the litigation by filing a complaint on June 25, 2020. App.Vol.1_87. The district court consolidated a second lawsuit brought by the five other plaintiffs.[2] *See* App.Vol.1_142. Both groups of plaintiffs asserted claims for municipal liability against Denver, generally alleging that Denver's policies, practices, and customs; failure to train; and ratification of officer conduct caused violations of their constitutional rights. *See generally* App.Vol.2_2; App.Vol.2_83.

The district court later consolidated yet another lawsuit into the action. App.Vol.1_146. As a result, the action included (for a time) three sets of plaintiffs who asserted three sets of differing (and sprawling) claims, including class claims,

---

[2] Other plaintiffs joined each plaintiff group in filing their respective complaints, but no judgment entered in favor of those other plaintiffs and they are not parties to this appeal.

against three sets of municipal and individual defendants from three Denver-area jurisdictions. App.Vol.1_147; App.Vol.2_2; App.Vol.2_83. The district court set three different trials. *E.g.*, App.Vol.1_144; App.Vol.11_178; App.Vol.11_180.

Relevant here, Plaintiffs' claims for municipal and individual liability against Denver and one Denver police officer, Jonathan Christian, for violation of Plaintiffs' First and Fourth Amendment rights went to trial in March 2022. Plaintiffs advanced three theories—an "official policy, practice, or custom"; "failure to train"; and "ratification"—in seeking to impose municipal liability on Denver. *See* App.Vol.11_158-62. To establish a failure to train or a pattern or practice of constitutional violations amounting to an actionable municipal custom, Plaintiffs presented voluminous, inflammatory evidence of officers, who are not parties to this litigation, using force at the George Floyd protest (and at no other prior event) against people ***other than*** Plaintiffs who also are not parties to this litigation. This evidence included videos of:

- an officer holding a pepper-ball launcher in one hand and a pepper-spray canister in the other and simultaneously deploying both at protesters, App.Vol.24_168:23-169:16; App.Vol.34_83 (Exh. 658, at 4:05-4:20);

- an officer pointing the barrel of his 40-millimeter launcher at protesters, and using explicit language directed at one protester, App.Vol.17_142:18-143:14; App.Vol.34_81 (Exh. 648, at 0:20-0:56); and

- an officer pulling a woman's sign away from her face before pepper-spraying her in front of the Colorado Supreme Court, App.Vol.17_176:13-177:13; App.Vol.34_89 (Exh. 670, at 51:00-51:20).

Plaintiffs also called Nicholas Mitchell, Denver's former Independent Monitor, as a lay witness. Much like Plaintiffs' two experts on policing and crowd-management—whom Plaintiffs actually disclosed as experts and whose testimony was subject to the requirements of Rule 702, *see* App.Vol.17_98:23-99:3 (Stamper); App.Vol.24_129:13-17 (Maguire)—Mitchell testified (as explained further below) about his after-the-fact assessment of Denver's response to the protest and the conclusions he reached, namely, that Denver's response was deficient in several respects. But unlike the testimony and opinions of Plaintiffs' disclosed experts, Mitchell's testimony and opinions were cloaked with authority from his prior service as a Denver official whose assessment had been requested by the Denver City Council and unsubtly permeated with recommendations as to how Denver should do things differently.

After a 15-day trial, the case was submitted to the jury. Over Denver's objection, the district court did not instruct the jury that "deliberate indifference" is an element of all of Plaintiffs' municipal liability theories. *See* App.Vol.11_159-62. Although it instructed the jury that Plaintiffs' "failure to train" theory requires proof that "Denver adopted its policy of deficient ***training*** with deliberate indifference," that theory also was based on deficient "supervision"—for which the same instruction lacked any culpability element. App.Vol.11_161. The district court likewise declined to instruct the jury that, to prove Plaintiffs' First

Amendment claim, they were required to show their participation in protected activity was a "***substantially motivating***" factor in an officer's decision to take action against them. Instead, the court instructed that participation in protected activity need only be "***a*** substantial ***or*** motivating" factor. App.Vol.11_153 (emphasis added).

The jury returned a verdict in Plaintiffs' favor. It found that all Plaintiffs (except Ashlee Wedgeworth, who proved only her First Amendment claim) established Denver's liability for violating both their First and Fourth Amendment rights on all three theories of municipal liability. App.Vol.11_169-77. It further found that the constitutional rights of two plaintiffs—Zachary Packard and Joe Deras—were violated by an officer from a mutual-aid jurisdiction acting pursuant to an official policy, practice, or custom of Denver. App.Vol.11_171, 173. Based on these findings, the jury awarded Packard $3 million, Wedgeworth $750,000, and all other Plaintiffs an even $1 million. App.Vol.11_169-77.

The district court denied Denver's motion for judgment as a matter of law, a new trial, or remittitur. App.Vol.12_81. After it entered an amended judgment on August 29, 2024, App.Vol.12_104, Denver timely appealed, App.Vol.12_109.

## SUMMARY OF THE ARGUMENT

The district court made four categories of errors that require reversal and either judgment for Denver, retrial with instructions for the district court to exclude certain evidence and legally defective *Monell* theories, or remittitur.

I. The district court erred by failing to instruct the jury that culpability—specifically, the element of "deliberate indifference—is an element of ***all*** of Plaintiffs' *Monell* theories, despite precedent from this Court and other circuits requiring consistent application of that key element. *E.g.*, *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). The court also erred by failing to instruct the jury that Plaintiffs' First Amendment claim requires proof that participation in protected activity was a "substantially motivating" factor in an officer's decision to take action against a plaintiff. Again, this error contravened binding precedent. *E.g.*, *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Each of these two errors lessened Plaintiffs' burden of proof and thus requires reversal.

II. The district court's evidentiary errors also require reversal. The court should not have permitted Mitchell to testify, because his opinions (which relied solely on secondhand information gleaned from a post-hoc incident investigation) exceeded the bounds of permissible lay opinion and were not subject to the rigors of Rule of Evidence 702; his testimony was impermissibly directed to subsequent

remedial measures in violation of Rule 407; and his testimony was unfairly prejudicial. These errors, too, are not harmless.

III. The district court erred in denying Denver's motion for judgment as a matter of law. Plaintiffs advanced theories based on policies that relied on individual officers' discretion or actions that fail as a matter of law to establish a pattern, practice, or custom. These theories therefore cannot give rise to municipal liability under *Monell*. Additionally, Plaintiffs failed to introduce sufficient evidence of causation or deliberate indifference on their other theories. If this Court does not vacate the judgment and enter judgment in Denver's favor for these reasons and instead remands for a new trial, Plaintiff's defective *Monell* theories should excluded from the new trial.

IV. Finally, and alternatively, remittitur is required because the evidence does not support the excessive, largely identical compensatory damages awards.

## ARGUMENT

I. **Retrial is required due to instructional errors that impermissibly lessened Plaintiffs' burden of proof.**

A. **Preservation and standard of review.**

Before trial, Denver argued the jury must be instructed that deliberate indifference is an element of each of Plaintiffs' municipal-liability theories. App.Vol.14_209:22-210:10, 212:2-8. Plaintiffs contended that element applies only to a failure to train. App.Vol.14_209:24-210:2. Separately, Denver argued

that, for purposes of Plaintiffs' First Amendment claim, the jury should be instructed that an officer's decision to take action against a plaintiff must have been "substantially motivated" by the plaintiff's participation in protected activity. App.Vol.14_181:7-18, 183:6-10. Plaintiffs argued the proper test is the disjunctive "substantial or motivating." App.Vol.14_179:8-21.

The district court agreed with Plaintiffs on both issues. App.Vol.14_188:24-189:5, 212:9-11. At trial, it instructed the jury that deliberate indifference is an element only of Plaintiffs' "failure to train" theory—but only to the extent that theory alleges a failure to train, and not a failure to supervise—and not the "official policy, practice, or custom" or "ratification" theories. App.Vol.11_159-62. And it instructed that, to establish liability on the First Amendment claim, a plaintiff must prove only that the plaintiff's participation in protected activity was "a substantial or motivating factor" in the officer's decision to take an action against the plaintiff. App.Vol.11_153.

This Court "review[s] a district court's decision to give a particular instruction for abuse of discretion, but [it] review[s] de novo legal objections to the jury instructions." *Burke v. Regalado*, 935 F.3d 960, 1009 (10th Cir. 2019) (quoting *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012)). To give a challenged instruction that "incorrectly states the governing law" is an abuse of discretion. *Lederman*, 685 F.3d at 1154 (quoting *Webb v. ABF*

*Freight Sys., Inc.*, 155 F.3d 1230, 1248 (10th Cir. 1998)). An erroneous instruction is prejudicial and requires reversal "if the jury might have based its verdict on" the instruction. *Id.* at 1155 (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003)). And "instructions outlining the appropriate burdens of proof are almost always crucial to the outcome of the trial." *Id.* (quoting *Karnes v. SCI Colo. Funeral Servs., Inc.*, 162 F.3d 1077, 1079 (10th Cir. 1998)).

**B.      The district court erroneously omitted the key legal requirement of deliberate indifference from Plaintiffs' "official policy, practice, or custom," "failure to supervise," and "ratification" theories, lessening Plaintiffs' burden of proof.**

Municipalities "are responsible only for their own illegal acts and are not vicariously liable under § 1983 for their employees' actions." *George v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) (internal quotation marks and citation omitted). To hold a municipality liable, a plaintiff therefore "must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *Id.* A municipality acted with deliberate indifference when it had "'actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation' and 'consciously or deliberately [chose] to disregard the risk of harm.'" *Finch*, 38 F.4th at 1244 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). This culpability element "must not be diluted," because where "'a court fails to adhere

to rigorous requirements of culpability … municipal liability collapses into respondeat superior liability.'" *James v. Harris Cnty.*, 577 F.3d 612, 618 (5th Cir. 2009) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)); *see also Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022) (the fault element "must be scrupulously applied to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability" (internal quotation marks omitted)).

Although deliberate indifference certainly is an element of *Monell* claims based on a failure to train or supervise, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (a plaintiff must prove deliberate indifference in "claims of inadequate hiring, training, or other supervisory practices"), this Court also applies the element to other *Monell* theories, including those alleging that informal or formal policies or decisions by final policymakers create municipal liability, *e.g.*, *Finch*, 38 F.4th at 1244 (applying the element to a claim based on an informal policy and a practice); *Arnold v. City of Olathe*, 35 F.4th 778, 794-95 (10th Cir. 2022) (formal policy); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1240-42 (10th Cir. 2020) (formal policy); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 775-76 (10th Cir. 2013) (final

policymaker's decision not to discipline).[3] So too do other circuits. *E.g.*, *Bohanon*, 46 F.4th at 675-77 (formal policy); *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1187-88 (11th Cir. 2011) (various policies); *James*, 577 F.3d at 617-18 (formal policy). In concluding that deliberate indifference is an element ***only*** of Plaintiffs' "failure to train" theory and instructing the jury accordingly, the district court erred.

That error prejudiced Denver because it lessened Plaintiffs' burden of proof by removing the culpability element entirely from two of Plaintiffs' three *Monell* theories and from part of the third theory. On that third theory (*i.e.*, "failure to train"), because the verdict form did not distinguish between a failure to train and a failure to supervise, *see, e.g.*, App.Vol.11_169 (referring to "Failure to Train (Instruction 16)"), it is possible the jury rendered a verdict on the failure-to-supervise theory for which the required culpability element was omitted from the instructions. This Court "must reverse based on an erroneous instruction if there is even a slight possibility of an effect on the verdict," *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 827 (10th Cir. 2019), and "[j]ury instructions

---

[3] Relying on these cases, District Judges in this circuit have rejected the argument that deliberate indifference applies only to failure-based theories. *Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 896755, at *10 n.15 (D. Colo. Mar. 1, 2024); *Dennis v. City & Cnty. of Denver*, No. 22-cv-0608-WJM-KAS, 2023 WL 5864117, at *3-4 (D. Colo. Sept. 11, 2023).

outlining the appropriate burdens of proof are almost always crucial to the outcome of the trial," *Lederman*, 685 F.3d at 1155 (quoting *Karnes*, 162 F.3d at 1079); *United States v. Kalu*, 791 F.3d 1194, 1201 (10th Cir. 2015) ("Ordinarily, failure to instruct on such an essential element as intent or knowledge requires reversal." (citation omitted)). The erroneous instruction was crucial to the outcome here and requires reversal.

**C.** **The district court's failure to instruct the jury that an officer's decision to take action against a plaintiff must be "substantially motivated" by the plaintiff's participation in a protected activity impermissibly reduced Plaintiffs' burden of proof on their First Amendment claim.**

For over 24 years and as recently as this year, this Court has applied to "First Amendment retaliation claims against defendants other than the plaintiff's employer" a requirement that the plaintiff prove the "defendant's adverse action was ***substantially motivated*** as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell*, 219 F.3d at 1212 (quoting *Lackey v. Cnty. of Bernalillo*, 166 F.3d 1221 (Table), 1999 WL 2461, at *3 (10th Cir. Jan. 5, 1999)) (emphasis added); *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 n.2 (10th Cir. 2024) (same). By contrast, for First Amendment retaliation claims by employees, which seek to protect a narrower free speech interest and otherwise are more stringent, this Court requires proof that "the protected [conduct] was ***a***

motivating factor" in the defendant's action. *Pryor*, 99 F.4th at 1250 & n.2 (emphasis added).

The district court rejected the "substantially motivated" test for First Amendment claims against someone other than an employer articulated in *Worrell* (and elsewhere), apparently basing that ruling on its understanding of *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). *See* App.Vol.14_180:13-181:6. *Nieves* involved a First Amendment claim for retaliatory arrest and presented the issue whether the fact of probable cause defeats such a claim. 587 U.S. at 394-95. After holding that it does, the Court stated that the test from *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), which requires proof "that the retaliation was a substantial or motivating factor behind the" adverse action, applies where the plaintiff establishes the absence of probable cause. *Id.* at 404 (quoting *Lozman v. City of Riviera Beach*, 585 U.S. 87, 97 (2018)). But *Mt. Healthy*, like *Worrell* and unlike this case, involved a First Amendment retaliation claim against an ***employer***. 429 U.S. at 276. The *Nieves* Court did not address this distinction, nor did it address whether (much less hold that) the "substantial or motivating" causation test applies in all contexts. *Nieves* does not control.

Indeed, that the *Nieves* Court did not intend to lessen the causation standard is evident from its statement that, for First Amendment retaliation claims generally, "[i]t is not enough to show that an official acted with a retaliatory motive and that

the plaintiff was injured—the motive must **cause** the injury. Specifically, it must

be a 'but-for' cause, meaning that the adverse action against the plaintiff would not

have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 398-99 (citing

*Hartman v. Moore*, 547 U.S. 250, 260 (2006), which reasoned, "[i]t may be

dishonorable to act with an unconstitutional motive, … but action colored by some

degree of bad motive does not amount to a constitutional tort if that action would

have been taken anyway").

It was not harmless for the district court's instruction to contradict this

Court's precedents in First Amendment retaliation cases against non-employers.

The distinction between a **substantially motivating** factor and one that is only **a**

"substantial **or** motivating" factor is not one without a difference. For example,

certain Plaintiffs were exposed to less-lethal munitions while admitting they were

in crowds with people who threw objects at police officers or buildings, *e.g.*,

App.Vol.22_149:17-150:20; App.Vol.19_8:1-11, 9:3-25, or stood behind a

barricade that protesters had erected across a four-lane street in an effort to defy the

curfew, App.Vol.24_107:19-108:13, 114:8-21. Had the jury been instructed that

their participation in a protected activity, rather than violent activity, must have

"substantially motivated" the officers' actions against them, and was not just **a**

substantial **or** motivating factor, the verdict might have been different.

The erroneous instruction lessened Plaintiffs' burden and might have affected the verdict, so this Court must reverse. *Advanced Recovery Sys.*, 923 F.3d at 827.

## II. The district court's erroneous admission of evidence from the Office of the Independent Monitor—which Plaintiffs used as a centerpiece of their case—warrants a new trial.

### A. Preservation and standard of review.

In a pretrial briefing, Denver argued that the November 2020 report from the Office of the Independent Monitor (the "OIM") and Mitchell's related testimony were inadmissible under Federal Rules of Evidence 407 and 403. App.Vol.5_8-11. At trial, before Plaintiffs called Mitchell to testify, Denver reiterated this argument, *see* App.Vol.23_5:5-6:11, and further argued that, because Plaintiffs did not designate Mitchell as an expert, Mitchell could provide only lay testimony under Federal Rule of Evidence 701, App.Vol.23_4:19-24. Additionally, because Mitchell lacked personal knowledge about the protest, Denver contended, he necessarily could not offer any testimony based on his own perceptions. App.Vol.23_4:13-18, 4:25-5:4.

The district court acknowledged that the "opinions or the fact findings of the [OIM] … recognized … that certain things had to be improved." App.Vol.23_10:6-10. And, in response to Plaintiffs' offer to cure the Rule 407 objection by asking Mitchell only about his conclusions and not his

recommendations, *see* App.Vol.23_8:7-13, 8:24-9:7, the district court stated it "bothers me," "risk[s] [Plaintiffs'] entire case," and is "a huge mistake" that Plaintiffs would call Mitchell to "take the stand and say, well, you know, I was hired to be a jury, just like this jury, and I've reviewed the evidence just like this jury, and this is what I found," App.Vol.23_11:11-19.

Despite these serious concerns, the district court nonetheless overruled the Rule 407 objection (and Denver's other objections), based on the irrelevant notion that "these taxpayers sitting in the jury box are entitled to hear about" the OIM's "public report, paid for by the taxpayers." App.Vol.23_11:11-12:8. The court ordered that Mitchell could testify and could be cross-examined on his personal knowledge. App.Vol.23_11:11-12:8. The court further ordered, inconsistently, that, while "[w]hat [Mitchell] did is a matter of fact," and he can "talk[] about facts," his testimony shall be "restricted to the opinions that he expressed at the time" of the report and, because Plaintiffs "didn't endorse him as an expert," he could not offer "new opinions." App.Vol.23_54:5-10; *accord* App.Vol.23_54:25-55:2 (repeating that "the opinions that he expressed and that were fully disclosed in his report are fair game, but any new opinions would not be").

Where an objection is timely made, this Court "review[s] the district court's rulings on the admission for evidence for abuse of discretion." *United States v. Magleby*, 241 F.3d 1306, 1315 (10th Cir. 2001); *Prager v. Campbell Cnty. Mem'l*

*Hosp.*, 731 F.3d 1046, 1054 (10th Cir. 2013) (same for the admission of expert testimony). "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Vincent v. Nelson*, 51 F.4th 1200, 1213 (10th Cir. 2022) (internal quotation marks omitted). Under this standard, this Court will reverse "if the [district] court exceeded the bounds of permissible choice, given the facts and the applicable law in the case at hand." *Prager*, 731 F.3d at 1054 (internal quotation marks omitted).

If the district court abused its discretion, this Court "must then determine whether the error was harmless." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1212 (10th Cir. 2011). An error that "had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect" is not harmless. *Id.* (quotation marks omitted). "Put another way, after reviewing the entire record, [this Court] must reverse unless [it] find[s] that this jury's verdict more probably than not was unaffected by the error." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 886 (10th Cir. 2006).

**B.      Mitchell, Denver's former Independent Monitor, testified about his after-the-fact investigation of Denver's response to the protest and opinions he reached based on that investigation.**

The OIM, which is created in the City and County of Denver's charter and reports to the Mayor, receives and oversees the investigation of complaints alleging Denver police misconduct and issues public reports recommending

improvements to the Department's policies and practices. App.Vol.23_58:18-59:7, 119:12-14. Mitchell, a lawyer who has never worked as a police officer, was the Independent Monitor from August 2012 to January 2021. App.Vol.23_58:2-11, 118:24-119:3. He was not present at the George Floyd protest and did not personally observe anything that happened there. App.Vol.23_123:25-124:6.

On June 5, 2020—the same day the court below enjoined Denver's use of certain less-lethal munitions, *see* App.Vol.21_15:25-16:7—the Denver City Council asked Mitchell to assess the Department's response to the protest, including the department's use-of-force policy, use of various equipment, and other crowd-control measures. App.Vol.23_60:18-61:21; App.Vol.34_116-18 (Exh. 754). To perform the investigation, the OIM gathered and was provided information relating to the protest, including video and Department records, and conducted interviews. App.Vol.23_124:7-125:18. It prepared a report that it issued in November 2020. App.Vol.23_60:13-17, 62:3-8.

Plaintiffs called Mitchell as a witness at trial. He testified about the post-investigation conclusions the OIM reached in that report. Those conclusions included that the Department's response to the protest was inadequate in multiple respects:

- "there were deficient internal controls on officer use of force";
- officers deployed less-lethal munitions "in ways that were extremely troubling";

- some officers who were not certified to use pepper balls or 40-millimeter launchers "received those less-lethal weapons when they arrived at the protest" and "received some kind of emergency field training";

- officers from mutual-aid jurisdictions deployed over 150 less-lethal shotgun rounds, over 200 Kevlar bag rounds, and at least 73 rubber-ball rounds;

- the Department had more than 30,000 pepper ball rounds in its inventory at the start of the protest and received a resupply on the second day;

- there was a "footage gap" in body-worn camera footage recorded by Denver police officers;

- the Department's use of mutual-aid partners was "deficient in certain ways," including the lack of joint training;

- the tracking of less-lethal munitions is critical in protest management, and the Department did not do that at the beginning of the protest;

- the Department neither maintained a log of munitions distributions nor an accounting of the rate of their expenditure; and

- officer identification was a problem during the protest because there were examples in which officers did not have visible nametags and badge numbers.

App.Vol.23_65:5-9, 68:13-22, 97:5-10, 109:5-22, 110:9-25, 112:10-21, 116:3-10, 116:14-117:11, 117:16-118:8. Each of these conclusions is, on its face, highly suggestive of remedial measures that, in Mitchell's opinion, Denver should take.

Mitchell also testified about the interviews of several Denver police officers that the OIM conducted during its investigation. Through Mitchell, Plaintiffs introduced memoranda summarizing three of those interviews. App.Vol.23_70:23-71:4, 72:11-17, 81:1-11, 86:14-87:2; App.Vol.37_61-64 (Exh. 861 (Coppedge)); App.Vol.37_69-72 (Exh. 874 (Sich)); App.Vol.37_65-68 (Exh. 864 (Knutson)).

Mitchell recounted that those three officers and others shared various criticisms about the Department's response to the protest:

- "officers on the ground were reacting to what they saw without any sort of leadership";

- "during the prior administrations of the police department, there had been a greater focus on training in crowd control, crowd management, and field force operations";

- Denver officers "felt a need for greater emphasis on training and crowd management and field force operations";

- "the current chief's attitude [is] that training was not important, or not as important as other chiefs had indicated in the past";

- in the command post, Denver Police Chief Pazen "would lose it if he was presented with a differing opinion";

- Chief Pazen "was often angry or paralyzed" during the protest;

- "a lot of officers and protesters may have been injured due to a lack of supervision and command";

- "there was an absence of command and control, and too much reliance on [pepper balls]";

- "the [Department's] operational response to the protests [was] not pretty, and that the department was caught with their pants down";

- officers were "throwing gas just to deploy gas instead of making tactical decisions"; and

- it was a "theme" in multiple interviews that officers "hadn't received crowd control or field force training for several years prior to the onset of the George Floyd protest."

App.Vol.23_75:7-10, 75:23-76:1, 77:2-6, 77:14-19, 81:20-25, 82:1-5, 83:13-18, 89:1-4, 90:11-15, 95:2-6, 99:5-10.

Mitchell featured prominently in Plaintiffs' opening statements, where Plaintiffs described his conclusions as coming from "the government official from the city of Denver tasked with investigating the police." App.Vol.15_21:9-25, 22:3-18, 25:7-26:5, 34:20-24, 35:14-21, 36:7-20, 38:15-39:19. And in closing argument, Plaintiffs argued that "Mitchell spent months with a team of experts looking at everything …. That's the full picture, and you heard what he had to say." App.Vol.29_51:24-52:2.

### C. The district court should have excluded Mitchell's testimony under Rules 701, 407, and 403, and its admission of that testimony was not harmless.

#### 1. Mitchell's opinions strayed beyond what Rule 701 permits and were never subjected to the protections of Rule 702.

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is," among other things, "rationally based on the witness's perception," Fed. R. Evid. 701(a), meaning it must be based on the witness's "first-hand knowledge or observation," Fed. R. Evid. 701 advisory committee's note (1972 Proposed Rules). "The perception requirement stems from [Federal Rule of Evidence] 602 which requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information to the finder of fact." *United States v. Bush*, 405 F.3d 909, 916 (10th Cir. 2005) (citation omitted). Admissible lay opinions are those "observations [that] are common enough and require … a limited amount of

27

expertise, if any." *James River Ins. Co.*, 658 F.3d at 1214 (citation omitted).

Examples include "the appearance of persons or things, identity, the manner of

conduct, competency of a person, degrees of light or darkness, sound, size, weight,

distance, and an endless number of items that cannot be described factually in

words apart from inferences." *Id.* (citation omitted).

Because Rule 701(a) requires first-hand knowledge, courts exclude lay

opinion gleaned from post-incident investigations by witnesses who relied on

second-hand information. *E.g.*, *United States v. Johnson*, 617 F.3d 286, 293 (4th

Cir. 2010) (district court abused its discretion by permitting DEA agent to give lay

opinions interpreting wiretapped phone calls where agent "did not participate in the

surveillance during the investigation, but rather gleaned information from

interviews … ***after*** listening to the phone calls"); *United States v. Peoples*, 250

F.3d 630, 641 (8th Cir. 2001) (district court erred in admitting FBI agent's lay

opinions about meaning of words and phrases in recorded conversations that "were

based on her investigation after the fact, not on her perception of the facts").

Here, Mitchell relied ***only*** on second-hand information. He had no

involvement in Denver's response to the protest, *see* App.Vol.23_123:25-124:6,

and his after-the-fact investigation relied on the review of information and

interviews, App.Vol.23_124:7-125:18. That the district court permitted him to

opine on deficiencies in Denver's response to the protest despite his lack of first-

hand knowledge—and even though such an opinion far exceeds what Rule 701 allows, *James River Ins. Co.*, 658 F.3d at 1214—violated Rule 701. The district court implicitly acknowledged as much—and implicitly recognized that Mitchell would give ***expert***, not lay opinions—by ordering that Mitchell would "be restricted to the opinions that he expressed at the time" and that "were fully disclosed in his report." App.Vol.23_54:5-10, 54:25-55:2. Yet the court neither excluded Mitchell's opinions for not having been properly disclosed under Federal Rule of Civil Procedure 26(a)(2) nor subjected them to the requirements for the admission of expert opinions under Rule 702. By failing to do so it abdicated its important gate-keeping function that serves "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This error is not harmless. Mitchell's conclusions—which Plaintiffs emphasized resulted from his "months [of work] with a team of experts looking at everything," App.Vol.29_51:24-52:1—included that there were deficiencies in Denver's training, internal controls, and use of mutual-aid partners, and that Denver officers deployed less-lethal munitions in "extremely troubling" ways. But unlike the opinions of Plaintiffs' properly disclosed experts who also testified about Denver's response to the protest based on their after-the-fact review, these opinions came from, in Plaintiffs' words, "***the*** government official from the city of

Denver tasked with investigating the police." App.Vol.15_22:15-16 (emphasis added). That the jury would be unduly influenced by opinions from such an authority is evident from the record. *See Stump v. Gates*, 211 F.3d 527, 536-38 (10th Cir. 2000) (erroneous admission of grand jury report and special prosecutor's testimony regarding defendant's interference with dealth investigation was not harmless in a § 1983 action alleging defendants' destruction of evidence precluded plaintiffs from filing a wrongful-death action).

## 2. Mitchell's testimony impermissibly implicated subsequent remedial measures.

"When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent remedial measures is not admissible to prove" negligence or culpable conduct. Fed. R. Evid. 407. While a post-event investigation may be admissible notwithstanding this prohibition if references to remedial measures are excluded, the "correct procedure" when introducing such evidence "is to refer to the results of [the investigation] without referring to [its] post-event time frame." *Rocky Mtn. Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 919 (10th Cir. 1986). That is because emphasizing that an investigation was performed after an event has "the effect of characterizing" it as remedial. *Id.*

Mitchell's testimony had exactly that effect. Its admission therefore violated Rule 407. Mitchell's explanation that it took about four months to complete his

report, which was published in November 2020, necessarily means his investigation occurred *after* the protest. App.Vol.23_62:3-15. Plaintiffs emphasized this fact in closing, stating that Mitchell "spent months with a team of experts looking at everything." App.Vol.29_51:25-52:1. And although he did not specifically address the remedial recommendations he included in his report, his "conclusions" necessarily implied what those recommendations were. For example, his conclusion that "there were deficient internal controls on officer use of force" during the protest, App.Vol.23_65:5-9, implies a need for better internal controls. His conclusion that the department's use of mutual-aid partners and lack of joint training was deficient, App.Vol.23_116:3-10, implies a need for joint training. The exception to the rule allowing the admission of post-event investigations therefore applies. *Rocky Mtn. Helicopters*, 805 F.2d at 919.

This error is not harmless. The conclusions Mitchell reached as Denver's Independent Monitor, after spending months investigating the protest response, were, in effect, presented as admissions by Denver that its response was deficient and that it knew precisely how it should have better managed and trained its police force. These opinions—which no other witness could state with such authority— went to the heart of Plaintiffs' *Monell* theories, and it cannot be that the "jury's verdict more probably than not was unaffected by" the error in admitting them. *Sims*, 469 F.3d at 886.

### 3. Mitchell's testimony was unfairly prejudicial under Rule 403.

Under Federal Rule of Evidence 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [or] misleading the jury." Unfairly prejudicial evidence is that which tends "to suggest to the jury that it should render its findings 'on an improper basis, commonly, though not necessarily, an emotional one.'" *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) (citation omitted). And confusing and misleading evidence is that which tends "to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case." *Id.* Proper balancing under Rule 403 is especially important in the context of expert testimony, given that juries are "less equipped to evaluate the weight of testimony that comes across as conveying expert information." *United States v. Bindues*, __ F. Supp. 3d __, No. CR 22-0466 JB, 2024 WL 3488301, at *40 (D.N.M. 2024) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)).

Each of these dangers substantially outweighed the relevance of Mitchell's testimony, if any. First, the danger that Mitchell's testimony was unfairly prejudicial is evident. Mitchell's criticisms of Denver's response to the protest and recounting of interviewees' critical statements were cloaked in unique authority by virtue of Mitchell's past service as Denver's Independent Monitor and were

presented as admissions of wrongdoing. What's more, in Mitchell, Plaintiffs had a *third* witness who conducted an after-the-fact review of Denver's protest response and found it deficient. But unlike the other two witnesses—*i.e.*, Plaintiffs' disclosed experts, a former Seattle police chief and a professor of criminology and criminal justice, App.Vol.17_95:14-15 (Stamper); App.Vol.24_124:21-23 (Maguire)—Mitchell had, until about one year before the trial, been employed by Denver. That Denver defended itself at trial, while its former Independent Monitor delivered a lengthy (and greatly emphasized) criticism of Denver's conduct, invited the jury to punish Denver for not conceding liability.

Second, Mitchell's testimony bore little relation to the elements of Plaintiffs' claims, creating significant danger of confusing the issues and misleading the jury. To establish municipal liability, "a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George*, 32 F.4th at 1253. But Mitchell expressly disclaimed having analyzed any individual incident, App.Vol.23_126:8-21, and instead testified about the OIM's conclusions that Denver's protest response was deficient and recounted interviewees' general criticisms about the Department's leadership and training. Those were not issues the jury was called to determine. Mitchell's testimony—much like the videos purporting to show an actionable pattern and

practice of constitutional violations—served only to emphasize that the protest response was sufficiently reprehensible to require that ***someone*** be held responsible.

It cannot be said that the "jury's verdict more probably than not was unaffected by [this] error." *Sims*, 469 F.3d at 886. Mitchell was the ***only*** witness who testified to asserted widespread failures in Denver's protest response who also reached his conclusions ***as a Denver official***—indeed, ***the*** Denver official, tasked with monitoring the Department and with the unique ability to personally interview Denver officers about their thoughts on the protest response. And he was the only witness who, in Plaintiffs' words, "spent months with a team of experts looking at everything," giving the jury "the full picture." App.Vol.29_51:25-52:2. His testimony—a centerpiece of Plaintiffs' case—certainly influenced the verdict.

## III. The district court erred in denying Denver's motion for judgment as a matter of law.

### A. Preservation and standard of review.

Defendants moved for judgment as a matter of law on day ten of trial, after Plaintiffs rested their case. App.Vol.25_35:7-11. Denver argued that Plaintiffs presented insufficient evidence of municipal liability based on any formal or informal policy, custom or practice, decision by someone with final policymaking authority, ratification, or failure to train. App.Vol.25_39:7-47:5. It also argued that Denver cannot be liable for the actions of officers from mutual-aid jurisdictions.

App.Vol.25_47:6-48:19. The district court denied the motion. App.Vol.25_59:19-

22. Denver repeated these arguments post-trial in its motion for judgment as a

matter of law, a new trial, or remittitur. App.Vol.11_183-87. Again, the district

court rejected them. App.Vol.12_82-90.

This Court "review[s] de novo a district court's decision to grant or deny a

motion for judgment as a matter of law, applying the same standards as the district

court." *Burke*, 935 F.3d at 991 (citation omitted). "Judgment as a matter of law is

appropriate only if the evidence points but one way and is susceptible to no

reasonable inferences which may support the nonmoving party's position," *id.*

(citation omitted), or "if there is no legally sufficient evidentiary basis for a claim

under the controlling law," *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir. 2000).

This Court "consider[s] the evidence, and any inferences drawn therefrom, in favor

of the non-moving party." *Id.*

**B.** **Plaintiffs' "official policy, practice, or custom" theory under *Monell* relies on policies that cannot give rise to liability as a matter of law and was not supported by sufficient evidence of causation.[4]**

The district court denied Denver's motion for judgment as a matter of law on

the basis that, in its view, sufficient evidence supported Plaintiffs' "official policy,

---

[4] Plaintiffs' "official policy, practice, or custom" theory fails for the additional reason that Plaintiffs were not required to prove deliberate indifference, as explained above.

practice, or custom" theory. App.Vol.12_84-88. In so concluding, it relied in part on evidence of a discretionary policy that cannot itself give rise to *Monell* liability as a matter of law and in part on policies for which there is insufficient evidence that the policy caused any violation of Plaintiffs' constitutional rights. Setting aside the district court's instructional error on this theory (discussed above) that absolved Plaintiffs of proving culpability, none of the policies Plaintiffs relied on in support of this theory caused Plaintiffs' injuries.

> **1.   A policy permitting officers to exercise discretion cannot itself establish *Monell* liability, nor can a single incident establish a pattern or practice amounting to an actionable "custom."**

The district court relied primarily on Denver's policy allowing officers discretion as to when to deploy less-lethal munitions. App.Vol.12_84-86; *see also, e.g.*, App.Vol.20_192:1-8 (during the protest, officers were allowed "discretion … to use less-lethal [munitions] within policy"); App.Vol.21_24:2-20 (Commander Phelan testifying that, while the crowd-management manual does not say officers have discretion to decide when to use CS gas to disperse an assembly, "it's a guide" for which changes are made to respond to fluid, dynamic situations). But a discretionary policy cannot itself give rise to *Monell* liability.

"The fact that a particular official … has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469,

481-82 (1986) (plurality op.). This is because "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Establishing municipal liability therefore requires proof that a municipal policy *itself*—and not an officer's discretionary action taken pursuant to a policy—was "causally responsible" for the constitutional violation. *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1280 (10th Cir. 2009) (finding liability where the officers' conduct "was caused by a straightforward enforcement of [city] ordinances, and not by any additional discretionary actions by the officers").

Plaintiffs' reliance on Denver's policy allowing officers discretion as to when to use less-lethal munitions goes directly against this prohibition. That an officer **can** decide when to use less-lethal munitions does not mean Denver's policy **required** any use of force. To hold Denver liable for actions its policy did not require impermissibly reduced Plaintiffs' *Monell* claim to a claim for respondeat superior. Because there "is no legally sufficient evidentiary basis for" a theory based on a discretionary policy "under the controlling law," *Brown*, 227 F.3d at 1285, this theory should not have been submitted to the jury.

The same is true for Plaintiffs' theory that evidence of officers' uses of force show an actionable "custom" for which Denver is liable under *Monell*. In its

motion for judgment as a matter of law, Denver argued there was insufficient evidence to support liability for any custom or practice because Plaintiffs' evidence of Denver's informal customs was limited to Denver's response during the first few days of the George Floyd protest. App.Vol.11_184-85. Plaintiffs responded that there was "extensive evidence that Denver's policies, practices, and customs caused Plaintiffs' injuries," citing various acts and omissions reflected in "video after video of officers using excessive and inappropriate force." App.Vol.12_3. While Plaintiffs contended they were not required to show "a history of problems" if a practice or custom is a "standard operating procedure," they submitted that Denver knew of but did not address problems with certain policies. App.Vol.12_4-5. The district court did not reach Denver's argument because it concluded the jury could have found that Denver's policies caused Plaintiffs' injuries. App.Vol.12_86.

There was legally insufficient evidence to establish a pattern or practice amounting to an actionable "custom," and this theory should not have been submitted to the jury. A municipality can be liable for a practice that causes a constitutional violation only "if the practice is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal quotation marks and citation omitted). To establish such a custom, "the actions of the municipal employees must be

'continuing, persistent and widespread.'" *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (citation omitted).

Proof of a custom requires a history of ***prior*** constitutional violations. *E.g.*, *Waller*, 932 F.3d at 1290 (finding "one similar incident of excessive force prior to [the plaintiff's] own injuries" to "fall far short of plausibly alleging a 'widespread practice' of excessive force," much less one constituting a custom); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) ("A pattern also requires sufficiently numerous prior incidents, as opposed to isolated instances." (internal quotation marks omitted)); *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996) (noting "[t]here must exist a prior pattern of unconstitutional conduct"). But even prior isolated or sporadic incidents do not suffice. *See Lankford*, 73 F.3d at 287. "Proof of a single incident of unconstitutional activity" instead is "sufficient to impose liability under *Monell*" only where the incident "was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

The bulk of Plaintiffs' trial evidence showed officers' uses of force between May 28 and June 2, 2020, against persons ***other than*** Plaintiffs—which could be relevant to Plaintiffs' claims only if it showed a municipal "custom" for purposes of *Monell* liability. It does not. Those uses of force happened at the same time as those Plaintiffs themselves complained of, do not establish a history of prior

constitutional violations, and cannot establish a practice that amounts to a

municipal custom for which Denver can be liable. *Peterson*, 588 F.3d at 851;

*Andrews*, 98 F.3d at 1075.

The scant evidence predating the George Floyd protest that Plaintiffs offered

likewise does not establish an actionable municipal custom. In particular, Mitchell

testified about certain prior recommendations he made or concerns he voiced about

Department tactics, procedures, or policies:

- in 2012—eight years before the George Floyd protest—when the OIM prepared a report addressing (among other things) Denver's response to the Occupy Denver protest; noting that officers had deployed pepper balls and OC spray, affecting people in the crowd; and stating it would help to assess whether different tactics could prevent similar confrontations in the future, App.Vol.23_59:18-60:7; App.Vol.23_167:1-168:17;

- in 2014, when Mitchell suggested the Department deploy body-worn cameras to Metro SWAT officers, App.Vol.23_170:17-21;

- also in 2014, when OIM wrote a report stating supervisors' use-of-force cover reports sometimes lacked sufficient detail, App.Vol.23_172:3-21; and

- in 2017, when Mitchell expressed (1) concerns about a draft use-of-force policy relating to aerosol and gas munitions "that could be used for a variety of reasons, including any situation where the officer can clearly articulate the need for employment," and suggested more specific guidance is needed; (2) that it is important to prohibit the use of force on people who are only verbally confrontational; and (3) that it is important to prohibit the use of force in retaliation or to punish citizens. App.Vol.23_173:1-174:11.

None of these pieces of evidence proves prior ***constitutional violations***. Even if the

officers' use of less-lethal munitions at the Occupy Denver protest eight years

before the protest here amounted to a constitutional violation—and Plaintiffs

introduced no evidence that it did—that would be only an isolated incident that cannot establish a municipal "custom" for purposes of *Monell* liability.[5] *Lankford*, 73 F.3d at 287; *Tuttle*, 471 U.S. at 823-24.

Because Plaintiffs did not introduce legally sufficient evidence to establish a "pattern" or "practice" amounting to a municipal "custom," this theory too should not have been submitted to the jury. *Brown*, 227 F.3d at 1285.

### 2. The other policies Plaintiffs relied on are unsupported by sufficient evidence of causation.

Plaintiffs also relied on certain other decisions by a final municipal policymaker (*i.e.*, Commander Phelan) and Denver's purported informal policies in support of their "official policy, practice, or custom" theory. *See* App.Vol.12_4-5, 7-8. To the extent they are actionable policies, Plaintiffs did not introduce sufficient evidence that the policies caused any violation of Plaintiffs' constitutional rights.

It "is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). "The plaintiff must also demonstrate that, through its ***deliberate*** conduct, the municipality was the 'moving force' behind the injury alleged." *Id.*

---

[5] Even if the jury properly had been instructed that deliberate indifference is an element of this theory, Mitchell's testimony would not establish that element because it does not show any final policymaker in 2020 knew of Mitchell's recommendations.

This means the "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This is a stringent requirement: "The fact that a municipal policy might lead to police misconduct is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a ***constitutional*** violation." *Tuttle*, 471 U.S. at 824 n.8 (some internal quotation marks omitted). Causation must be stringently applied because "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Brown*, 520 U.S. at 415.

***Commander Phelan's decisions.*** First, Plaintiffs pointed to certain decisions by a final policymaker (*i.e.*, Commander Phelan) generally authorizing the use of less-lethal munitions (and certain types of less-lethal munitions) and specifically authorizing the use of less-lethal munitions at certain locations. App.Vol.12_4-5, 7. A municipality is responsible for "actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). But it was not Commander Phelan's authorizations from the command post that directly caused any violation of Plaintiffs' constitutional rights. Instead, it was the officers on the ground exercising discretion as to when and how to use the

authorized less-lethal munitions that caused the claimed violations. Absent evidence of an unconstitutional decision by Commander Phelan himself—and Plaintiffs introduced no evidence of such a decision—to hold Denver liable for his decisions that then were effected through discretionary decisions by officers on the ground results in liability that is "indistinguishable from *respondeat superior* liability." *Praprotnik*, 485 U.S. at 126.

*Body-worn cameras.* Next, Plaintiffs pointed to Denver's decision not to require officers to activate body-worn cameras during the protest. App.Vol.12_4; *see also* App.Vol.25_129:21-131:11 (explaining that policy did not require the use of body-worn cameras during protest activity, but starting on Saturday, May 30, 2020, officers were directed to wear and activate their cameras); App.Vol.26_27:6-12 (SWAT officers were not required to wear body-worn cameras because the protest was considered a "tactical operation"). This too is a discretionary policy—as Plaintiffs made clear by the volume of body-worn-camera footage they showed at trial—that cannot give rise to *Monell* liability. That aside, and even assuming the failure to require activation of body-worn cameras might have made it more likely that Plaintiffs' rights would be violated, that Denver did not require the use of body-worn cameras cannot have been the moving force behind any violation of Plaintiffs' constitutional rights. *E.g.*, *Wooden v. City of Philadelphia*, No. 19-1054, 2022 WL 17724423, at *4 (E.D. Penn. Dec. 15, 2022) ("Courts that have addressed

the issue have universally rejected the theory that a failure to provide or conduct recording of certain law enforcement activities satisfies the constitutional violation, deliberate indifference, or causation requirements of *Monell*." (citing cases)).

*Use-of-force reports.* Plaintiffs also cited Denver's decision not to require officers to complete use-of-force reports until after the protest. App.Vol.12_4; *see also* App.Vol.28_60:8-61:8 (explaining that, due to concerns over officer wellbeing at the end of the protest's first day, the Department let officers go home without completing use-of-force statements at the end of their shifts); App.Vol.35_18 (Exh. 787) (e-mail instructing officers to prepare use-of-force statements on June 6, 2020). This policy is also too indirect to legally cause a constitutional violation. Denver is aware of no authority requiring completion of use-of-force reports or holding that the failure to require their "timely" completion is unconstitutional. That not requiring the daily completion of use-of-force reports *might* lead to constitutional violations is not sufficient to establish "moving force" causation. *Tuttle*, 471 U.S. at 824 n.8.

*Mutual-aid jurisdictions.* Finally, Plaintiffs offered Denver's policy of allowing the mutual-aid jurisdictions to follow their own use-of-force policies. App.Vol.12_8; App.Vol.21_15:7-22 (Denver policy was to allow mutual-aid agencies to use their own policies and weapons). Even assuming a municipality can be liable for the actions of another municipality's agents that violate a person's

constitutional rights—and Denver maintains it cannot[6]—Plaintiffs introduced no evidence that this policy was the "moving force" behind any violation of Plaintiffs' constitutional rights. *Cousik*, 2024 WL 896755, at *20 (granting summary judgment in Denver's favor on a mutual-aid claim and concluding "evidence that Aurora officers were acting as [Denver's] agents" does not show any Denver *policy* was the "moving force" behind injuries allegedly caused by an Aurora officer).

Nor could they have. Plaintiffs pointed to Commander Phelan's general statements about role as Incident Commander and the fact that Denver officers served as "liaisons" between the command post and the mutual-jurisdiction units. *See* App.Vol.12_8. But there is no *causal* link between that evidence and the injuries of the two Plaintiffs harmed by officers from mutual-aid jurisdictions. Each officer from a mutual-aid jurisdiction was acting pursuant to that jurisdiction's training and policies. Setting aside individual liability, if the officer's

_____

[6] Plaintiffs suggested officers from mutual-aid jurisdictions were Denver's agents but introduced insufficient evidence to establish an agency relationship. Where, as here, the parties do not designate their relationship as one of agency "and do not subjectively intend that legal consequences flow from their relation," "[w]hat is critical" in determining whether an agency relationship nonetheless was formed "is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency." *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 395 (Colo. 1987). Plaintiffs introduced no evidence of such an agreement here.

actions violated a person's constitutional rights and a policy of the mutual-aid jurisdiction caused the violation, it would be that jurisdiction's policy—not Denver's—that was the moving force behind the violation. This is why Packard—one of the two Plaintiffs injured by an officer from a mutual-aid jurisdiction—sued the Aurora Police Department for the same injury for which he also sued Denver. App.Vol.16_215:24-216:7.

**C. Plaintiffs' "failure to train" and "failure to supervise" theories are unsupported by sufficient evidence of deliberate indifference.**

Plaintiffs took issue with virtually all aspects of the Department's training program and supervision of its officers during the George Floyd protest. They argued trainings were too infrequent and to brief, did not cover all relevant topics, were too loosely connected to the Department's written policies, and were insufficiently supported by the Department's leadership. *See* App.Vol.12_5-6. Plaintiffs' criticism of the supervision was even more nebulous and, to the extent it differed from their criticisms of the training, relied on an assertion that, after George Floyd's death, Denver should have better prepared for a protest. *See* App.Vol.12_5 (stating "evidence of failure to train and prepare for the protests was overwhelming and largely uncontested" and Denver provided "inadequate supervision and leadership").

But a *Monell* claim for failure to train or supervise requires more than evidence of "insufficient" or "infrequent" training or general criticisms about

supervision. These claims require proof that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Waller*, 932 F.3d at 1284 (citation omitted). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). A "lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result [the Supreme Court] rejected in *Monell*"—and "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs," an exercise "the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

This standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* Absent such notice, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. "In a 'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal

rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney*, 143 F.3d at 1307-08 (quoting *Brown*, 520 U.S. at 409); *see also Waller*, 932 F.3d at 1284 (stating these principles apply to claims of inadequate training or other supervisory practices).

Plaintiffs did not offer sufficient evidence to meet this demanding element. They offered no evidence of any pattern of tortious conduct that would put Denver on notice before the George Floyd protest that its training or supervision was insufficient. Nor did they introduce evidence showing that constitutional violations were a "highly predictable" or "plainly obvious" consequence of any claimed training or supervisory deficiency. On this point, they cited in response to Denver's motion for judgment as a matter of law only their expert's conclusory testimony agreeing with their counsel that Denver had routinely failed to train its officers in the years before the protest about how not to use excessive force during protests and that Denver's claimed training failure presented "an obvious potential for excessive use of force" and "violation of First [A]mendment rights of protesters." *See* App.Vol.24_175:5-15. The cited testimony says nothing about supervision.

This testimony might have sufficed to show a failure to train if a protest of the kind Denver faced in 2020 was a "recurring situation" such that Denver's

training presented an "obvious potential for constitutional violations." *Barney*, 143 F.3d at 1308. But the evidence showed the opposite, precluding a finding of deliberate indifference as to supervision. *E.g.*, App.Vol.21_49:21-22 (Commander Phelan testifying he has "never seen more abuse towards police officers in 40 years"); App.Vol.28_99:14-100:23 (Chief Thomas testifying that the protest "[u]ndoubtedly" was unprecedented because officers "were the targets of violence" and the volume of destruction and harm to officers was something that had "never been seen before"); App.Vol.26_94:16-21 (Sergeant Knutson, who oversees the field training program, characterizing what police officers faced as "unprecedented").

Plaintiffs failed to introduce legally sufficient evidence of deliberate indifference to support its "failure to train" theory, including to the extent that theory is directed to a failure to supervise, and so the district court erred by denying Denver's motion for judgment as a matter of law on that theory. *Brown*, 227 F.3d at 1285.

**D. Plaintiffs' "ratification" theory is unsupported by sufficient evidence that a Denver policymaker knew the reasons for and approved of any act causing a constitutional violation.**

To establish municipal liability on a ratification theory, a plaintiff must prove "a final policymaker's ratification of ***both*** an employee's unconstitutional actions ***and*** the basis for them." *Waller*, 932 F.3d at 1290 (emphasis added). This

means the ratifying policymaker must have known of "an employee's specific unconstitutional actions" directed at the plaintiff and "the basis for these actions." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 790 (10th Cir. 2010) (city could not be liable for ratification where decisionmakers were not aware of employee's "unconstitutional actions with respect to Plaintiff" despite city's general commendation of employee's work in the face of criticisms).

Ratification "generally requires more than acquiescence," and the "mere failure to discipline [officers] does not amount to ratification of their allegedly unconstitutional actions." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015); *accord Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (noting "basic [principles] of linear time prevent us from seeing how conduct that occurs ***after*** the alleged violation could have somehow caused that violation"); *Hernandez v. City & Cnty. of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *8 (D. Colo. Aug. 23, 2022) (noting "a mere failure to discipline does not constitute ratification" (citing cases)).

The district court acknowledged ratification is Plaintiffs' "weakest claim," App.Vol.27_222:6-16, yet it submitted the claim to the jury[7] and denied Denver's motion for judgment as a matter of law. App.Vol.12_88 (declining to decide Denver's ratification argument based on its finding of sufficient evidence on the "official policy, practice, or custom" theory). It erred in doing so, because Plaintiffs offered no evidence showing that any final policymaker knew that an officer violated any Plaintiff's constitutional rights, knew why, and ratified the officer's conduct.

To show ratification, Plaintiffs first cited a press conference on May 29, 2020—the second day of the protest—at which Chief Pazen commended officers for "demonstrat[ing] extreme restraint" the night before "as they became the target of people's rage and anger"—a statement Commander Phelan agreed with. App.Vol.21_49:15-21; App.Vol.30_17 (Exh. 39 at 12:17-12:33). Next, Plaintiffs offered an e-mail from the Executive Director of the Department of Public Safety to the Department stating language in a temporary restraining order entered against Denver "is not reflective of the dedicated service that I have witnessed from our officers when on the front line." App.Vol.21_52:10-53:15; App.Vol.34_114

---

[7] The jury was instructed that Chief Pazen, Commander Phelan, and Mayor Michael Hancock "had final policymaking authority from Denver" in this case. App.Vol.11_162.

(Exh. 753). Neither of these statements shows that a final policymaker knew of an officer's conduct that violated a Plaintiff's constitutional rights, and the reasons for it, and then ratified the conduct.[8]

Plaintiffs also cited the facts that few officers were disciplined for their conduct during the protest and that Internal Affairs had concluded certain uses of force were consistent with training and policy. *See* App.Vol.12_6-7 (citing testimony). Setting aside that a failure to discipline cannot amount to ratification, *e.g.*, *Sheehan*, 743 F.3d at 1231, this evidence also fails to show that any final policymaker had the requisite knowledge of the fact of, and reasons for, an officer's constitutionally violative conduct and ratified it.

Finally, Plaintiffs pointed to Commander Phelan's testimony that certain uses of force that counsel showed him at trial appeared to be or could be consistent with training and policy. *See* App.Vol.12_7 (citing testimony). Even if any of these incidents showed an unconstitutional use of force against a Plaintiff, absent evidence that Commander Phelan knew the reasons for that conduct and ratified it, his testimony cannot amount to ratification. *Bryson*, 627 F.3d at 790. Of course, it

---

[8] In other George-Floyd-protest lawsuits against Denver, District Judges rejected arguments that this press conference or e-mail show ratification. *Bjelland v. City & Cnty. of Denver*, No. 22-cv-01338-SKC-SBP, 2024 WL 4165428, at *8 (D. Colo. Sept. 12, 2024); *Cousik*, 2024 WL 896755, at *17.

also is inconceivable that testimony given at trial years after a claimed constitutional violation could establish "moving force" causation.

Because there "is no legally sufficient evidentiary basis for [Plaintiffs' ratification theory] under the controlling law," *Brown*, 227 F.3d at 1285, the district court erred by declining to enter judgment in Denver's favor on that theory.

## IV. Remittitur is required because the evidence does not support Plaintiffs' excessive and largely identical compensatory damages awards.

### A. Preservation and standard of review.

In its motion for judgment as a matter of law, Denver sought, in the alternative, remittitur of Plaintiffs' compensatory damages awards. App.Vol.11_192-96. The district court declined to remit the awards against Denver. App.Vol.12_99-101. This Court reviews for an abuse of discretion, *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1314 (10th Cir. 2022), and a damages award cannot stand if it is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Osterhout v. Bd. of Cnty. Comm'rs*, 10 F.4th 978, 996 (10th Cir. 2021) (citation omitted). The determination of the upper limit of a permissible damages award is a question of law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996).

**B. Plaintiffs introduced evidence of physical and emotional injury that significantly varied in nature and extent yet received largely identical compensatory damages awards.**

The evidence of Plaintiffs' injuries varied. Each Plaintiff testified about exposure to chemicals from less-lethal munitions. But most offered only subjective testimony about subjective emotional distress, and none claimed lost wages or presented evidence of any emotional injury that had been diagnosed by a professional. The commonalities end there. For example:

- Two of the twelve Plaintiffs were pepper-sprayed. App.Vol.16_157:2-3 (Smith); App.Vol.24_70:17-71:2 (Lyman).

- Seven were hit by at least one pepper ball. *E.g.*, App.Vol.16_116:25-117:2 (Sannier); App.Vol.16_148:2-7 (Smith); App.Vol.18_179:22-23 (Fitouri); App.Vol.20_14:10-11 (Deras); App.Vol.22_161:2-4 (Taylor); App.Vol.23_201:18-25 (Epps); App.Vol.24_74:12-24 (Lyman).

- Three were hit by some other impact munition. App.Vol.16_196:3-11 (Packard was struck in the head and knocked unconscious); App.Vol.16_206:19-21 (the weapon used against Packard was a 12-gauge shotgun); App.Vol.20_24:22-25:12 (unknown impact munitions hit Deras's helmet, hand, and back); App.Vol.24_36:19-37:3 (Epps was hit by an impact munition other than a pepper ball).

- Five testified that a flash-bang grenade or other concussive device exploded near them. App.Vol.16_123:4-13 (a flash-bang exploded next to Sannier's foot); App.Vol.18_164:22-165:2 (it is "impossible to count" how many flash-bang grenades Fitouri was exposed to); App.Vol.20_14:11-15 (a flash-bang grenade caused Deras's ears to ring for an hour or two); App.Vol.23_24:15-18 (Parkins was with Fitouri when a flash-bang grenade landed on Fitouri's foot); App.Vol.24_86:2-8 (a concussive device exploded above Lyman's head).

- Only two Plaintiffs, Packard and Deras, received medical treatment for physical injuries. App.Vol.16_208:1-8 (Packard was taken to a hospital and had a hemorrhage, a fractured skull, a fractured jawbone, and two broken

disks in his neck); App.Vol.20_26:11-27:4 (Deras got an x-ray and saw an orthopedic specialist for his hand).

- Only one Plaintiff, Packard, presented evidence of medical bills, any physical injury at the time of trial, or any inability to work due to injury. App.Vol.16_211:18-212:23 (Packard's medical bills totaled $181,065.57); App.Vol.16_213:9-22 (Packard was unable to work due to his neck injury); App.Vol.16_226:9-14 (Packard's neck grinds, is restricted in certain spots, and "doesn't feel right or like it used to").

- Each Plaintiff testified at least briefly about emotional distress ranging from sensitivity to loud noises, fear of police, nightmares, exacerbated pre-existing psychological conditions, and undiagnosed post-traumatic stress disorder. App.Vol.16_85:13-24 (Sannier no longer feels safe in her neighborhood or trusts police, had nightmares for days, and felt unsafe in crowds for weeks), 131:10-15 (Sannier believes she suffers from acute PTSD but has not been diagnosed); App.Vol.16_161:4-16 (Smith was embarrassed to return to school after he was pepper-sprayed and now fears the police); App.Vol.16_213:23-214:7 (Packard feels skateboarding was taken from him and now lacks the confidence to push and challenge himself in the sport); App.Vol.18_170:6-16 (during the protest, Fitouri had dreams where she ran from the police, but she had those dreams less often after the protest); App.Vol.19_33:23-34:18 (Rothlein is afraid of the police and "can't be around fireworks anymore"); App.Vol.19_93:13-94:19 (Blasingame now avoids and does not trust police, no longer feels protests are safe, and is sensitive to loud noises); App.Vol.20_13:17-20 ("the environment that the police have created" "supercharged" Deras's depression and anxiety); App.Vol.22_166:20-25 (Taylor fears the police); App.Vol.22_227:22-228:6 (Wedgeworth is more fearful of being around police and suffered insomnia and anxiety after the protest); App.Vol.23_32:3-12 (Parkins has nightmares in which police chase her); App.Vol.23_202:7-22 (Epps has nightmares about an officer who shot her with a pepper ball and is re-exposed to trauma when she attends meetings for her work relating to policing); App.Vol.24_93:18-94:2 (Lyman "already [had] PTSD" and so is "susceptible" and "had nightmares for months after this").

- Three Plaintiffs met with a mental-health specialist after the protest, and one only "[b]riefly" discussed the protest with the specialist. App.Vol.16_131:16-132:9 (Sannier received *pro bono* treatment for emotional distress from a friend's wife and attended six to eight therapy sessions for protest-related emotional distress and other issues);

App.Vol.19_118:24-119:9 (Blasingame attended "one session with a behavioral health specialist" at which she "[b]riefly" spoke about the protest); App.Vol.20_46:10-47:20 (Deras started seeing a psychiatrist monthly in fall 2020).

Although these injuries were largely temporary—even the district court acknowledged that "[P]laintiffs for the most part did not sustain, as I heard the evidence, significant damages," App.Vol.23_10:21-24— and differed greatly across Plaintiffs, Plaintiffs received large, and nearly identical, compensatory damages awards. The jury awarded Packard $3 million, Wedgeworth $750,000, and each other Plaintiff $1 million. App.Vol.11_169-77.

### C. The evidence does not support Plaintiffs' compensatory damages awards, and those awards must be remitted.

In a § 1983 action, a plaintiff cannot recover for the abstract value of a violation of a constitutional right; instead, the plaintiff must show actual injury. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1214 (10th Cir. 1999); *see also Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) ("The deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages." (citation omitted)). An exceptional damages award that enters in favor of a plaintiff who suffers both physical and emotional injury "require[s] substantial evidence, whether it comes in the form of detailed testimony or other supporting documentation." *Bell v. Williams*, 108 F.4th 809, 817, 834-35 (9th Cir. 2024) (finding "grossly excessive" a compensatory award of $504,000 where the plaintiff

56

testified he suffered severe pain, including swelling, bruising, and a popped

shoulder, and felt degraded when he was carried to and left naked in a different cell

but did not testify to long-term psychological harm or lasting pain).

That sort of evidence is lacking here. Plaintiffs relied almost exclusively on

their own testimony, photographs, and videos to prove their injuries. That evidence

showed only limited physical injury. Only Packard suffered more than temporary

physical injury, presented documentary evidence of medical treatment, or

presented evidence of any inability to work due to injury. App.Vol.16_211:18-

212:23, 213:9-23, 226:9-14. The evidence also showed only limited emotional

injury that was undiagnosed and, with three exceptions, untreated. *See, e.g.*,

App.Vol.16_131:16-132:9 (explaining treatment); App.Vol.19_118:24-119:9

(same); App.Vol.20_46:10-47:20 (same). Plaintiffs' injuries also differed

significantly. That the jury nonetheless awarded ten Plaintiffs $1 million, and

Packard $3 million and Wedgeworth $750,000, is excessive and raises the

inference that the "compensatory damages awards [went] beyond their

compensatory function and turn[ed] punitive." *Bell*, 108 F.4th at 831.

## CONCLUSION

The Court should vacate the judgment for lack of sufficient evidence to

establish municipal liability on any of Plaintiffs' three *Monell* theories and enter

judgment in Denver's favor. If the Court instead determines Plaintiffs introduced

sufficient evidence on any *Monell* theory, it should vacate the judgment and remand for a new trial based on the instructional and evidentiary errors, and instruct the district court that Plaintiffs cannot present any *Monell* theory that is not viable as a matter of law or was unsupported by sufficient evidence. Alternatively, the Court should remand with instructions to remit the excessive compensatory damages awards.

Dated: December 23, 2024

Respectfully submitted,

*s/ Frederick R. Yarger*

Frederick R. Yarger (#39479)
William D. Hauptman (#51168)
Miranda B. Worthington (#55135)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:303.244.1800
E-mail:    yarger@wtotrial.com
           hauptman@wtotrial.com
           worthington@wtotrial.com

*Attorneys for Defendant–Appellant City and County of Denver*

Andrew D. Ringel (#24762)
Robert A. Weiner (#21572)
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, Colorado 80202
Telephone: (303) 628-3300
E-mail:  ringela@hallevans.com
           weinerrhallevans.com

*Attorneys for Defendants–Appellants City and County of Denver and Jonathan Christian*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee City and County of Denver respectfully requests oral argument given the size of the record and the complexity and number of the issues on appeal.

By:  *s/ Frederick R. Yarger*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

[X] this brief contains 12,989 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010/2019 in Times Roman 14 point font.

## CERTIFICATE OF HARD COPY SUBMISSION

The undersigned hereby certifies that, upon the acceptance of this Brief and
the Appendix, all hard copies required to be submitted to the Court will be exact
copies of the versions filed electronically.

*s/ Frederick R. Yarger*
Frederick R. Yarger
William D. Hauptman
Miranda B. Worthington
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:  303.244.1800
Facsimile:   303.244.1879
E-mail:  yarger@wtotrial.com
          hauptman@wtotrial.com
          worthington@wtotrial.com

*Attorneys for Defendant–Appellant City
and County of Denver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this **Brief of Appellant City and County of Denver** was served on all counsel of record via the Tenth Circuit Court of Appeals' electronic e-mail system this 23rd day of December 2024.

*s/ Frederick R. Yarger*

# ATTACHMENT INDEX

| Attachment | Document |
|:---:|:---|
| 1 | Excerpts from the Transcript of Oral Ruling on "Substantial or Motivating" in First Amendment Jury Instruction (Feb. 23, 2022) |
| 2 | Excerpts from the Transcript of Oral Ruling on "Deliberate Indifference" in *Monell* Jury Instructions (Feb. 23, 2022) |
| 3 | Excerpts from the Transcript of Oral Rulings on Nicholas Mitchell's Testimony (Mar. 17, 2022) |
| 4 | Excerpts from the Transcript of Oral Ruling on Defendants' Rule 50(a) Motion for Judgment as a Matter of Law (Mar. 21, 2022) |
| 5 | Order on the Motions for Judgment as a Matter of Law, New Trial, or Remittitur as to Defendants Denver and Jonathan Christian, filed Sept. 19, 2022 |
| 6 | Amended Final Judgment Pursuant to Rule 58, filed Aug. 29, 2024 |

Ai

Attachment 1:

Transcript of Oral Ruling on "Substantial or Motivating"
in First Amendment Jury Instruction (Feb. 23, 2022)

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF COLORADO

 3
    Civil Action No. 20-CV-01878-RBJ
 4

 5    ELISABETH EPPS, et al.,

 6            Plaintiffs,

 7            vs.

 8    CITY AND COUNTY OF DENVER, et al.,

 9            Defendants.

10   ------------------------------------------------------------

11                       REPORTER'S TRANSCRIPT
                       Trial Preparation Conference
12
     ------------------------------------------------------------
13          Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 23rd day of February, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.
15
                               APPEARANCES
16   For the Plaintiffs:
     TIMOTHY R. MACDONALD and ROBERT REEVES ANDERSON and MATTHEW J.
17   DOUGLAS, Arnold & Porter Kaye Scholer, LLP, 1144 Fifteenth
     St., Ste. 3100, Denver, CO 80202
18
     ELIZABETH C. WANG, Loevy & Loevy, 2060 Broadway St., Ste. 460,
19   Boulder, CO 80302

20   For the Defendants:
     ANDREW D. RINGEL and KATHERINE HOFFMAN and ROBERT A. WEINER,
21   Hall & Evans, LLC, 1001 Seventeenth St., Ste. 300, Denver, CO
     80202
22
     LINDSAY M. JORDAN and HOLLIE R. BIRKHOLZ, Denver City and
23   County Attorney's Office, 201 West Colfax Ave., Denver, CO
     80202
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                   Denver, CO 80294, 303-335-2108
            Proceedings reported by mechanical stenography;
                 transcription produced via computer.
```

A2

20-CV-01878-RBJ      Trial Prep. Conference      02/23/2022      89

1    jury to expect some admission of guilt on the stand.  That it

2    needs to have some kind of guilty mind revelation.  In

3    determining whether there was a motivating factor in the

4    defendant's decision -- and I'm reading from a pattern

5    instruction from another jurisdiction -- you may consider any

6    statements made or act done or admitted by the defendant and

7    all other facts and circumstances in evidence indicating a

8    state of mind.  An improper motive, if it exists, is seldom

9    directly admitted, and may or may not be inferred from the

10   existence of other facts.  If we are going to talk about

11   intent or subjective desire in an instruction, we would want

12   the jury to understand that it is seldom admitted on the stand

13   and may be inferred from other objective evidence.

14        THE COURT:  Mr. Anderson, I've given an instruction

15   like that probably, I don't know, several dozen times.  It's

16   obvious.  But many times, maybe hundreds of times I've

17   instructed juries that it's rare that you find direct evidence

18   of intent, so you have to infer -- may infer intent from other

19   evidence.

20        MR. ANDERSON:  If Your Honor is amenable to it, we'd

21   be happy to propose it.  If we're going to have an instruction

22   like that, we'd want to have a balanced one, which is all I'm

23   proposing, Your Honor.

24        THE COURT:  Well, subject to what Gavri might come up

25   with, it's decision time, and I'm going to go with substantial

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     90

1    or motivating.  That appears to be more likely to be the

2    consensus view, even though to me, if I'm writing on a clean

3    slate, substantially motivating makes more sense to me.  So

4    we're going to leave it with substantial or motivating unless

5    Gavri comes up with something that convinces me otherwise.  So

6    you'll make those changes accordingly on page 16, and then we

7    get to 17.

8            MS. HOFFMAN:  Would you like to hear from defendants

9    regarding the first paragraph on 17 as previously addressed by

10   plaintiffs' counsel?

11           THE COURT:  Yeah, why I haven't heard from defendants

12   all along?  All I heard were the comments from the plaintiffs.

13           MS. HOFFMAN:  Sure.  That is something that we wanted

14   to bring up.  We weren't aware that the plaintiffs were

15   submitting issues and objections with these particular

16   proposed jury instructions.  We did meet and confer early

17   Monday morning.  We were able to reach some agreements.  We

18   were not able to reach agreements on other matters.  We did

19   review what we believed to be the final set of instructions on

20   Monday late afternoon.  They did not include the issues and

21   objections.  So we approved sending that to chambers, and then

22   later it came to our attention that the issues and objections

23   were added.

24           THE COURT:  They pulled a fast one on you.

25           MS. HOFFMAN:  So if we had known that, we would have

Sarah K. Mitchell, RPR, CRR

A4

1                    REPORTER'S CERTIFICATE

2

3         I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10        Dated this 28th day of February, 2022.

11

12

13

14             /s/ Sarah K. Mitchell

15             SARAH K. MITCHELL
               Official Court Reporter
16         Registered Professional Reporter
               Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

                              A5

Attachment 2:

Transcript of Oral Ruling on "Deliberate Indifference" in
*Monell* Jury Instructions (Feb. 23, 2022)

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLORADO

 3
      Civil Action No. 20-CV-01878-RBJ
 4

 5      ELISABETH EPPS, et al.,

 6            Plaintiffs,

 7            vs.

 8      CITY AND COUNTY OF DENVER, et al.,

 9            Defendants.

10    ------------------------------------------------------------

11                       REPORTER'S TRANSCRIPT
                       Trial Preparation Conference
12
      ------------------------------------------------------------
13          Proceedings before the HONORABLE R. BROOKE JACKSON,
      Judge, United States District Court for the District of
14    Colorado, commencing on the 23rd day of February, 2022, in
      Courtroom A902, United States Courthouse, Denver, Colorado.
15
                              APPEARANCES
16    For the Plaintiffs:
      TIMOTHY R. MACDONALD and ROBERT REEVES ANDERSON and MATTHEW J.
17    DOUGLAS, Arnold & Porter Kaye Scholer, LLP, 1144 Fifteenth
      St., Ste. 3100, Denver, CO 80202
18
      ELIZABETH C. WANG, Loevy & Loevy, 2060 Broadway St., Ste. 460,
19    Boulder, CO 80302

20    For the Defendants:
      ANDREW D. RINGEL and KATHERINE HOFFMAN and ROBERT A. WEINER,
21    Hall & Evans, LLC, 1001 Seventeenth St., Ste. 300, Denver, CO
      80202
22
      LINDSAY M. JORDAN and HOLLIE R. BIRKHOLZ, Denver City and
23    County Attorney's Office, 201 West Colfax Ave., Denver, CO
      80202
24

25       Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                    Denver, CO 80294, 303-335-2108
             Proceedings reported by mechanical stenography;
                 transcription produced via computer.
```

A7

20-CV-01878-RBJ      Trial Prep. Conference      02/23/2022      113

1    Honor.

2             MS. HOFFMAN:   I don't really have anything to add

3    other than we don't disagree that deliberate indifference is

4    the standard for failure to train.  We just think it goes

5    beyond that, and we think that's supported by the Tenth

6    Circuit's decision in *Schneider v. City of Grand Junction* in

7    which the Court clearly applied that state of mind requirement

8    to more than just failure to train.

9             THE COURT:   I'll go with the deliberate indifference

10   applicable to the training as indicated by Judge Martinez.

11   What's next?

12            MR. ANDERSON:   Thank you, Your Honor.  Now we're to

13   the failure-to-train instruction on page 27.

14            THE COURT:   Yes.

15            MR. ANDERSON:   We take Your Honor's comment to heart.

16   We think that most of the instruction that the defendants give

17   aligns with ours.  The rubber hits the road on deliberate

18   indifference in two places -- three, actually.  The first is

19   the one that Your Honor noted on page 29 -- excuse me -- on

20   the bottom of page 30, to strike the last sentence on page 30,

21   that you need not show a pattern or practice of constitutional

22   violations.  That's not the law, so we think that can't be

23   instructed.

24            So our deliberate -- we would like to replace the

25   defendants' deliberate indifference paragraph with ours.  What

1                        REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 28th day of February, 2022.

11

12

13

14              _____/s/ Sarah K. Mitchell_____

15                   SARAH K. MITCHELL
                   Official Court Reporter
16             Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

                              A9

Attachment 3:

Transcript of Oral Rulings on Nicholas Mitchell's
Testimony (Mar. 17, 2022)

1652

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3   Civil Action No. 20-cv-1878-RBJ

4   ELISABETH EPPS AND SARA FITOURI, ET AL.,

5          Plaintiffs,

6          vs.

7   CITY AND COUNTY OF DENVER, ET AL.,

8          Defendants.

9   ----------------------------------------------------------------

10                  REPORTER'S TRANSCRIPT

11                  Jury Trial, Vol. 9

12  ----------------------------------------------------------------

13          Proceedings before the HONORABLE R. BROOKE JACKSON,
    Judge, United States District Court for the District of
14  Colorado, commencing on the 17th day of March, 2022, in
    Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                  APPEARANCES
    For the Plaintiffs:
17  TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and ANDREAS E.
    MOFFETT, Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth
18  Street, Suite 3100, Denver, CO 80202

19  ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
    Broadway Street, Suite 460, Boulder, CO 80302
20

21  For the Defendants:
    ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22  & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
    80202
23
    HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24  Office, 201 West Colfax Avenue, Denver, CO 80202

25  Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
    A259, Denver, CO 80294, (303)335-2358

    Proceedings reported by mechanical stenography; transcription
                  produced via computer.

A11

1659

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  Floyd protests, interviewed DPD witnesses, DPD command officers,

2  and issued a public report that is admissible as a public

3  record, admissible as a business record.  And if the Court

4  doesn't want us to have the report in evidence, then we will

5  proceed to ask him questions about what his conclusions were as

6  an independent monitor, and it is directly tied to our *Monell*

7  claim, Your Honor.

8        THE COURT:  All right.  Thank you.  You know what this

9  brings to mind is something I've said to you folks before, and

10  that I alluded to at least during the bench conference when you

11  got into the thing about the injunction.  And probably what I'm

12  about to say just is my view of the case versus your view on

13  behalf of your clients.

14        I do not for the life of me understand why Denver is so

15  nervous about the injunction or about the independent monitor's

16  opinions, or his fact findings.  And my reason is this:  The

17  evidence in the case, as I see it, is that the Denver Police

18  Department faced a huge, extremely difficult situation because

19  of the size of the protest, the violence, the rock throwing, the

20  bottle throwing, all the rest of it.  And I think that will come

21  across to the jury very clearly.

22        To me, it is equally clear that there were excessive

23  applications of force.  I think the videos demonstrate that.  I

24  found that in my temporary restraining order, and I think that,

25  too, clearly will come across to the jury.  What happened as a

20-cv-1878-RBJ    Jury Trial    03-17-2022

1   result of that unique event is that not just did a Court issue

2   an injunction, but the City and County of Denver entered into a

3   settlement in which they recognized that certain of their

4   practices needed to be improved, and they committed to changing

5   those practices.

6          The opinions or the fact findings of the Office of the

7   Independent Monitor are to the same effect.  Namely, it was

8   recognized by the OIM as well as by the City and the police

9   department that certain things had to be improved.  And

10  presumably, they've done that.

11         To me, that is compelling evidence in favor of the

12  defendant in a case like this.  People make mistakes.  And if

13  you own up to your mistakes, and if you fix things, people will

14  rally around you, and we've seen that throughout history.

15         But in my view, Denver doesn't want to admit that it

16  made even a single mistake.  They don't want to have the jury

17  know that they acknowledged those mistakes and corrected their

18  practices, and they're going to defend this case to the end of

19  the Earth on the proposition that we did absolutely nothing

20  wrong.

21         I just don't get it.  The one thing that may save the

22  defendants, in my view, in this case, is that the defendants --

23  plaintiffs for the most part did not sustain, as I heard the

24  evidence, significant damages.  But to me, it's bizarre.

25         However, you guys are defending the case the way you

1661

20-cv-1878-RBJ   Jury Trial   03-17-2022

1    want to defend it, and if you want to go into the valley of the

2    shadow of death proclaiming that we did zero wrong, so be it.

3         Now, to the point, 407 reads, when measures are taken

4    that would have made an earlier injury or harm less likely to

5    occur, evidence of the subsequent measures is not admissible to

6    prove culpable conduct.  It's very clear.  It's very

7    straightforward.  You cannot, plaintiff, put into evidence any

8    measures that have been taken by Denver, even though I think it

9    would help Denver, that if taken before, would have made

10   culpable conduct less likely.

11        You say that you've eliminated that problem because

12   you're not going to ask the OIM about the recommendations that

13   he made.  Basically, you're going to have the OIM take the stand

14   and say, well, you know, I was hired to be a jury, just like

15   this jury, and I've reviewed the evidence just like this jury,

16   and this is what I found.

17        Boy, that bothers me.  I think you're risking your

18   entire case by doing that, but I think you're entitled to it.  I

19   think it's a huge mistake on your part to do that.  And it's a

20   huge mistake on the defense part to oppose it, but hey, that's

21   not for me to say.

22        This was a public investigation, a public report, paid

23   for by the taxpayers, and it seems to me that these taxpayers

24   sitting in the jury box are entitled to hear about it.  And the

25   points that Mr. Ringel made about how he didn't really have any

Kevin P. Carlin, RMR, CRR

A14

1662

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   personal knowledge, and he just reviewed -- just interviewed

2   people and compiled his findings based on that, that's a matter

3   for cross examination, in my view.  So, I will permit him to

4   testify just like I permitted the plaintiffs to have his

5   interview memos.

6          And if it causes your case to be -- your verdict,

7   plaintiffs, to be reversed, that's on you.  I think you're

8   making a mistake.  That's my ruling.

9          Now, let's keep going.

10     (Jury in at 9:11 a.m.)

11          THE COURT:  Good morning, ladies and gentlemen of the

12   jury.  Happy Saint Patrick's Day.  I see some of you have worn

13   your green.  I want to show you that I've worn my green too.

14   The snow isn't quite as bad yet as I was afraid it would be.

15   Let's hope that continues.  All right.  Where are we?

16          MS. RUTAHINDURWA:  Thank you, Your Honor.  Plaintiffs

17   call Jackie Parkins.

18          THE COURT:  Okay.  Good morning.

19          THE WITNESS:  Good morning.

20     (The Witness is Sworn)

21          THE COURT:  Thank you.

22                    **DIRECT EXAMINATION**

23   BY MS. RUTAHINDURWA

24   Q    Good morning.

25   A    Good morning.

20-cv-1878-RBJ   JACQUELYN PARKINS - Redirect   03-17-2022

1  else who hasn't been systemically subjected to police brutality

2  throughout my life, I always follow the instructions of

3  organizers of the protest, because I'm there to support them.

4  And I would have -- I'm not sure if I would have felt safer.

5          THE COURT:  Okay.  Any other questions from the jury?

6  Follow-up from plaintiff?

7          MS. RUTAHINDURWA:  No, Your Honor.  Thank you.

8          THE COURT:  How about from defendant?

9          MS. BIRKHOLZ:  No, Your Honor.  Thank you.

10         THE COURT:  Okay.  Thank you.  Who is next?

11         MR. MACDONALD:  The plaintiffs call Nick Mitchell to

12  the stand.

13         THE COURT:  All right.  You know, I want to talk with

14  you about that briefly before, so let's take about a

15  seven-minute break here.  I want to speak to the lawyers about

16  something.

17     (Jury out at 10:13 a.m.)

18         THE COURT:  All right.  The jury has been excused.  We

19  talked about this witness earlier, and I ruled on the

20  defendants' objections, but it has occurred to me thinking about

21  it that there was at least one objection that Mr. Ringel made

22  that I didn't discuss, and that was that he had not been listed

23  as an expert.

24         If he wasn't listed as an expert, then that restricts

25  his ability to express opinions; right?

20-cv-1878-RBJ   JACQUELYN PARKINS - Redirect   03-17-2022

1    MR. MACDONALD:  Your Honor, I think he can express his
2    conclusions based on what he observed and concluded from the
3    interviews of the DPD and what he communicated to the public in
4    his report.
5    THE COURT:  What he did is a matter of fact, and I
6    don't have a problem with his talking about facts.  But he has
7    to be restricted to the opinions that he expressed at the time.
8    MR. MACDONALD:  Understood, Your Honor.
9    THE COURT:  Not new opinions, because you didn't
10   endorse him as an expert.
11   MR. MACDONALD:  That's right, Your Honor.  We don't
12   intend to ask him about new opinions.
13   THE COURT:  And you agree with that, don't you?
14   MR. RINGEL:  I agree with that, but I don't think
15   there's anything that he's going to be asked that's not an
16   opinion.
17   THE COURT:  Correct.
18   MR. RINGEL:  And the problem, Your Honor, is you have
19   the -- as I argued earlier, the 702 lay opinion rule allows
20   opinions that are based on personal knowledge that help the jury
21   understand and assist the actual knowledge of the witness.
22   Mr. Mitchell has no personal knowledge.  They could have
23   endorsed him as an expert.  They didn't.  He shouldn't be
24   allowed to testify.
25   THE COURT:  Okay.  Well, I think the opinions that he

1705

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   expressed and that were fully disclosed in his report are fair

2   game, but any new opinions would not be.  All right.  Let's take

3   a brief recess, and then we will hear from Mr. Mitchell.

4        (Recess at 10:16 a.m., until 10:27 a.m.)

5        (Jury in at 10:27 a.m.)

6             THE COURT:  Okay.

7             MR. MACDONALD:  Thank you, Your Honor.  The plaintiffs

8   call Nick Mitchell to the stand.

9             THE COURT:  Good morning.

10            THE WITNESS:  Good morning, Your Honor.

11       (The Witness is Sworn)

12            THE COURT:  Thank you.  Have a seat.

13                        **DIRECT EXAMINATION**

14   BY MR. MACDONALD

15   Q    Good morning, Mr. Mitchell.

16   A    Good morning.

17   Q    Would you like a water bottle?

18   A    Yeah.  That would be great.  Thank you.

19   Q    Could you state your name for the record, please.

20   A    Nicholas Ethan Mitchell.

21   Q    What do you do for work, Mr. Mitchell?

22   A    I'm a lawyer, and I was formerly the independent monitor of

23   the Denver Police Department.

24   Q    And tell the jury what you're doing currently for work.

25   A    I was appointed by a federal court to monitor a consent

Kevin P. Carlin, RMR, CRR

A18

1870

1                         REPORTER'S CERTIFICATE

2

3

4            I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11           Dated this 8th day of April, 2022.

12

13

14

15

16                                  _____
                                    Kevin P. Carlin, RMR, CRR
17                                  Official Court Reporter

18

19

20

21

22

23

24

25

                          Kevin P. Carlin, RMR, CRR

Attachment 4:

Transcript of Oral Ruling on Defendants' Rule 50(a)
Motion for Judgment as a Matter of Law (Mar. 21, 2022)

```
1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5            Plaintiffs,

6            vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8            Defendants.

9    -----------------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                        Jury Trial, Vol. 11

12   -----------------------------------------------------------------

13           Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 21st day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                            APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and DIANA K. STERK,
     Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18   3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302
20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202
23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358
```

Proceedings reported by mechanical stenography; transcription
produced via computer.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   Wedgeworth.  I think that Mr. Ringel actually had said that the

2   problem with her is that she talked specifically and in detail

3   about two events, and there were other nights where she said she

4   was gassed but didn't go into huge detail.  And, you know, we

5   had done that in part, Your Honor, to move things along.  She

6   did testify that on the other nights she had similar experiences

7   to what she did testify about.

8          THE COURT:  That wasn't his point.  His point was very

9   simple and straightforward.  There was no evidence that she

10  incurred any economic damages in the form of medical expenses.

11         MS. STERK:  If that was the issue, that's true.  And I

12  don't think she testified about medical damages.  I don't think

13  that was the issue, but it is correct, Your Honor, that she did

14  not testify about medical expenses.

15         THE COURT:  All right.

16         MS. WANG:  Are there other specific questions that

17  Your Honor would like me to address?

18         THE COURT:  No.

19         MS. WANG:  Okay.  No?  All right.

20         THE COURT:  So, before getting into the details, I

21  will say this from the standpoint of the Court having witnessed

22  all of the evidence so far:  It is indisputable in my mind that

23  the plaintiffs have presented evidence that there were

24  widespread excessive applications of force to protesters.

25         To be totally fair, I think it's also indisputable that

2142

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    the Denver Police Department faced a Herculean task in this

2    case.  How you could cope with that number of protesters, that

3    degree of violence, property destruction, looting, breaking of

4    windows, throwing of rocks and water bottles and other things is

5    almost beyond my understanding.

6            There absolutely is evidence of fault on both sides,

7    the protesters' side and the police department's side.  But the

8    plaintiffs refuse to acknowledge any good things that the police

9    did.  The police refuse to acknowledge that they did anything

10   wrong.  The two sides are blinded by their biases, and that's, I

11   think, why we are having this trial.  I've said that before, and

12   I now say it again.

13           With respect to the motion, the Court is required to

14   construe all the evidence in favor of the plaintiff for purposes

15   of a Rule 50 motion.  And as part of that, to draw inferences

16   that rationally can be drawn in favor of the plaintiff, and then

17   take the case away from the jury only if no rational jury could

18   find in favor of any of the plaintiffs.

19           The motion will be denied.  I can't think of a case

20   that I've had or that I'm even aware of in this court that more

21   deserves the pulse of the people, the pulse of the community as

22   reflected in the eight jurors that have heard the case.

23           In terms of details, however, with respect to the claim

24   which is the main claim here, that the harms sustained by the

25   plaintiff, which were the plaintiffs' exposure to PepperBalls in

2143

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   several cases, exposure to tear gas in all cases, exposure to

2   emotional as well as physical harm, were caused by policies,

3   practices, and/or customs of the City and County of Denver, I

4   find that there is evidence construed in favor of the plaintiff

5   that could support a *Monell* decision in their favor.  Not of

6   course that that necessarily will be or even should be the

7   jury's decision, but it rationally could be, first of all.

8          We have the testimony of Commander Phelan, who is in my

9   view a final policy authority.  I think that was stipulated, but

10  even if it wasn't, he was the incident commander in charge of

11  the entire response to the protests.  That certainly makes him a

12  final policymaker.  And his testimony was -- and there were

13  others who were similar -- was that all actions of all of the

14  officers who were involved in the response to the protests were

15  consistent with the City and County of Denver's policies.  That

16  in and of itself is sufficient in my view to send this case to

17  the jury.

18         It was notable to me that even the incident where the

19  officer reached into a car and shot a PepperBall and/or gas

20  through the window, into the car which was then moving into

21  traffic, even that, although he said he didn't like the look,

22  was consistent with policy.  That is sufficient to send the case

23  to the jury.

24         But there's more.  There is testimony from the experts,

25  the police chief retired from Seattle and Professor Maguire,

2144

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    that the training was substandard, and the result was the

2    violations that we all saw in video after video.  Violations of

3    people's rights to speech and to assembly and to be free from

4    excessive applications of force.

5          There were criticisms by the experts of the body-worn

6    camera policies as it existed and as it was implemented,

7    criticisms of the use of nonlethal projectiles, the fact that it

8    was discretionary with the officers, all of that expert

9    testimony supported this Court's finding that a prima facie case

10   has been presented.

11         There was the Coppedge memo, which I thought was

12   particularly poignant in that he basically said -- and this is

13   an officer now, not a patrol officer, but a management level

14   officer of the Denver Police Department -- that frankly, said he

15   to the Office of Independent Monitor, under the present chief of

16   police, training has not been considered to be all that

17   important.  It's a big change from how it used to be.  Better

18   training could have prevented a lot of what happened.

19         In addition to all of that, I think there is support

20   for a ratification theory.  Again, Phelan's statement to

21   everything that happened was consistent with Denver policy is a

22   form of ratification.  The fact that there was almost no

23   discipline imposed even though it is evident to the Court that

24   there was evidence of widespread violations, inappropriate

25   applications of force, inappropriate response to peaceful

2145

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   protesters, but no discipline, virtually was imposed, by itself

2   distinguishes this case in terms of ratification based on lack

3   of discipline from the *Jackson* case and the other cases which

4   had to do with individual officer actions as opposed to this

5   massive response that occurred in this case.

6          We also have, of course, the televised press conference

7   featuring the chief of police and the mayor, both of whom

8   assured the people of Denver that the police department had

9   responded with great restraint to the protests.  Not so.  There

10  was not great restraint, at least I would say there is certainly

11  evidence that suggests there was not great restraint.

12         As for the sister agencies, I think that's a closer

13  call, but the evidence is, from Phelan, that they were under his

14  direction -- under his direction, and as an example of that,

15  when he discovered that one of the agencies, I think it was

16  Jefferson County, was using shotguns, a particular method that

17  he did not approve of, he told them to stop, and they stopped.

18  That to me showed that they were acting under his direction.

19         Indeed, I think the video showed Aurora, Jeff. Co., and

20  other agency officers intermingled with Denver officers to the

21  point that they were all, as Phelan said, acting in effect under

22  the policies, procedures, and practices of the City and County

23  of Denver through the police department.

24         So, that takes me to the final issue, which is the one

25  that is like the tail wagging the dog, and that is the claim

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

 1   against Officer Christian.  I have been fairly vocal in saying

 2   what I thought of that claim.  I don't know what a jury will do

 3   with the claim.  I have a pretty good suspicion as to what they

 4   will do with the claim.

 5         What the evidence is is that Ms. Epps, minding her own

 6   business, walking across 14th Street, filming, doing nothing

 7   offensive other than the fact that she was jaywalking, saw

 8   Christian take a knee, aim his PepperBall rifle right at her,

 9   and fire a PepperBall.

10         Now, she claims that it hit her and caused a bruise on

11   her inner left calf.  And I guess you could infer that when she

12   saw him fire, she heard or felt a sting on her calf, and later

13   found a bruise there.

14         However, the objective evidence from the video, which

15   in all other circumstances the plaintiffs have endorsed, shows

16   that the PepperBall did not, as I see it, hit her, but as

17   Christian testified, missed her, hit on the street to her right.

18   There was some flutter about which way the wind was blowing.

19   Nothing came of that.

20         If it hit on the road to her right as the video seems

21   to show, then it is difficult, if not almost impossible to

22   understand how that same PepperBall would have caused a bruise

23   to Ms. Epps' inner left calf.  And I have cautioned the

24   plaintiff, of course they don't listen, that their effort to

25   contort the evidence to support this claim against Christian

2147

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   could easily backfire in terms of the credibility of their case,

2   I believe.

3       But there is evidence, which if believed, from Ms. Epps

4   could show that that PepperBall caused her a bruise.  If you

5   think that the bruise is a major damage, then I guess it's worth

6   to be in federal court suing about it.

7       In terms of his intent and the punitive damages, intent

8   has to be inferred.  It's rare in our life that somebody just

9   comes out and says, I intended to shoot her in the leg or I

10  intended to hit her with the PepperBall.  His testimony was to

11  the contrary, but one could infer, since he's a police officer,

12  after all, he took a kneeling position, lined up his sights at

13  her, and fired, that he intended to hit her, or at least scare

14  the bejeebies out of her.  And I can't say that that couldn't

15  support a finding of reckless disregard of Ms. Epps' rights.

16      So, I think to the plaintiffs' detriment, I deny the

17  motion to dismiss the claim by Ms. Epps against Christian, as

18  well as the main claim against the City and County of Denver.

19      I do want to say that with respect to causation, no,

20  you can't link something that Phelan specifically did to any

21  exposure of one particular plaintiff.  That would be impossible.

22  But what the evidence does show is that the overreaction of the

23  cops, the excessive application of PepperBalls and tear gas and

24  sometimes some of the other projectiles, if you infer in favor

25  of the plaintiff, you construe in favor of the plaintiff, which

2148

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    I have to do, was what led to the exposure of the plaintiffs to

2    PepperBalls and tear gas, notwithstanding their peaceful

3    protesting.  And that to me establishes causal link.  That means

4    that the case has to go to the jury.

5          So, with respect to the claims of Fisk, which have been

6    dismissed with prejudice, and the Court's agreement with

7    Mr. Ringel that there is no evidence to support any award of

8    economic damages in the form of medical expenses or otherwise,

9    at least as to Deras, Blasingame, Sannier, and Wedgeworth, and

10   any such economic damages claims by them are now dismissed.

11   With those exceptions, the Court denies the motion, and we will

12   proceed to the defendants' case after taking a short break so we

13   can all refresh and regroup.

14          MS. STERK:  Your Honor, I have one very quick issue,

15   if it's okay to raise it?  We had played the deposition of

16   Michael O'Donnell, and I don't believe that there's anything in

17   the record, because that -- those designations are not typed out

18   by the court reporters, and I wanted to see if we can put a clip

19   report of the actual pieces of testimony that were played into

20   the record.

21          THE COURT:  Sure.

22          MR. RINGEL:  No objection.

23          MS. STERK:  And so I don't know if you would prefer me

24   to just mark it as a court exhibit?

25          THE COURT:  Just mark it as an exhibit, and it's

2303

1                        REPORTER'S CERTIFICATE

2

3

4            I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11           Dated this 9th day of April, 2022.

12

13

14

15

16   _____
                                    Kevin P. Carlin, RMR, CRR
17                                   Official Court Reporter

18

19

20

21

22

23

24

25

                    Kevin P. Carlin, RMR, CRR
                            A30

Attachment 5:

Order on the Motions for Judgment as a Matter of Law,
New Trial, or Remittitur as to Defendants Denver and
Jonathan Christian (filed Sept. 19, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01878-RBJ
*Consolidated with 1:20-cv-01922-RBJ-MEH*

ELISABETH EPPS,
ASHLEE WEDGEWORTH,
AMANDA BLASINGAME,
MAYA ROTHLEIN,
ZACH PACKARD,
HOLLIS LYMAN,
CIDNEY FISK,
STANFORD SMITH,
SARA FITOURI,
JACQUELYN PARKINS,
KELSEY TAYLOR,
YOUSSEF AMGHAR,
JOE DERAS,
JOHNATHAEN DURAN,
MICHAEL ACKER and
CLAIRE SANNIER,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
DANIEL FELKINS,
DAVID ABEYTA,
CITY OF AURORA,
CORY BUDAJ,
BOARD OF COUNTY COMMISIONERS FOR JEFFERSON COUNTY, COLORADO,
JONATHAN CHRISTIAN,
KEITH VALENTINE,
DAVID MCNAMEE,
PATRICIO SERRANT,
MATTHEW BRUKBACHER,
J. LNU,
JOHN AND JANE DOES 1-100, and
JOHN AND JANE BOES 1-50,

       Defendants.

ORDER ON THE MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR
REMITTITUR AS TO DEFENDANTS DENVER AND JONATHAN CHRISTIAN

This matter is before the Court on Denver and Jonathan Christian's motions for judgment

as a matter of law, new trial, and remittitur (ECF Nos. 373, 374).  For the reasons discussed

below, Denver's motion is DENIED.  Mr. Christian's motion is GRANTED IN PART and

DENIED IN PART.

## I.    BACKGROUND

This case is a consolidation of claims arising from police-protestor interactions during

demonstrations following George Floyd's murder.  It was tried to a jury from March 7 through

March 25, 2022.  The jury returned a verdict in favor of the plaintiffs on almost every claim.  The

jury found Denver liable for violating Ms. Wedgeworth's First Amendment rights and awarded her

$750,000 in compensatory damages.  ECF No. 343 at 6.  The jury found Denver liable for violating

all the other plaintiffs' First and Fourth Amendment rights.  *See* ECF No. 343.  It awarded each of

these plaintiffs, other than Mr. Packard, $1 million in compensatory damages.  *Id.*  It awarded Mr.

Packard $3 million in compensatory damages.  *Id.* at 3.  Mr. Packard and Mr. Deras suffered injuries

because of the actions of Aurora officers, who came to aid Denver's protest response as mutual aid

officers.  The jury found that Denver was liable for the actions of these mutual aid officers.  *Id.* at 3,

5.  Ms. Epps brought a claim against individual defendant Jonathan Christian, in addition to her

claims against Denver.  The jury found that Mr. Christian had violated Ms. Epps Fourth Amendment

rights and awarded the $1 million in compensatory damages against Denver and Mr. Christian.  *Id.* at

8.  In addition, the jury awarded Ms. Epps $250,000 in punitive damages against Mr. Christian.

## II.   JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

### A.   <u>Standard of Review</u>

1.   <u>Judgment as a Matter of Law (JMOL)</u>

"A party is entitled to JMOL only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (brackets and ellipsis omitted). All reasonable inferences should be drawn in favor of the nonmoving party. *See id.* at 772. Judgment as a matter of law is not warranted unless all evidence points in one direction, and the evidence is not susceptible to any reasonable inferences supporting the nonmoving party's position. *Id.* "The question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party]." *Century 21 Real Est. Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003). At bottom, the question in determining whether a motion for judgment as a matter of law should be granted is "whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

Federal Rule of Civil Procedure 50(a)(2) requires a party to make any motion challenging the sufficiency of the evidence prior to the case being submitted to the jury. *See Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1130–31 (10th Cir. 2019). The moving party must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). A party can renew its motion for judgment as a matter of law under Rule 50(b) after the jury returns a verdict. Fed. R. Civ. P. 50(b). A Rule 50(b) movant, however, can only reassert the same grounds for judgment as a matter of law

that he first asserted in his pre-deliberation Rule 50(a) motion. *Mountain Dudes*, 946 F.3d at

1131.

     2. <u>New Trial</u>

     Under Federal Rule of Civil Procedure 59, a court may grant a new trial after a jury trial,

"for any reason for which a new trial has heretofore been granted in an action at law in federal

court." A new trial may be granted if prejudicial error has occurred or if the verdict is against the

weight of the evidence. *Anderson v. Phillips Petroleum Co*., 861 F.2d 631, 637 (10th Cir.1988).

A new trial may also be granted if damages are excessive. See *Montgomery Ward & Co. v.

Duncan*, 311 U.S. 243, 251 (1940). "A motion for new trial on the grounds that the jury verdict

is against the weight of the evidence normally involves a review of the facts presented at trial,

and thus involves the discretion of the court." *Black v. Hieb's Enter., Inc.*, 805 F.2d 360, 363

(10th Cir.1986). The Court must grant a new trial if it determines that excessiveness in the

amount of the award gives rise to the inescapable inference that it resulted from passion or

prejudice on the part of the jury, since the prejudice may have infected the jury's liability

determination as well. *See Malandris v. Merrill Lynch*, 703 F.2d 1152, 1168 (10th Cir.1981).

     **B. <u>Analysis of Denver's Motion for Judgment as a Matter of Law</u>**

     Denver seeks judgment as a matter of law or a new trial because it believes the jury's

verdict was not supported by the evidence in this case. As an initial matter, plaintiffs pursued

three theories of liability against Denver: (1) policy, custom, or practice, (2) failure to train, and

(3) ratification. Any of these theories on their own would be sufficient to support liability

against Denver, and the jury found Denver liable for each plaintiff's injuries under all three

theories.

1.    Denver is Not Entitled to a Judgment as a Matter of Law or a New Trial on Plaintiffs'
      Claims Under an Official Policy, Practice, or Custom Theory

First, Denver argues that there was no evidence of a direct causal link between any

municipal policy and plaintiffs' injuries.  It argues that "a municipal policy must be the moving

force behind the constitutional violation."  ECF No. 373 at 2 (quoting *Bd. of Cnty. Comm'rs of*

*Bryan Cty., Okla. v. Brown,* 520 U.S. 397 (1997)).  It says there was no evidence that, "[f]or

example, with respect to Mr. Christian's use of PepperBall in the direction of Ms. Epps . . . Mr.

Christian specifically acted pursuant to an unconstitutional formal policy or an informal custom,

he was a final policymaker for Denver, any final policymaker specifically ratified Mr.

Christian's actions, or there was a specific known deficiency in Denver's training concerning

PepperBall use."  *Id.*  Denver argues that the same logic applies to all plaintiffs; there was no

evidence that a municipal policy was the moving force behind constitutional violations.

Plaintiffs respond that significant evidence was presented on causation.

I agree with plaintiffs.  There was evidence presented that the officers who violated

plaintiffs' constitutional rights acted pursuant to an unconstitutional policy.  The evidence

supported a conclusion that Denver Police Department (DPD) policy gave command officers

virtually limitless discretion to authorize officers to use less-lethal weapons in protest situations.[1]

ECF No. 350 at 1202–04.  In addition to the mountain of video evidence from which a

reasonable jury could have inferred this policy's existence, Commander Phelan testified that he

did not see any police actions during the protests that did not fall within DPD policy.  *See* ECF

No. 350 at 44.  There was also evidence that the use of less-lethal weapons resulted in harm to

protesters, including plaintiffs.  *See e.g.,* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195

---

[1] This order is based on my recollections of the testimony and evidence presented at trial, as well as a
review of the certified transcript.

(Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).

As I said in ruling on the initial motion for judgment as a matter of law made at the close of plaintiffs' evidence, on the issue of causation, "the overreaction of the cops, the excessive application of PepperBalls and tear gas and sometimes some of the other projectiles . . . if you construe in favor of the plaintiff, which I have to do, was what led to the exposure of the plaintiffs to PepperBalls and tear gas, notwithstanding their peaceful protesting." ECF No. 344 at 31–32. As in the Rule 50(a) order, I must construe everything in favor of the plaintiffs in this order. A reasonable jury could find, and this jury did find, that Denver caused plaintiffs' specific injuries. As the jury's finding on causation was supported by evidence, Denver's motion for judgment as a matter of law or a new trial is denied on the issue of causation.

Second, Denver complains that plaintiffs failed to specify "precisely what formal policy of Denver violated any of their constitutional rights" and how such a formal policy violated their rights. ECF No. 373 at 3. Plaintiffs respond that evidence was presented regarding "Denver's official policies" of not requiring officers to activate body-worn cameras (BWCs), not requiring officers to timely complete use of force reports for protests, allowing "unlimited discretion to officers to use less lethal weapons as they saw fit," and allowing the use of 12-guage shotguns, flashbangs, and other explosives, and kettling. ECF No. 392 at 2–4.

Denver insists in its reply that plaintiffs have "failed to respond" to its argument that plaintiffs never specified any formal Denver policy violative of their constitutional rights. ECF No. 406 at 2. I disagree. Plaintiffs, in their presentation of evidence, specified several policies that caused violations of their First and Fourth Amendment rights and reiterated those policies in

their response to the instant motion.  One policy emphasized by plaintiffs was Denver's policy of permitting mutual aid partners to proceed under their own use-of-force policies, rather than requiring that they follow Denver's use-of-force policy.  *See* ECF No. 350 at 13–15.  Another was Denver's policy to permit use of less-lethal weapons against protesters on a discretionary basis.  *See id*. at 44.  Plaintiffs made sufficiently specific articulations of the Denver policies to which they objected.  I outlined above the evidence that could lead a reasonable juror to conclude that these policies caused plaintiffs' injuries.  This argument does not warrant judgment as a matter of law or a new trial.

Third, Denver argues that plaintiffs could not have alleged a practice or custom because they only introduced evidence from the first six days of the George Floyd protests.  ECF No. 373 at 3–4.  It cites *Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) for the proposition that "[i]n order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread."  *Id*. (internal quotations omitted).  Denver concludes that no practice or custom could have been established over such a short period.  Plaintiffs respond that they "did *not* need to show that there was a history of problems relating to use of force reporting, BWC camera use at protests, or any of the official policies" because as an official policy, practice, or custom requires either a showing of deliberate action by policymakers or that the practice or custom is a "standard operating procedure."  ECF No. 392 at 3–4.  Denver asserted in its reply that plaintiffs did not respond to this argument.

Once again, I disagree with Denver.  I need not reach Denver's arguments about its customs or practices because a reasonable juror could have found that certain *policies* of Denver caused plaintiffs' injuries.  As plaintiffs would be entitled to recover if they showed a policy, practice, *or* custom of Denver's caused their injuries, it does not matter whether the six-day

period at issue would be sufficient to establish a custom or practice—there was sufficient evidence to support that Denver had a policy that caused the constitutional violations, which is enough to support the jury's verdict. The evidence about Denver's policies would, however, also be powerful evidence of identical practices or customs.

Fourth, Denver argues that there is no evidence to support liability against it on plaintiffs' "policy, practice, or custom" theory because the final policymaker relied on by plaintiffs, Commander Phelan, has not been shown to have "personally participated in the specific events involving each plaintiff." ECF No. 373 at 4. Denver posits that Commander Phelan's orders as a final policymaker cannot be causally linked to the injuries suffered by plaintiffs. Plaintiffs respond that because Commander Phelan authorized use of chemical munitions each day, authorized the use of less-lethal weapons to move protestors and ordered commanders to use less-lethal weapons against protestors, each of these decisions directly resulted in injuries to the plaintiffs. ECF No. 392 at 4. Plaintiffs also identify several incidents where plaintiffs were injured, and Commander Phelan authorized use of force. *Id.*

Denver claims that the even if Commander Phelan was a final policymaker for the specific incidents cited, there remains no evidence of his participation as the final policymaker in the remaining incidents. I must reject this argument because most of the policies identified by plaintiffs were orders of Commander Phelan. A reasonable juror could find a causal link between the actions of Commander Phelan and the injuries suffered by plaintiffs on the evidence presented at trial. Every plaintiff was injured by the inhalation of CS gas (2-chlorobenzylidene malononitrile, commonly called tear gas) from less lethal weaponry. *See* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 159-60 (Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62

(Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).  Commander Phelan authorized use of chemical munitions at each daily supervisor briefing during the six-day period at issue.  ECF No. 350 at 21.

The jury was instructed that "[o]fficial policy for Denver includes any actions Commander Phelan took or instructed others to take during the protests."  ECF No. 340 at 20.  In light of those two facts and that instruction, there is sufficient evidence to conclude that Commander Phelan's orders caused plaintiffs' injuries.  But for his authorization of the use of CS gas, plaintiffs would not have been injured by the inhalation and interaction with CS gas. There is additional evidence linking Commander Phelan's actions to specific injuries sustained by plaintiffs, but the authorization of chemical munitions alone is sufficient for a reasonable juror to conclude that some of plaintiffs' injuries were caused by Commander Phelan's actions as policies of Denver.

Denver also argues that there is insufficient evidence to support the jury's finding of liability under the "ratification" and "failure to train" theories.  However, as I found above that there was sufficient evidence on the "policy, practice, or custom" theory to support the jury's finding of liability, I need not determine whether there was sufficient evidence to support these other theories.  For judgment as a matter of law to be warranted, Denver would have had to show that *no* theory of liability supported the jury's verdict.  As it has not done so, I will not address the remaining theories.

2.  <u>Denver is Not Entitled a Judgment as a Matter of Law or a New Trial on the Mutual Aid Officer Issue</u>

Denver next argues that "there is no legal support for the proposition one municipality can be held liable under a municipal liability theory for the actions of an officer of another municipality pursuant to 42 U.S.C. § 1983."  ECF No. 373 at 6.  It also argues that even if this

were a viable legal theory, it was not supported by sufficient evidence.  *Id*.  Plaintiffs respond

that there was "extensive evidence" to support the jury's finding on this point, including

evidence of Denver's policy to "allow mutual aid agencies to use their own policies and

weapons," evidence that the mutual aid agencies "operated under Phelan's direction," and

evidence that a DPD supervisor was embedded with each mutual aid unit and "provided direction

on how to deploy weapons through communications with the Command Post."  ECF No. 392 at

7.

      This issue was hashed out at length during the jury instruction conference.  ECF No. 357

at 222–233.  At that time, the Court and the parties discussed the best way to ensure that the jury

would understand that they could only hold Denver liable for acts committed by officers from

other jurisdictions if they found that those mutual aid officers were acting pursuant to a policy,

practice, or custom of *Denver*.  There is a great deal of law supporting the proposition that a

municipality can be liable for officers' actions that violate citizens' rights committed pursuant to

an official policy, practice, or custom of the municipality.  *See e.g., City of Canton, Ohio v.

Harris*, 489 U.S. 378, 385 (1989).  That is exactly what the jury was instructed.  *See* ECF No.

340 at 24.  Denver cannot escape liability for officers who acted pursuant to its policies simply

because those officers were not Denver officers—liability attaches because it was Denver's

policy that caused the injury, not based on whether offending officers were on Denver's payroll.

      Additionally, I find the evidence presented sufficient to support the jury's verdict that

Denver was liable for the injuries caused by mutual aid officers.  Commander Phelan testified

that officers from mutual aid agencies were under his direction during the George Floyd protests.

ECF No. 350 at 12–13.  He also testified that Denver's policy was to allow mutual aid officers to

follow the policies of their home jurisdictions and use weapons authorized for use in their home

jurisdictions.  *Id*. at 13–14.  Mr. Packard and Mr. Deras were hit with munitions from 12-guage

shotguns shot by members of the Aurora police department.  ECF No. 387 at 195.  The DPD did

not use these weapons.  ECF No. 350 at 15.  But for Denver's policy of permitting mutual aid

agencies to follow their own use-of-force policies and use their own weapons, Mr. Packard and

Mr. Deras could not have suffered the injuries that they did.  This evidence supports the jury's

finding that Denver's policy of permitting mutual aid partners to use their own less-lethal

weapons caused at least some of the injuries inflicted on plaintiffs.  Judgment as a matter of law

is not warranted on this issue.

      3.   <u>Admission of Testimony of Nicholas Mitchell Does Not Warrant a New Trial</u>

      Mr. Mitchell was the independent monitor in Denver during the time of the protests.  His

office conducted a review of the actions of the DPD at the George Floyd protests and produced a

report with its findings.  Denver argues that Mr. Mitchell's testimony should have been

inadmissible for two reasons.  First, it argues that his testimony regarding the Office of

Independent Monitor's (OIM) report was evidence of subsequent remedial measures and thus

inadmissible under FRE 407.  ECF No. 373 at 7. Second, it argues Mr. Mitchell's testimony was

inadmissible because Mr. Mitchell had no personal knowledge of anything that occurred at the

protests, and he was not endorsed as an expert witness.  *Id*. at 7–8.  Finally, they argue that any

probative value of Mr. Mitchell's testimony was far outweighed by the prejudice to Denver.  *Id*.

at 8.  Plaintiffs respond that because these evidentiary issues with Mr. Mitchell's testimony were

not raised in Denver's Rule 50(a) motion, they cannot be raised in Denver's Rule 50(b) motion.

ECF No. 392 at 7–8.  Rather, plaintiffs argue, this alleged error can only be considered under the

Rule 59(a), where the grant of a new trial is appropriate "only where an error that led to a verdict

that is 'clearly, decidedly or overwhelmingly against the weight of the evidence.'" *Id*. at 8

(quoting *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013)).  Denver did

not respond to this argument in its reply and instead reiterates the argument it made in its original

motion.  ECF No. 406 at 4.

I agree with plaintiffs that Denver did not raise this issue in its Rule 50(a) motion.  Even

if I were to assume for this purpose that the admission of Mr. Mitchell's testimony was an error,

to find that a new trial is warranted I would have to find that the admission of Mr. Mitchell's

testimony led to a verdict decidedly against the evidence.  *See Anderson*, 861 F.2d at 637.  I

cannot make such a finding.  There was substantial evidence supporting the verdict, including the

testimony of plaintiffs, plaintiffs' expert witnesses, Commander Phelan, and numerous videos

and pictures.  As I discussed at length above, the jury's verdict was not contrary to the weight of

the evidence.  A new trial is not warranted due to the admission of Mr. Mitchell's testimony

(which in any event I believe to have been proper).

### 4.  Admission of OIM Memos Does Not Warrant a New Trial

The memos objected to in this section were created by the OIM in its process of

reviewing DPD actions at the George Floyd protests.  Denver argues that the admission of the

OIM memos was improper for three reasons.  First, it argues the OIM memos contain evidence

of subsequent remedial measures, which are inadmissible under Federal Rule of Evidence 407.

ECF No. 373 at 8.  Second, it argues that the memos were hearsay that did not fall within any

exception because the OIM did not have an agency relationship with Denver.  *Id*.  Third, it

argues that any probative value of the OIM memos was substantially outweighed by the

prejudice to Denver.  *Id*.  Plaintiffs respond first that Denver did not raise this issue in its Rule

50(a) motion, and so it can only proceed on a new trial motion with this issue and not under its

renewed judgment as a matter of law motion, and second, that the officers interviewed by the

OIM were agents of Denver because they were employees acting within the scope of their responsibilities. ECF No. 392 at 9. Denver does not respond to plaintiffs' argument that this issue was not raised in its Rule 50(a) motion.

I agree with plaintiffs that Denver did not raise the admissibility of the OIM memos in its Rule 50(a) motion. A new trial is not warranted on this issue. Even assuming it was error to admit the OIM memos, I cannot find that their admission led to a verdict decidedly against the weight of the evidence. Moreover, the Court went through these memos carefully and in detail before trial and redacted information that it found to be protected by a privilege, including the law enforcement privilege.

5. Plaintiff Counsel's Misconduct Does not Warrant a New Trial

Next, Denver argues that Ms. Wang's (the Fitouri plaintiff counsel) reference to comments made by Derek Chauvin's lawyer during her examination of Officer Cunningham warrants a new trial. ECF No. 373 at 9. Plaintiffs respond that counsel's comment was not inappropriate, and even if it was, does not warrant a new trial. Ms. Wang asked Officer Cunningham, "[w]ould you agree that there's a limitation to cameras, that the camera only sees what the camera sees?" ECF No. 357 at 119. After Officer Cunningham responded in the affirmative, Ms. Wang asked, "[a]re you aware that the person who said that led Derek Chauvin's defense in his trial for the murder of George Floyd?" *Id*. The defense objected and that objection was immediately sustained. *Id*.

A judgment will not be disturbed for inappropriate remarks "unless it clearly appears that the challenged remarks influenced the verdict." *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019). In deciding whether the jury was influenced by a remark, courts consider the extent of the remark, whether it can be cured through jury instruction, and whether the remark had a

prejudicial effect." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1169 (10th Cir. 2017).

This Court made extremely clear that Ms. Wang's reference to the Chauvin trial was inappropriate.  ECF No. 357 at 119–21.  The Court immediately sustained Denver's objection to that question.  *Id*. at 119.  However, the remark was not extensive.  It consisted of one question. *Id*.  And within minutes, the Court issued a curative jury instruction.  It stated:

> Ladies and gentlemen, you probably could tell from the tone of my sustaining that last objection that I was not amused.  There is no basis whatsoever for counsel to have asked a question that suggests a comparison of what happened in Denver to what happened in the Chauvin case in Minnesota.  Please don't be prejudiced by that in any way.  This case stands on its own evidence, its own facts, and I don't want any counsel to be suggesting something different than that to you.

*Id*. at 121.

Denver argues that counsel's statement was not remedied by instruction because counsel's question equated all police officers with Mr. Chauvin would inflame the passions of the jury in a way that could not be remedied.  ECF No 373 at 10.  However, jurors are presumed to follow instructions, and there is no reason to believe that any prejudice Denver suffered could not be cured by this instruction or that it was not cured by this instruction.  *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 341 (2009).

## C. <u>Analysis of Mr. Christian's Motion for Judgment as a Matter of Law and for a New Trial</u>

Mr. Christian first argues that there was not sufficient evidence to support the jury's verdict against Mr. Christian because all the evidence indicated that his action in shooting a PepperBall at Ms. Epps as she crossed the street was objectively reasonable.  ECF No. 374 at 4. He therefore requests judgment as a matter of law or a new trial.  Second, he argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions.  *Id*. at 4–5.  Third, he argues that

he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support a punitive damage award. *Id*. at 5. Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion for bifurcation and is entitled to a new trial because of that prejudice. *Id*. at 6. I will proceed through these arguments in turn.

      1.   Sufficiency of the Evidence

Mr. Christian first argues that judgment as a matter of law or a new trial is warranted because all the evidence indicated that his shooting a PepperBall at Ms. Epps was objectively reasonable. ECF No. 374 at 4. Ms. Epps responds that there was video of the incident showing that as Ms. Epps peacefully crossed the street, Mr. Christian, got on one knee and shot at her, and was subsequently told by another officer not to shoot at her anymore. ECF No. 391 at 2.

As Mr. Christian stated in his motion, "[w]hether Mr. Christian's use of force against Ms. Epps violated the Fourth Amendment turns on whether his actions were objectively reasonable and requires a totality of the circumstances analysis considering the severity of the crime at issue, whether Ms. Epps posed an immediate threat to the safety of the officers or others, and whether Ms. Epps was actively resisting or attempting to evade arrest by flight." ECF No. 374 at 4 (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989); *Simpson v. Little,* 16 F.4th 1353, 1360-61 (10th Cir. 2021)). Based on those considerations, I find that the weight of the evidence is sufficient to support to jury's finding in favor of Ms. Epps. Ms. Epps' crime was not severe; she was, at most, jaywalking. There was no evidence that she posed an immediate threat to anyone other than the fact that she was crossing the street at night and not at the crosswalk. Mr. Christian argues that he "reasonably perceived Ms. Epps posed a danger to herself and the public in the traveling vehicles." ECF No. 374 at 4. However, whether Mr. Christian's perception of Ms. Epps as a threat was *reasonable* was a question of fact for the jury, not an issue that can be

determined by a conclusory statement by Mr. Christian in a motion.  Further, there was no evidence that she was fleeing or actively resisting the officers.  There is sufficient evidence to support the jury's conclusion that Mr. Christian's actions were not objectively reasonable—neither judgment as a matter of law nor a new trial is appropriate.

      2.  <u>Qualified Immunity</u>

Second, Mr. Christian argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions.  ECF No. 374 at 4–5.  He argues that the two cases most relied on in the Court's order on Mr. Christian's motion for summary judgment likewise did not identify the constitutional right violated with sufficient specificity.  *Id*. at 5.  Ms. Epps responds that the right violated was sufficiently defined in those cases, and that those cases are analogous to this case—those cases "involved Fourth Amendment claims for the use of force, including the use of PepperBalls, on peaceful protestors."  ECF No. 391 at 3.

I agree with plaintiffs for largely the same reasons I identified in my order on Denver's motion for summary judgment.  *See* ECF No. 304 at 15–16.  In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008), plaintiffs engaging in peaceful protest were subjected to tear gas and PepperBall shots.  Ms. Epps behavior was even less likely than the plaintiffs in *Buck* to cause any danger from others.  While some plaintiffs in *Buck* remained in the street to obstruct traffic, Ms. Epps was in the process of crossing the street when Mr. Christian shot at her, with no indication that she was going to stop in the street or was attempting to obstruct traffic.  *See id*.; ECF No. 352 at 199.  The illegality of actions like Mr. Christian's have been specifically outlined in past Tenth Circuit cases, and he is not entitled to judgment as a matter of law or a new trial on this issue.

3.  Punitive Damages

Third, Mr. Christian argues that he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support punitive damages.  *Id*. at 5.  Ms. Epps responds that there was evidence of Mr. Christian's reckless or callous intent: the videos that show him shooting at Ms. Epps and Ms. Epps' testimony recounting what she saw when Mr. Christian shot at her.  Mr. Christian argues that the only evidence regarding his intent is his own testimony.  ECF No. 374 at 5–6.  However, intent can be inferred from a variety of evidence, including video evidence and the testimony of others, both of which Ms. Epps presented.  I cannot agree with Mr. Christian that there is no evidence to support the jury's finding that he acted with a reckless or callous intent.

Mr. Christian also argues that there is no evidence that Mr. Christian "perceived" the risk that his actions would violate Ms. Epps' constitutional rights.  He cited *Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018) for the proposition that "'reckless or callous indifference' requires that the defendant have acted 'in the face of a perceived risk that its actions will violate federal law.'"  *Id*. (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999)).  However, upon a review of that case, it seems that the perception requirement is another way of requiring that the law be clearly established.  The *Eisenhour* Court explained the perception requirement by stating that, in the employment discrimination context, even where there has been intentional discrimination, there may not be liability because "the underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability."  *Id*. (quoting *Kolstad*, 527 U.S. at 536–37).  As I explained in the order on Mr. Christian's motion for summary judgment and above, the law was sufficiently

established for liability, and Mr. Christian's hair-splitting legal argument on the perception requirement does not persuade me otherwise.

    4.  <u>Bifurcation</u>

Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion for bifurcation. ECF No. 374 at 6. Specifically, he claims that "the steady parade of video evidence involving other Denver police officers and other people and the allegations those actions were caused by failures by Denver itself were profoundly prejudicial to Mr. Christian." *Id*. Mr. Christian also argues that he should not have been made to proceed with Denver under *Tanburg v. Sholtis*, 401 F.3d 1151 (10th Cir. 2005), which stands for the proposition that evidence showing that an officer did not comply with department policy cannot be introduced to show that the officer violated a plaintiff's constitutional rights.

Ms. Epps responds that the jury did not just lump Mr. Christian in with Denver—it found Denver liable for violating Ms. Epps' Fourth and First Amendment rights but found Mr. Christian liable only for violation of Ms. Epps' Fourth Amendment rights. She also argues that evidence of Denver's policies and training was not prejudicial to Mr. Christian because the jury was instructed specifically on that issue. Instruction 10 stated, "[a]s you consider those instructions, you must bear in mind that in order for the plaintiffs to prove a constitutional violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or practice." ECF No. 340 at 12. On the *Tanburg* issue, Ms. Epps responds that as plaintiffs did not argue or seek to argue that Mr. Christian's actions in shooting Ms. Epps were outside of Denver policy, *Tanburg* was inapplicable.

I agree with Ms. Epps on the *Tanburg* issue. Ms. Epps never argued that Mr. Christian's actions were outside of policy—she argued to the contrary, that Mr. Christian's actions were

exactly in line with Denver's use-of-force policy, a policy that she and her co-plaintiffs argued was far too discretionary. *Tanburg* is not a consideration that would require the Court to bifurcate Ms. Epps' case against Mr. Christian, and it is not a reason that Mr. Christian would be entitled to judgment as a matter of law or a new trial.

I also agree with Ms. Epps that the denial of Mr. Christian's request to bifurcate did not unfairly prejudice the jury against him. There is no reason to believe that the jury did not follow the instruction "in order for the plaintiffs to prove a constitutional violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or practice," especially because jurors are presumed to follow jury instructions. ECF No. 340 at 12. Further, the jury's determination that Mr. Christian violated Ms. Epps' Fourth Amendment but not her First Amendment rights shows that the jury did not simply lump Mr. Christian's actions in with Denver's—had they done so, they would have found Mr. Christian liable for First Amendment violations against Ms. Epps, as they found Denver was liable for First Amendment violations against Ms. Epps. *See* ECF No. 343 at 7–8. This jury was extremely diligent throughout this case. They asked thoughtful questions and engaged in a lengthy deliberation, and they were instructed to consider Mr. Christian's liability separately from Denver's. *See* ECF No. 340 at 13–17, 18–23. I presume that they followed those instructions, and Mr. Christian has presented no evidence that they did not, other than the fact of the award against him. As there is no reason to believe that, even if the failure to bifurcate was error, such an error was prejudicial to Mr. Christian, he is entitled to neither judgment as a matter of law nor a new trial.

### III.    REMITTITUR

#### A.  **Standard of Review**

Remittitur is appropriate only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or

another improper cause invaded the trial." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006) (quotations omitted).  "The [] court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981). Courts evaluating emotional distress compensatory damages awards focus on the specific testimony of the plaintiff, whether medical or other healthcare assistance was sought, and corroborating objective evidence supporting the plaintiff's testimony.  *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997).

   **B.  Denver's Request for Remittitur**

   Denver argues that the damages awarded by the jury against Denver are so excessive that they cannot be compensatory.  The jury awarded $1,000,000 per plaintiff, except for Ms. Wedgeworth ($750,000) and Mr. Packard ($3,000,000).  Denver argues that the only reasonable explanation of the jury award is that the award was based on "its determination Denver's overall response to the protests was inappropriate and violative of people's constitutional rights generally."  ECF No. 373 at 14.  It asks the court to order remitter to $100,000 per plaintiff except Ms. Wedgeworth $75,000 and Mr. Packard $500,000.

   Plaintiffs respond that they presented evidence of physical injuries for each plaintiff that would be sufficient to support the jury's award in favor of each plaintiff against Denver. However, they argue, even if the physical injuries were insufficient, the evidence of plaintiffs' emotional damages would be more than sufficient to support the award.

   Each plaintiff presented testimony that they suffered, at minimum, from the inhalation of CS gas.  *See e.g.,* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195 (Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11

(Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).  Almost all testified that they were chased through the streets, shot at or hit with PepperBalls or other less-lethal projectiles.  Denver is correct that, other than Mr. Packard, none of the plaintiffs presented evidence that their physical injuries were extensive.  However, physical damages are not the only damages suffered in this case.

Plaintiffs also testified at length regarding the emotional distress they suffered because of the police actions they experienced at the protests.  Plaintiffs described the distress that they felt at the time, and the distress that they felt in the days, weeks, and months that followed their experiences at the protest.  Plaintiffs did not testify to seeking much, if any, medical attention for their emotional distress, nor did any receive a diagnosis regarding their emotional distress.

However, measuring damages for emotional distress is not an exact science.  The jurors observed the testimony of the plaintiffs regarding how their experiences at these protests affected them.  The jurors, as judges of the facts, determined that the emotional distress suffered by the plaintiffs was significant.  More than just the words that plaintiffs spoke, the jurors were able to observe the demeanor of plaintiffs as they spoke about their distress.  And even without a diagnosis or significant long-term symptoms of that distress, there was evidence in the form of plaintiffs' testimony of significant distress suffered during the protests and in their immediate aftermath.

Remittitur is an extreme remedy and one that this Court would not engage in without a verdict that shocked the judicial conscience.  This is not such a verdict.  The plaintiffs testified about the impact that their experiences at the hands of the police while they peacefully protested had on them.  It is clear from the verdict that the jury believed that testimony and assessed damages that they believed were warranted in light of that impact.  The Court might have

awarded less.  However, the jury is the conscience of the community.  This was an attentive and thoughtful jury, and I do not find that its decision was shocking or the result of passion, prejudice, or impropriety.  The police no doubt faced a very difficult situation, as there were individuals in the crowds who threw rocks, full water bottles, and other objects at officers throughout the protests.  However, Denver's stubborn instance that the police did nothing wrong in the face of overwhelming video evidence to the contrary, coupled with evidence that each plaintiff was peaceful but sustained injuries as a result of the misconduct, was sufficient to support the jurors' verdict.  The Court will not exercise its discretion to remit the awards against Denver.

### C.  Mr. Christian's Request for Remittitur

Mr. Christian argues that the punitive damages awarded against him are excessive, unfair, and in violation of the due process clause, and he requests that the Court remit the punitive damage award against him.  More specifically, Mr. Christian argues that as the jury did not order any compensatory damages against him, the punitive damages are extremely excessive, as many courts have held that punitive damages should be held around a 1:1 ratio with compensatory damages.  Ms. Epps responds that there was a compensatory award against Mr. Christian—after inquiring whether Denver was liable for the claims against it and whether Mr. Christian was liable the claims against him, the verdict form asked the jurors only, "[w]hat amount of compensatory damages do you award to Elisabeth Epps?" and then "[w]hat amount of punitive damages do you award to Elisabeth Epps against Jonathan Christian?".  ECF No. 391 at 8–10 (quoting ECF No. 343 at 8).  The jury answered the compensatory damages question with an award of $1 million, not specifying which compensatory damages were against Denver and which were against Mr. Christian.

I agree with Ms. Epps that the jury did award compensatory damages against Mr. Christian, and that he is jointly and severally liable with Denver for the compensatory award in favor of Ms. Epps.  However, I agree with Mr. Christian that the punitive damages awarded against him are excessive.  Mr. Christian shot one PepperBall at Ms. Epps as she crossed the street.  He should not have done that, and the jury found that by doing so, he violated her Fourth Amendment rights.  However, the evidence was unclear as to whether the PepperBall hit her; at most, it caused a bruise.  Compared to the other injuries that Ms. Epps suffered during the protests, Mr. Christian's shooting caused minimal damage.  Ms. Epps was shot with PepperBalls and exposed to CS gas on numerous occasions, and from an objective standpoint, and considering those other shootings and exposures, Mr. Christian's actions do not warrant a punitive damage award of $250,000.

While I have immense respect and appreciation for the jury's work in deciding this case, the punitive damages as to Mr. Christian are excessive.  Using my discretion, I will remit the punitive damage award against Mr. Christian to $50,000.  I believe that would be a fair and not excessive punishment for the wrong he committed against Ms. Epps.  If Ms. Epps is unwilling to accept that amount, then I will grant a new trial as to her claims against Mr. Christian.

ORDER

1. Defendant the City and County of Denver's motion for judgment as a matter of law, or a new trial, or remittitur, ECF No. 373, is DENIED.

2. Defendant Jonathan Christian's motion for judgment as a mater of law, or a new trial, or remittitur, ECF No. 374, is GRANTED IN PART and DENIED IN PART.  It is granted to the extent that the Court orders that the punitive

damages award be remitted to $50,000; and if that is not accepted by plaintiff

Epps, then the Court orders a new trial as to her claims against Mr. Christian.

DATED this 19th day of September, 2022.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

Attachment 6:

Amended Final Judgment Pursuant to Rule 58
(filed Aug. 29, 2024)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01878-RBJ (consolidated with No. 20-cv-1922-REB-MEH)

ELISABETH EPPS,
ASHLEE WEDGEWORTH,
AMANDA BLASINGAME,
MAYA ROTHLEIN,
ZACH PACKARD,
HOLLIS LYMAN,
CIDNEY FISK,
STANFORD SMITH,
SARA FITOURI,
JACQUELYN PARKINS,
KELSEY TAYLOR,
JOE DERAS,
JOHNATHEN DURAN, and
CLAIRE SANNIER,

      Plaintiffs

v.

CITY AND COUNTY OF DENVER,
JONATHAN CHRISTIAN,
KEITH VALENTINE,
CITY OF AURORA,
MATTHEW BRUKBACHER,
PATRICIO SERRANT,
DAVID MCNAMEE,
CORY BUDAJ,
ANTHONY HAMILTON, and
TIMOTHY DREITH,

      Defendants.

_____

**AMENDED FINAL JUDGMENT PURSUANT TO RULE 58**
_____

      In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

The claims of plaintiffs Elisabeth Epps, Ashlee Wedgeworth, Amanda Blasingame, Maya Rothlein, Zachary Packard, Hollis Lyman, Stanford Smith, Cidney Fisk, Sara Fitouri, Jacquelyn Parkins, Kelsey Taylor, Joe Deras, and Claire Sannier against the defendant City and County of Denver, together with Elisabeth Epps's individual claim against former Denver Police Department Officer Jonathan Christian, exclusive of claims against the defendant City and County of Denver arising from curfew violations, were tried before a jury of eight duly sworn between March 7 and March 25, 2022, with Senior U.S. District Judge R. Brooke Jackson presiding, and the jury rendered a verdict (ECF No. 343).

IT IS ORDERED that judgment is entered in favor of the defendants and against plaintiff Cidney Fisk as to all her claims, which were dismissed with prejudice.

IT IS FURTHER ORDERED that judgment is entered in favor of plaintiffs Claire Sannier, Stanford Smith, Zachary Packard, Sara Fitouri, Maya Rothlein, Amanda Blasingame, Joe Deras, Kelsey Taylor, Jacquelyn Parkins, Elisabeth Epps, and Hollis Lyman and against defendant City and County of Denver as to those plaintiffs' First Amendment and Fourth Amendment claims. Judgment is entered in favor of Ashlee Wedgeworth and against defendant City and County of Denver as to her First Amendment claim. Judgment is entered in favor of defendant City and County of Denver and against Ashlee Wedgeworth as to her Fourth Amendment claim. Judgment is entered in favor of plaintiff Elisabeth Epps and against defendant Jonathan Christian as to her Fourth Amendment claim. Judgment is entered in favor of defendant Jonathan Christian and against plaintiff Elisabeth Epps as to her First Amendment claim.

IT IS FURTHER ORDERED that compensatory damages were awarded by the jury in the amounts of $3,000,000.00 as to plaintiff Zachary Packard; $1,000,000.00 as to plaintiff Claire Sannier; $1,000,000.00 as to plaintiff Stanford Smith; $1,000,000.00 as to plaintiff Sara Fitouri; $1,000,000.00 as to plaintiff Maya Rothlein; $1,000,000.00 as to plaintiff Amanda Blasingame; $1,000,000.00 as to plaintiff Hollis Lyman; $1,000,000.00 as to plaintiff Joe Deras; $1,000,000.00 as to plaintiff Kelsey Taylor; $1,000,000.00 as to plaintiff Jacquelyn Parkins; $1,000,000.00 as to plaintiff Elisabeth Epps; and $750,000.00 as to plaintiff Ashlee Wedgeworth, and judgment in those amounts to those individuals is entered.

IT IS FURTHER ORDERED that defendant City and County of Denver's motion for judgment as a matter of law, or a new trial, or remittitur (ECF No. 373), is DENIED.

IT IS FURTHER ORDERED that defendant Jonathan Christian's motion for judgment as a matter of law, or a new trial (ECF No. 374), is DENIED.

IT IS FURTHER ORDERED that defendant Johnathan Christian's motion for remittitur of the jury's $250,000.00 punitive damages award to plaintiff Elisabeth Epps is GRANTED. The Court orders that the punitive damages award be remitted to $50,000.00. This amount having been accepted by plaintiff Elisabeth Epps (ECF No. 430), judgment in that amount on the punitive damages award is entered.

IT IS FURTHER ORDERED that in the discretion of the Court, pre-judgment interest to Zachary Packard is awarded on his $181,000.00 in economic damages at the applicable federal post-judgment interest rate of 4.45% from May 31, 2020 to the date of entry of this final judgment.

IT IS FURTHER ORDERED that as the prevailing party, the *Fitouri* plaintiffs are awarded costs in the amount of $18,770.44 pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and D.C.COLO.LCivR 54.1. As the prevailing party, the *Epps* plaintiffs are awarded costs in the amount of $44,851.23 pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and D.C.COLO.LCivR 54.1.

IT IS FURTHER ORDERED that in the discretion of the Court, attorneys' fees are awarded to the *Fitouri* Plaintiffs in the amount of $1,193,071.00 and costs under 42 U.S.C. § 1988 in the amount of $3,942.72. Attorneys' fees are awarded to the *Epps* Plaintiffs in the amount of $1,663,232.00 and costs under 42 U.S.C. § 1988 in the amount of $27,494.67.

IT IS FURTHER ORDERED that post-judgment interest, pursuant to 28 U.S.C. § 1961, is awarded to the plaintiffs on the damages awards and award of attorneys' fees and costs at the federal rate applicable at the time this final judgment is entered.

IT IS FURTHER ORDERED that judgment is entered in favor of defendants Anthony Hamilton and Timothy Dreith and against plaintiff Joe Deras as to his First Amendment and Fourth Amendment claims for the reasons set forth in the Court's summary judgment ruling of February 22, 2022 (ECF No. 298).

IT IS FURTHER ORDERED that judgment is entered in favor of defendant Keith Valentine and against plaintiff Elisabeth Epps as to her First Amendment and Fourth Amendment claims for the reasons set forth in the Court's summary judgment ruling of March 1, 2022 (ECF No. 304).

IT IS FURTHER ORDERED that judgment is entered in favor of defendant Matthew Brukbacher and against plaintiff Zachary Packard's First, Fourth, and Fourteenth Amendment claims and in favor of defendants City of Aurora, David McNamee, and Patricio Serrant and against plaintiff Zachary Packard as to his First Amendment claim for the reasons set forth in the Court's summary judgment ruling of September 23, 2023 (ECF No. 429).

IT IS FURTHER ORDERED that judgment is entered in favor of defendants City of Aurora and Cory Budaj and against plaintiff Johnathen Duran as to his First Amendment claim for the reasons set forth in the Court's summary judgment ruling of September 23, 2023 (ECF No. 429).

All of the other claims in this matter were finally dismissed or resolved by Notice of Voluntary Dismissal, Stipulation, or approval of settlement by this Court. (ECF Nos. 33, 47, 108, 211, 221, 280, 305, 311, 502, 503, 512, 513, 522, 525).

Dated at Denver, Colorado this 29th day of August, 2024.


FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:     s/.J. Dynes_____
        Deputy Clerk


APPROVED BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge

5
A61