# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ZACH PACKARD, AMANDA BLASINGAME, JOE DERAS, ELISABETH EPPS, SARA FITOURI, HOLLIS LYMAN, JACQUELYN PARKINS, MAYA ROTHLEIN, CLAIRE SANNIER, STANFORD SMITH, KELSEY TAYLOR, ASHLEE WEDGEWORTH,

*Plaintiffs-Appellees*,

v.

CITY AND COUNTY OF DENVER,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Colorado
No. 1:20-cv-1878-RBJ (Hon. R. Brooke Jackson)

## BRIEF FOR APPELLEES SARA FITOURI, JOE DERAS, JACQUELYN PARKINS, CLAIRE SANNIER, AND KELSEY TAYLOR

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642

*Oral Argument Not Requested*

February 21, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1(a), Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor make the following disclosures:

1.    Are said parties a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named parties:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

s/ Elizabeth Wang

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Counsel of Record for Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT REGARDING PRIOR/RELATED APPEALS ................. xi

INTRODUCTION .................................................................................... 1

STATEMENT OF ISSUES ....................................................................... 3

STATEMENT OF THE CASE ................................................................. 4

I.      Overwhelming Trial Evidence Supported The Verdict ................... 4

        A.      Constitutional Violations ........................................................ 4

                1.      May 28: Highland Bridge .............................................. 6

                2.      May 28: 16th and Platte ............................................... 7

                3.      May 28: Colfax and Washington .................................. 7

                4.      May 28: 14th and Sherman .......................................... 8

                5.      May 29: Capitol ............................................................ 9

                6.      May 29: Shot for Recording ....................................... 11

                7.      May 30: 16th and Welton ........................................... 11

                8.      May 30: Lincoln and Colfax ....................................... 12

                9.      May 30: Hunted in Alleys ........................................... 17

                10.     May 31: Colfax and Washington ................................ 18

                11.     May 31: Basilica Kettling ........................................... 20

                12.     June 1: Capitol ........................................................... 23

        B.      Damages ................................................................................ 23

    C.     Acts of Final Policymaker Phelan ........................................ 25

    D.     Failure to Train, Supervise, and Prepare ........................... 26

          1.    Failure to Train ........................................................ 26

          2.    Failure to Supervise ................................................. 29

          3.    Deliberate Indifference ............................................ 30

          4.    Failure to Prepare .................................................... 35

    E.     Official Policies ................................................................. 36

          1.    Unlimited Discretion Policy ...................................... 36

          2.    BWC Policy ............................................................. 39

          3.    Use-of-Force Reporting Policy ................................. 40

          4.    Mutual-Aid Officers ................................................ 42

    F.     Ratification ....................................................................... 43

    G.    Verdict ............................................................................. 44

II.    Post-Trial Motions ..................................................................... 45

SUMMARY OF ARGUMENT ............................................................ 46

ARGUMENT ...................................................................................... 48

I.    The Verdict Was Amply Supported By The Evidence ................... 48

    A.    Denver Waived Many of Its Arguments .............................. 48

    B.    Phelan Directly Violated Plaintiffs' Rights ......................... 51

    C.    Denver's Failure to Train and Deliberate Indifference
          Caused the Violations of Plaintiffs' Rights and Their
          Injuries ............................................................................. 53

D.      Denver's Official Policies Caused the Violations of Plaintiffs' Rights and Their Injuries ................................... 56

        1.    Unlimited Discretion Policy Included Use of Excessive Force ............................................................ 56

        2.    BWC and Use-of-Force Reporting Policies Caused Use of Excessive Force ................................................ 58

        3.    Mutual-Aid Officers Were Denver's Agents Who Followed Denver Policy ................................................ 58

E.      Denver's Final Policymakers Ratified Officers' Use of Excessive Force ..................................................... 59

F.      Denver's Widespread Practices and Customs Caused Plaintiffs' Injuries ................................................. 61

II.    The Jury Instructions Were Correct, And Any Purported Error Was Harmless Because Plaintiffs Prevailed On Alternate Theories Of Liability Sufficient To Sustain The Verdict ............. 61

   A.      The Failure-to-Train Instruction Was Correct and Proposed by Denver ........................................... 62

   B.      The Ratification Instruction Was Correct and Stipulated to by Denver ...................................................... 64

   C.      The Official Policy Instruction Was Correct and Any Error Was Harmless ............................................. 65

   D.      First Amendment Instruction Was Correct and Any Error Was Harmless ............................................. 70

III.   Admission Of Nicholas Mitchell's Testimony Does Not Warrant A New Trial ................................................... 74

IV.   Denial Of Remittitur Was Not An Abuse Of Discretion ............... 76

CONCLUSION ........................................................................... 80

# TABLE OF AUTHORITIES

## Cases

*Abay v. City and Cnty. of Denver*,
445 F. Supp. 3d 1286 (D. Colo. 2020) ..................................................... 41

*Advanced Recovery Sys. v. Am. Agencies*,
923 F.3d 819 (10th Cir. 2019) ................................................................. 61

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) ................................ 53

*Aref v. Lynch*, 532 F.3d 242 (D.C. Cir. 2016) ......................................... 72

*Arnold v. City of Olathe*, 35 F.4th 778 (10th Cir. 2022) ......................... 67

*Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*,
738 F.2d 1509 (10th Cir. 1984) ............................................................... 62

*Babcock v. White*, 102 F.3d 267 (7th Cir. 1996) ..................................... 72

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1988) ....................... 53, 54

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997) .................................................. 52, 53, 54, 66, 68, 69

*Bell v. Williams*, 108 F.4th 809 (9th Cir. 2024) ...................................... 79

*Blanke v. Alexander*, 152 F.3d 1224 (10th Cir. 1998) ............................ 79

*Bradshaw v. Freightliner Corp.*, 937 F.2d 197 (5th Cir. 1991) .............. 63

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010) ............................................................... 66

*Brothers v. Johnson*, 105 F.4th 1279 (10th Cir. 2024) ........................... 63

*Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000) ................................ 53, 56

*Bryson v. City of Oklahoma City*,
627 F.3d 784 (10th Cir. 2010) .......................................................... 60, 66

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) ........................... 50, 76

*Capp v. Cnty. of San Diego*, 940 F.3d 1046 (9th Cir. 2019) .................. 72

*City of Canton v. Harris*, 489 U.S. 378 (1989) ............................. 54, 65, 66

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ................. 57, 59, 64

*Comcoa, Inc. v. NEC Telephones, Inc.*,
931 F.2d 655 (10th Cir. 1991) .............................................................. 48

*Connick v. Thompson*, 563 U.S. 51 (2011) ........................................... 66

*Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547 (10th Cir. 1989) ...... 71

*Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009) ............................. 60

*Ebron v. CTO Huria*, 205 F.3d 1322,
2000 WL 241576 (2d Cir. 2000) ........................................................... 72

*Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199 (10th Cir. 2013) ..... 48

*Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022) ..................................... 67

*Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*,
606 F.3d 494 (8th Cir. 2010) ............................................................... 63

*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996) ............. 78

*George v. Beaver Cnty.*, 32 F.4th 1246 (10th Cir. 2022) ........................ 67

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014) ........................................ 72

*Hartman v. Moore*, 547 U.S. 250 (2006) ............................................. 72

*Harris v. Terhune*, 45 F. App'x 95 (3d Cir. 2002) .................................. 72

*Hedquist v. Beamer*, 763 F. App'x 705 (10th Cir. 2019)........................ 72

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*,
962 F.3d 1204 (10th Cir. 2020) ............................................. 67

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) ...................... 65

*Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*,
827 F.3d 1256 (10th Cir. 2016) ............................................. 49

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).................................. 11

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) ............................ 52

*Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021)..................................... 53

*Lederman v. Frontier Fire Prot., Inc.*,
685 F.3d 1151 (10th Cir. 2012) ................................... 61, 70, 73

*Lozman v. Riviera Beach*, 585 U.S. 87 (2018) ................................. 71, 72

*Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020)...................................... 72

*Monell v. Dep't of Social Servs. of New York*,
436 U.S. 658 (1978) ..................................................... 3, 56, 69

*Mountain Dudes v. Split Rock Holdings, Inc.*,
946 F.3d 1122 (10th Cir. 2019) ....................................... 48, 49

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ...................................................... 70, 71

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ..................................... 71, 72, 73

*NRA v. Vullo*, 602 U.S. 175 (2024)......................................................... 72

*Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002) ................. 53

*Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty.*,
10 F.4th 978 (10th Cir. 2021) .......................................................... 77, 79

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ............................................51, 52, 56, 57, 68, 69, 70

*Prager v. Campbell Cnty. Mem. Hosp.*,
731 F.3d 1046 (10th Cir. 2013) ........................................ 1, 76, 77, 78, 79

*Richison v. Ernest Grp., Inc.*, 634 F.2d 1123 (10th Cir. 2011) .............. 50

*Schneider v. City of Grand Junction Police Dep't*,
717 F.3d 760 (10th Cir. 2013) ............................................................... 67

*Sheets v. Salt Lake City*, 45 F.3d 1383 (10th Cir. 1995)....................... 76

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008) .................................. 72

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ............................ 72

*United States v. Cornelius*, 696 F.3d 1307 (10th Cir. 2012) ................. 62

*United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992) ................ 71

*United States v. Urbano*, 563 F.3d 1150 (10th Cir. 2009)...................... 76

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
546 U.S. 394 (2006) ....................................................................... 48, 49

*Valdez v. Macdonald*, 66 F.4th 796 (10th Cir. 2023)........................ 53, 55

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ........................ 51

*Waller v. City and Cnty. of Denver*,
932 F.3d 1277 (10th Cir. 2019) ....................................................... 54, 66

*Whitson v. Bd. of Cnty. Comm'rs of Cnty. of Sedgwick*,
106 F.4th 1063 (10th Cir. 2024) ............................................ 52, 66, 67, 70

*Williams v. City and Cnty. of Denver*,
99 F.3d 1009 (10th Cir. 1996) ................................................ 53

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*,
450 F.3d 1132 (10th Cir. 2006) ........................................ 61, 62

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000) ................................. 73

*Zuchel v. City and Cnty. of Denver*,
997 F.2d 730 (10th Cir. 1993) ................................... 48, 53, 56

## Rules

FED. R. CIV. P. 50 ....................................................... 49

FED. R. CIV. P. 51 ....................................................... 62

FED. R. EVID. 602 ....................................................... 74

## Other Authorities

Eleventh Circuit Pattern Civil Jury Instruction No. 5.1 ...................... 71

Ninth Circuit Pattern Civil Jury Instruction No. 9.5 ........................ 68

Ninth Circuit Pattern Civil Jury Instruction No. 9.6 ........................ 68

Ninth Circuit Pattern Civil Jury Instruction No. 9.7 ........................ 65

Ninth Circuit Pattern Civil Jury Instruction No. 9.11 ....................... 71

Third Circuit Pattern Civil Jury Instruction No. 4.6.4 ...................... 68

Third Circuit Pattern Civil Jury Instruction No. 4.6.5 ...................... 68

# STATEMENT REGARDING PRIOR/RELATED APPEALS

*Epps v. Christian*, No.24-1371; *Epps, et al. v. Budaj*, No.22-1365.

# INTRODUCTION

"Trial by jury is the bedrock right of our legal system." *Prager v. Campbell Cnty. Mem. Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013). After a three-week trial, a jury found that Denver used excessive force on Sara Fitouri, Jacquelyn Parkins, Claire Sannier, Joe Deras, and Kelsey Taylor ("Fitouri Plaintiffs") during protests against police violence. The jury found that Denver's policies, practices, and customs caused these violations, and Denver's final policymakers ratified them. The jury heard extensive evidence that Plaintiffs—a lawyer, a social worker, a software engineer, a union organizer, and a small-business owner—demonstrated peacefully for several days but that Denver responded by using violent tactics to control and silence them. Denver officers shot Plaintiffs with projectiles without warning, gassed them, threw explosives at them, and chased them through dark alleys—all without warning or justification. As a result, Plaintiffs suffered physical and lasting psychological injuries.

At trial, Denver made no real effort to contest its liability. Denver never contested that Plaintiffs protested peacefully, never argued the use of force against Plaintiffs was justified, and did not counter Plaintiffs' requested damages award. Plaintiffs presented two credentialed experts;

Denver presented zero experts in response. Instead, Denver's strategy was to suggest that unrelated vandalism committed by other unknown people, at other times and other locations than where Plaintiffs protested, justified the use of force on Plaintiffs. The jury didn't buy it. After weighing the evidence, assessing witness credibility (including demeanor), and applying sound instructions, the jury found in favor of Plaintiffs and assessed damages.

Now, after having made bad strategic decisions, Denver asks this Court to override the considered judgment of the jury and ignore prevailing law and the mountain of evidence supporting the verdict. This Court should affirm the jury's judgment. Denver's litany of challenges on appeal—which notably does not include a challenge to the Fourth Amendment liability finding despite the fact that this was quintessentially an excessive force case—are waived, meritless, or both.

# STATEMENT OF ISSUES

1. Whether this Court may review Denver's waived arguments never raised under Rule 50 to overturn a verdict supported by overwhelming evidence of Denver's liability under *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658 (1978).

2. Whether retrial can be granted where, as here, the jury instructions were correct (and even proposed by Defendants), and any imperfection in the instructions is harmless.

3. Whether the district court abused its discretion in admitting the testimony of the former Independent Monitor, Nicholas Mitchell, when it was based on his personal knowledge, its probative value was not substantially outweighed by any danger of unfair prejudice, it did not concern any subsequent remedial measures, and any error was harmless because other witnesses testified to the same facts.

4. Whether the district court abused its discretion in refusing to second-guess the jury's damages assessment that was amply supported by the evidence.

STATEMENT OF THE CASE

# I. Overwhelming Trial Evidence Supported The Verdict

## A. Constitutional Violations

Beginning on May 28, 2020, Plaintiffs protested in Denver against George Floyd's murder and police violence against Black people. 16-JA-10:22-11:10; 18-JA-153:10-14; 20-JA-6:18-23; 22-JA-143:12-22; 23-JA-14:4-16.[1] Several hundred Denver officers responded to the protest. 18-JA-83:25-84:3. During these protests, police were aggressive and intimidating because the protesters' message criticized the police. 16-JA-9:6-10:17, 42:12-17; 18-JA-225:3-12; 20-JA-13:1-7.

Former Seattle Police Chief Norman Stamper (Plaintiffs' expert), testified that DPD appeared not to have any strategy beyond using violence to move protesters. 18-JA-136:5-11. Professor Edward Maguire, Plaintiffs' other expert, agreed that DPD escalated violence and quashed assembly officers should have known was lawful. 24-JA-173:21-23. DPD failed to address these acts of violence by officers. 24-JA-174:22-175:4.

Each Plaintiff attended several days of protests. 16-JA-11:11-12, 12:7-14; 18-JA-153:15-19; 22-JA-143:12-144:2; 23-JA-14:13-18. Plaintiffs

---

[1] Joint Appendix citations: [Volume]-JA-[Page:Line]. Supplemental Appendix citations: SA-[Page].

4

did not commit violence, throw objects, destroy property, or commit any acts warranting use of force. 16-JA-35:8-17; 18-JA-167:9-14; 20-JA-17:16-24; 22-JA-154:18-20; 23-JA-18:25-19:6. This was uncontested. *See* 17-JA-84:7-85:9; 22-JA-46:3-18; 25-JA-152:13-153:13; 26-JA-190:3-19.

Denver Incident Commander Patrick Phelan admitted that protesters are generally allowed to march spontaneously in the streets and should not be gassed for doing so. He agreed that chanting, kneeling, standing in the street, and yelling expletives is constitutionally protected. 21-JA-10:8-12:9.

Denver presented only generalized evidence of property damage and violence entirely unrelated to Plaintiffs. Denver's effort to implicate Plaintiffs' conduct as disruptive was undercut by the fact that most arrests during the protests were for mere curfew violation. 22-JA-18:14-20:22. Denver's effort was further undermined when it elicited testimony from officers about alleged violence that was provably false. E.g., 20-JA-142:8-143:7, 176:16-182:1; Ex.5, 7:13:00-7:13:35pm.[2]

---

[2] "Ex." refers to exhibits submitted conventionally. CSP videos may be opened through the AvigilonControlCenterPlayer.

### 1. May 28: Highland Bridge

On May 28, Sannier, Fitouri, Parkins, Deras, and Taylor marched to a pedestrian bridge over I-25. 16-JA-13:2-15:15; 18-JA-154:10-155:5; 20-JA-10:15-18; 22-JA-144:3-9; 23-JA-15:22-24; 41-JA-146. While there, some protesters (including Taylor) carefully walked onto the highway in order to call attention to their message. Drivers slowed to a stop. 16-JA-15:25-17:7; 20-JA-11:11-12:1; 22-JA-183:6-20.

When DPD arrived, protesters immediately left the highway but officers gratuitously shot PepperBalls at protesters in the entire area without warning, exposing them to toxic OC powder.[3] 16-JA-19:15-20:9, 21:4-7, 21:18-21, 22:23-25:2, 89:2-5; Ex.530, 7:01:00-7:08:38pm; 18-JA-155:17-156:11, 223:15-21; 20-JA-12:7-16; 22-JA-144:13-22; 23-JA-15:25-16:9; 18-JA-157:3-158:5.

Sannier testified this was "horrible", "shocking," and a "huge betrayal." She could not breathe, coughed, and cried. 16-JA-21:22-22:11. Fitouri, Deras, and Parkins were scared and described their faces burning, blurred vision, disorientation, and trouble breathing. 18-JA-157:20-158:5, 159:5-18; 20-JA-12:17-22; 23-JA-16:10-15. Taylor, an

---

[3] Only DPD officers were present on May 28. 21-JA-12:15-17.

asthmatic, described the experience as "terrible," "painful," "disorienting," and "unbelievable." 22-JA-144:22-145:9.

Sannier ran back towards 16th Street, with the police continuing to shoot as she tried to get to safety. 16-JA-25:3-10. Fitouri, Parkins, and Deras were "overwhelmed" and "unprepared" by the police violence and cut their entire protest short. 18-JA-158:15-159:4; 23-JA-16:16-25.

### 2.    May 28: 16th and Platte

Taylor next protested at 16th and Platte. 22-JA-145:10-17. There, police caused more chaos when, again, they PepperBalled protesters. 22-JA-145:18-146:9, 148:14-150:20; Ex.559, 4:53-5:32min.

DPD had more than 30,000 PepperBall rounds in inventory at the start of the protest; they exhausted their supply in just one day. 26-JA-230:3-20 (Grothe testimony); 23-JA-110:9-112:6 (same testimony from Mitchell)

### 3.    May 28: Colfax and Washington

At 8:30pm, protesters, including Sannier, marched to the DPD station at Colfax and Washington, to communicate their message directly to police. Sannier demonstrated peacefully. 16-JA-25:11-26:24. Officers formed a line across Washington and began committing "completely

random" acts of violence, including by throwing less-lethal grenades and tear gas at those protesting.[4] 16-JA-27:14-28:14.

Sannier was enveloped in a "giant cloud" of gas thrown by DPD without warning in retaliation for protesting the police. 16-JA-28:15-17, 29:4-30:24, 31:9-12, 94:3-11; Ex.532, 8:38:41-8:39:43pm. Though it was hard to breathe or see, people fled; it was "chaotic, scary, and painful." 16-JA-28:17-22, 30:25-31:8.

### 4.    May 28: 14th and Sherman

From 8:30-9:00pm, Taylor protested at 14th and Sherman. There, Taylor and others chanted, some danced, and the atmosphere was calm and jovial. 22-JA-152:13-154:17; Ex.9, 8:37-9:00pm. On Phelan's order, DPD demanded the protestors disperse and began gassing them consistent with DPD policy, simply for allegedly blocking the street. 21-JA-59:1-11, 60:1-19; Ex.562, 10:59-11:22min.;[5] 22-JA-40:15-44:20,

---

[4] So-called "less-lethal" grenades include (1) rubber-ball ("Stinger") grenades that emit a bright flash, 175-decibel noise, and rubber balls in all directions, and (2) noise flash diversionary devices ("NFDDs") or flashbangs, which emit a bright flash, loud noise, and heat, causing disorientation, temporary blindness, and severe burns. CS ("tear") gas causes irritation, burning sensations, blisters, coughing, and shortness of breath. 23-JA-104:22-107:1; 24-JA-158:7-159:13.

[5] Times cited in "min." refer to the runtime. Denver BWC timestamps in the upper-right-hand-corner are in GMT. 41-JA-180.

154:21-156:15, 156:25-157:2; Ex.9, 9:10:05-9:10:40pm; 26-JA-7:24-8:19. Phelan ordered these acts of violence, even though he recognized the protest was peaceful. 21-JA-62:16-63:3.

Taylor did nothing but stand in the street, which DPD admitted is no reason to gas people. 26-JA-26:12-14. Taylor inhaled gas, which felt terrible and caused her to stop protesting and go home. 22-JA-156:20-24.

This was one of the few instances in which DPD gave warnings. Even so, DPD knew the announcements were inaudible and did nothing to ensure they were heard. 17-JA-213:8-215:16; Ex.562, 8:07-10:05min.; 18-JA-139:21-140:5.

As Stamper testified, DPD's use of gas was inconsistent with established policing standards. 17-JA-171:3-6; 18-JA-139:5-20. Gassing innocent protesters during this incident set the tone for police escalation and use of chemical means to disperse lawful protesters on subsequent days. 18-JA-148:21-25.

### 5.   May 29: Capitol

On May 29, Sannier, Fitouri, and Parkins protested at the Capitol when DPD released "massive" amounts of gas without warning. Plaintiffs were gassed repeatedly; they felt betrayed and horrified. Parkins and

Fitouri were pushed into traffic by police munitions. Police also PepperBalled protesters. The protesters had been peaceful. 16-JA-32:16-36:25; 18-JA-160:10-163:25, 166:10-12, 167:4-14; 23-JA-7:10-18:3, 19:10-20:8, 21:3-7; 26-JA-159:23-160:1; 38-JA-2-19; Ex.1011a; Ex.1011c:



Fitouri and Parkins remained at the Capitol; they were in the crowd when untrained DPD officers threw less-lethal grenades at them, consistent with policy. 18-JA-164:1-166:5; Ex.1120, 8:17-8:45, 16:04-16:50min.; 20-JA-84:10-87:2; 26-JA-218:16-20. DPD continued using gas,

PepperBalls, and grenades against Fitouri and Parkins that evening. 18-JA-167:22-168:20; 37-JA-92-96.

### 6. May 29: Shot for Recording

On May 29, Sannier saw a Black man speaking to some Denver officers and began filming them. Though engaged in protected First Amendment activity,[6] police shot Sannier with PepperBalls. 16-JA-37:4-41:4; Ex.947, 1:31-2:42, 3:08-3:53min.

### 7. May 30: 16th and Welton

On May 30, Sannier marched up 16th Street. At 16th and Welton, protesters chanted "Hands up, don't shoot" at officers. Sannier knelt as a sign of peace. Although the crowd was peaceful, when Denver police suddenly arrived, they threw gas and shot PepperBalls at Sannier and other protesters without warning. 16-JA-43:21-49:3, 118:19-22, 139:18-24; 26-JA-176:17-23; Ex.946; Ex.398, 26:37-27:33min., 22-JA-48:2-50:10; Ex.392, 10:00-10:20min.[7] Lieutenant Vincent Porter agreed that his team's actions were consistent with DPD policy, practice, and training.

---

[6] *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).
[7] Aurora BWC timestamps are in MT.

26-JA-197:6-11. Consistent with policy, they were not wearing BWC. 26-JA-198:12-19.

### 8. May 30: Lincoln and Colfax

Between 5:30-8:00pm, Sannier, Fitouri, Parkins, Deras, and Taylor protested at Lincoln and Colfax in front of the Capitol. 41-JA-146, 148; 16-JA-49:17-24; 18-JA-171:10-172:22; 20-JA-13:22-15:10; 22-JA-157:11-16; 23-JA-23:3-9; Ex.1005c. Phelan ordered officers to push protesters south of Colfax and form a line. 21-JA-96:24-97:4. Over 100 DPD gang-unit officers and additional DPD Metro/SWAT officers, all supervised by their lieutenants, formed the line. 25-JA-179:10-183:13; Ex.42, 2:14:29min.; 27-JA-181:25-182:8, 117:7-8. In the face of unarmed protestors, 16-JA-53:2-3, these armed officers wore full riot gear and "looked like an occupying army," 16-JA-52:7-21. Plaintiffs stood with hands up or knelt, held signs, and chanted. 16-JA-51:15-52:6, 55:8-56:11,

57:17-58:23;    22-JA-157:17-159:16;    23-JA-24:4-14;    18-JA-138:16-24;

Ex.27, 7:02:23pm; Ex.879, 00:22min.:



For over two hours, officers repeatedly unleashed gas, PepperBalls, and flashbangs, without warning or justification. 16-JA-53:4-54:8, 58:16-23; 20-JA-14:1-7, 17:13-15; 22-JA-159:6-16; 27-JA-115:19-23. Phelan authorized these acts, which were undisciplined, untrained, and harmful. 21-JA-98:13-25; 18-JA-10:8-31:4; e.g., Ex.638, 13:42-15:10min.; Ex.644, 2:08-4:35min.; Ex.666, 1:00-1:25, 2:37-3:10min.; Ex.662, 13:30-14:27,

16:08-16:35min.; Ex.349, 1:31:36-1:32:23, 1:33:50-1:35:16min.; Ex.669, 1:25-2:06min. Though DPD supervisors witnessed the violence, they took no action to stop it. 18-JA-145:13-146:2; 22-JA-159:17-23.

Sannier was shot in the back with PepperBalls. 16-JA-122:1-14. Sannier came back to the police line after each instance of being gassed or shot because "[e]verything the police did was proving my point." 16-JA-56:12-21. While protesting police violence, she was subjected to police violence.

Occasionally after the police used force against the crowd, someone tossed a water bottle. But DPD never made any attempt to isolate those specific individuals; instead, officers unnecessarily shot at the entire crowd. 16-JA-54:13-24. Furthermore, whenever one officer used their weapon, other officers followed. 16-JA-54:25-55:7. The police never attempted to deescalate; instead, they constantly escalated violence. 16-JA-59:2-11. When protesters attempted to deescalate, police pointed their weapons and pepper-sprayed them, including spraying protesters with signs. 16-JA-59:12-63:12; Ex.638, 28:51-29:52min.; 17-JA-149:16-150:13. At this time, Sannier was kneeling directly in front of the police. 16-JA-60:16-18, 63:21-23.

Sannier could not continue kneeling in protest because an officer lobbed two grenades into the crowd without justification. 16-JA-63:24-65:22, 68:12-69:3; Ex.338, 1:33-2:06min.; Ex.666, 00:19-0:33min.:



A flashbang exploded next to Sannier's foot. 16-JA-65:23-24. The explosion was extremely loud and bright; it stunned and disoriented her; and her ears rang. 16-JA-65:25-66:8, 122:21-123:13.

Fitouri, Parkins, and Deras were also present at this time, just behind the first row of protesters. A grenade exploded on Fitouri's foot. Her foot became numb and there were red marks on her leg that burned. 18-JA-173:6-175:22, 176:10-19; 23-JA-24:4-22.

Deras was shot with PepperBalls and a flashbang exploded near him, causing ringing in his ear and temporary loss of hearing. 20-JA-14:8-13, 32:5-20. Deras was on the grass when police suddenly gassed the crowd. 20-JA-15:25-17:1. He testified, "it felt like I was drowning. My lungs, every time I took a breath, didn't feel like I was getting any air." 20-JA-17:1-3. He would have "passed out next to the capitol steps" if someone had not caught him. 20-JA-17:4-8.

Parkins inhaled a lot of chemicals; her eyes, throat, lungs, nose, mouth and skin were "constantly burning." 23-JA-24:23-25:3.

Taylor was gassed repeatedly and shot with PepperBalls while standing with her hands up and chanting. This caused burning and pain. Ex.27, 7:05:59-7:06:45pm; 22-JA-158:21-162:11, 166:1-12, 210:23-25.

The actions of the officers were consistent with DPD training, policy, and practices. 21-JA-98:17-19; 19-JA-178:25-179:22, 182:5-184:24; 36-JA-2-47.

Denver declared a nighttime curfew starting on May 30, but, because it was a further attempt at speech suppression, Plaintiffs

continued protesting past curfew.[8] 16-JA-66:11-20, 124:2-16; 18-JA-176:23-177:13; 20-JA-17:25-18:5; 22-JA-163:22-164:3; 23-JA-25:4-25; 30-JA-183-184; 11-JA-126-132. At curfew, police attacked Plaintiffs with more gas, flashbangs, and PepperBalls. 18-JA-178:2-10.

### 9.    May 30: Hunted in Alleys

Later in the evening, Sannier, Fitouri, Parkins, and Deras marched through the Capitol Hill neighborhood. Denver police chased them through alleys, shooting them with PepperBalls. 16-JA-66:21-67:15; 18-JA-179:1-180:2; 23-JA-26:1-12; 26-JA-198:23-200:17; 17-JA-9:25-20:15, 22:11-29:3; 39-JA-38-59, 88. Deras described this incident as "very traumatic" because they were trapped and almost trampled. 20-JA-6:24-7:7, 20:19-21. In one alley, police threw large amounts of gas, and as Plaintiffs were trying to leave, another police car blocked the exit and started shooting at them. 20-JA-19:1-19. Sannier and Fitouri were hit repeatedly. 16-JA-67:16-20; 18-JA-179:22-180:18. As Parkins described it, "we were just constantly running for our lives…it was chaotic, and it felt like [the police] were playing a game, while I was thinking…it was

_____

[8] A certified class of curfew arrestees ultimately settled with Denver for $4.72 million. Dkts. 127, 494-1, 502.

only a matter of time before they started using live ammunition." 23-JA-26:16-20.

Porter agreed that his team's actions on this evening were consistent with DPD policy, practice, and training. No officer used their BWC to document this use of force. 26-JA-200:20-24.

### 10. May 31: Colfax and Washington

Sannier, Fitouri, Parkins, and Deras protested again on May 31. When the police stayed away, it was peaceful. 16-JA-71:13-72:1; 18-JA-185:18-186:1, 187:5-18. After experiencing so much police violence on prior days, they decided to wear helmets and bandannas with vinegar to counteract gas. 20-JA-21:21-24.

Fitouri, Parkins, and Deras peacefully marched to the police station at Colfax and Washington. 18-JA-187:19-188:25. Police began using gas, PepperBalls, and flashbangs against the protesters. 18-JA-187:25-190:20; 20-JA-22:24-23:15; 23-JA-32:18-33:15; 27-JA-78:24-79:6; Ex.544, 8:28:00-8:30:38pm:





The protesters included many families in the crowd and young people. 20-JA-22:9-18. Because Deras did not want to see them injured by poison gas, he kicked a canister away from protesters. 20-JA-23:16-19

24:10. Deras was shot three times, in the head, back, and hand, with Kevlar bags containing lead shot from a less-lethal shotgun fired by Jefferson County SWAT. 20-JA-24:24-25:18, 42:22-43:8; 23-JA-109:10-14. The DPD Command Post directed these actions; officers were instructed to "shoot up" the crowd for "traffic control." 27-JA-76:18-77:14; Ex.528 (N720DP-2020-01-01-014117.ts), 44:36-45:05min.

### 11. May 31: Basilica Kettling

At 9:37pm, Sannier, Fitouri, and Parkins marched down Colfax towards the Basilica between Logan and Pennsylvania. They were stopped by a line of Aurora officers at Pennsylvania who had been ordered there by Phelan. Phelan was directing and managing the police via HALO video from the Command Post. Phelan ordered a unit of Denver officers to Logan. The officers surrounding Plaintiffs then released massive amounts of gas. Plaintiffs felt trapped because officers were in front and behind them, a tall metal fence was to the north, and buildings were to the south. 16-JA-72:2-78:9, 128:3-17; 18-JA-191:24-193:2, 194:10-195:11; 21-JA-40:20-41:6, 66:3-75:8, 77:6-82:6, 128:21-129:14, 215:4-221:1; 22-JA-5:13-8:7; 23-JA-34:8-36:19; Ex.723, 9:37-9:41pm; Ex.547, 9:37:32-9:44:25pm; Ex.709, 0:00-2:05min. Phelan

authorized this "tactical plan," which complied with DPD policy and training. 21-JA-75:9-76:8, 79:4-7, 209:5-10; 30-JA-139-147 (encirclement policy).

Plaintiffs described the scene as "completely overwhelming," with people vomiting, coughing, falling over, crying, and needing to be carried away. 16-JA-77:19-78:3. Sannier had to go through gas to escape. 16-JA-128:24-129:7. Fitouri and Parkins were scared and panicked because they were trapped in a small space full of people and gas. They felt paralyzed; their eyes watered, their skin burned, and they had trouble seeing. 18-JA-193:3-12, 195:14-18; 23-JA-34:23-35:7. Fitouri and Parkins squeezed into an alley with hundreds of other panicked, blinded protesters who were falling and screaming. 18-JA-193:13-194:9; 23-JA-35:8-36:12; Ex.546, 9:37:35-9:43:31pm:



After Plaintiffs exited the alley, the police followed, shooting PepperBalls at people's backs. Fitouri and Parkins left the protest because Deras and another friend had been seriously hurt and it felt like they were "just living on borrowed time." 18-JA-195:24-196:3; 23-JA-36:13-19. Every night, Fitouri went home covered in gas, which burned when she showered. 18-JA-169:23-25, 170:3-5.

Denver's kettling and use of force at the Basilica was dangerous, contrary to accepted police practices, and showed officers to be inadequately trained. 17-JA-185:16-201:15.

### 12. June 1: Capitol

Around midnight on June 1, Sannier protested at the Capitol. It was peaceful until hundreds of police attacked protesters with gas, flashbangs, and other chemical weapons. 16-JA-79:10-82:20; Ex.35, 12:03:01-12:05:38am. Police shot Sannier with dozens of PepperBalls and tackled her. 16-JA-82:21-84:10, 130:15-22. Sannier's eyes and body were "burning" and "on fire." 16-JA-84:19-85:2.

### B. Damages

In addition to the injuries described above, Plaintiffs presented additional evidence of serious injuries.

Sannier described "extreme psychological trauma" because her protest was directed at stopping police violence, and yet, "they continued to harm us over and over and over again." 16-JA-85:6-9. She has PTSD and sought professional help, including EMDR therapy. 16-JA-95:21-25, 131:10-12, 132:2-19, 139:4-8. Sannier no longer feels safe in her neighborhood, does not trust the police, has nightmares, feels unsafe in crowds, and she has trouble engaging in protests. 16-JA-85:13-24.

Fitouri and Parkins have nightmares and trouble sleeping; as Fitouri explained, "I would go home late, having spent the night running

from the police on the streets, and then I would spend the night running from the police in my dreams. It was a really haunting scene." 18-JA-170:8-11. Parkins has nightmares where the police are chasing her into dead ends. 23-JA-31:22-32:12.

Deras also has nightmares. He testified that being hunted in an alley where people were almost trampled "left a lasting imprint in my mind….The screams, I can still…hear them sometimes…in my dreams, they have come back up…it's been very traumatic to see those things again." 20-JA-19:20-20:2.

After Deras was shot by a less-lethal shotgun, Deras's friend took him to the emergency room. 20-JA-26:6-12. Deras saw a specialist, but he could not tell if his hand had microfractures. 20-JA-26:20-28:1; 37-JA-73, 77. Deras had to wear a hand brace. 20-JA-27:8-9. He had difficulty typing, could not cook for himself, and needed help with daily tasks. 20-JA-28:2-11. He had trouble sleeping, severe back pain, and had trouble sitting or walking. Deras described it as the most pain he'd ever felt in his life. 20-JA-28:14-29:16; 37-JA-82. Deras testified, "It was very hard to understand that police would just start shooting at us in the middle of alleyways and hunting us down through the city like animals"; realizing

that he could have been seriously injured or killed was difficult. 20-JA-29:23-30:10. Deras started seeing a mental health professional. 20-JA-46:10-47:20.

Taylor's welts from the PepperBalls lasted up to a month and she has permanent scars. 22-JA-162:24-163:21; 37-JA-102-103. Her skin burned for a long time afterwards. Her psychological injuries are pervasive. She has developed a fear of police. 22-JA-166:13-167:6. As a small business owner, Taylor has had to call the police in the past, but since the protests, she no longer calls police and has to handle situations herself. 22-JA-142:1-8, 167:7-169:7.

## C.    Acts of Final Policymaker Phelan

Phelan made final decisions about how the police (including mutual-aid officers) responded to the protests. 21-JA-7:12-25, 8:24-9:4; 11-JA-159. Phelan gave daily orders, including regarding the use of force. 21-JA-21:7-8; 17-JA-9:15-22, 70:23-71:7. Consistent with policy, Phelan authorized the use of gas and less-lethal weapons to disperse entire crowds even if they were mostly peaceful. 21-JA-22:2-16, 23:18-24:23, 25:4-21, 133:25-134:9, 165:19-166:9; 26-JA-29:21-25. Phelan authorized

the use of PepperBalls and less-lethal grenades to move protesters. 21-JA-26:11-23; 27-JA-17:11-18.

As discussed *supra*, I.A.4., I.A.8., I.A.10., I.A.11., Phelan also gave specific orders to use force on protesters on May 28 at 14th and Sherman; on May 30 at Lincoln and Colfax; on May 31 at Colfax and Washington; and on May 31 at the Basilica.

### D. Failure to Train, Supervise, and Prepare

#### 1. Failure to Train

The jury heard extensive evidence—including from Plaintiffs' uncontradicted experts—of Denver's failure to adequately train its officers on the use of less-lethal weapons and crowd-control/crowd-management. *See* 18-JA-114:5-25, 117:3-25.

Maguire testified that for several years before the protest, DPD failed to train officers on how to avoid using excessive force during protests. 24-JA-175:5-8. Denver's repeated failure to train made it likely that its officers would use excessive force and violate protesters' rights. 24-JA-175:9-15; 25-JA-32:13-23. The failure to train manifested in several ways:

First, DPD failed to train entirely on certain munitions. 24-JA-157:6-9. Denver provided no training (or policies) on flashbang or Stinger grenades. 24-JA-157:10-15; 18-JA-141:19-142:24; 23-JA-107:11-14; 26-JA-110:7-9; 27-JA-8:13-15, 9:13-15. Flashbangs are used to stun people, but in crowd-control operations, the objective is the opposite, because police are typically looking to disperse people. There is no legitimate use for flashbangs in protests. 24-JA-157:16-158:3. Ryan Grothe, DPD's less-lethal coordinator, admitted that flashbangs are not meant to be used for crowd-control. 26-JA-206:5-25; 27-JA-8:16-20; *see also* 23-JA-96:2-6, 98:1-9. Nevertheless, DPD allowed these dangerous grenades to be used by untrained officers at the protest. 24-JA-158:4-6, 159:14-160:25; 26-JA-9:3-7.

Second, DPD training gave officers inaccurate and misleading information about protest crowds, fueling "overresponses to protests." 24-JA-145:1-25, 161:11-16; 33-JA-21-22.

Third, DPD's training on crowd-control and crowd-management was deficient. 24-JA-135:19-136:1. The failure to adequately train in crowd-control/crowd-management included the following specific failures:

Denver police routinely resorted to violence without communication, which reflected a lack of training. The preferred strategy is to target individual lawbreakers; when that is not possible, police "really need to use [their] words before [they] use [their] weapons." 24-JA-149:23-150:13, 154:10-18. Denver's use of force against protesters was widespread. 24-JA-150:14-18. Police gave few warnings before using force; instead, it was "communicating nonverbally with its less-lethal munitions." 24-JA-150:19-151:4. Appropriate communication strategies work well to avoid violence, property damage, and injuries. 24-JA-151:5-12. However, "there was no real training provided on communicating with crowds," and "in practice," DPD did not communicate with crowds. 24-JA-153:8-12.

Next, the minimal training that existed on crowd psychology was improper. 24-JA-137:21-141:2; 33-JA-6. Denver trained officers on the "contagion theory," which says that if there is one agitator in a crowd, that person will unduly influence others. This theory is outdated 40-50 years and "has no place in…police training material." 24-JA-140:16-141:2. This problematic training encouraged indiscriminate use of force. 24-JA-138:25-139:3, 141:3-8.

Additionally, DPD's leadership and supervisor training did not include any discussion of crowd psychology. Instead, training materials "focused almost entirely on what officers should wear" at a protest and the use of force. 24-JA-141:9-20; 32-JA-2-151. Denver's one eight-hour session of crowd-management training was insufficient. 24-JA-142:3-143:7.

Stamper testified that training on use of less-lethal weapons and crowd-management was "woefully inadequate," officers were "undisciplined and us[ed] techniques and methods that…no other police department [he knew of] would permit." 17-JA-102:2-11; 18-JA-32:1-9, 41:6-19. The failure to train caused officers to use less-lethal munitions in inappropriate ways. It was "inevitable" that there would be problems with the use of less-lethal grenades in the absence of any training. 18-JA-142:25-143:7.

### 2. Failure to Supervise

Maguire and Stamper testified that DPD failed to appropriately supervise its officers, an extension of failure to train. This led to a lack of accountability. 24-JA-164:2-13; 17-JA-103:25-104:11; 18-JA-33:2-34:7, 35:17-25. Supervisors behaved inappropriately, encouraged officers to

behave inappropriately, and ignored officers they saw behaving inappropriately. 24-JA-164:20-165:1, 167:4-25. Lieutenant John Coppedge told Mitchell, "officers on the ground were reacting to what they saw without any sort of leadership." 37-JA-61; 23-JA-75:1-3, 92:7-10.

Stamper explained that one of the "root causes" of "what went wrong" was the failure of leadership and the failure of supervisors down to rank-and-file officers to understand that their job was "to protect those who assemble and express themselves nonviolently." 18-JA-48:8-49:15.

### 3. Deliberate Indifference

Police leadership knew that their training was deficient and were deliberately indifferent to it. The jury heard the same evidence from both Maguire and Mitchell about the Office of Independent Monitor ("OIM")'s interviews with DPD witnesses such as Coppedge, head of the training academy, and Sergeant Erik Knutson, a Rule 30(b)(6) witness. In an interview with Mitchell after the protest, Coppedge said, "[u]nder the current Chief of Police, the prevailing attitude is that training is not

important" and officers were not receiving organizational support. 37-JA-62; 24-JA-136:11-19; 23-JA-70:23-74:21, 77:7-78:13.

Coppedge "saw what happened at the [protests] as a symptom of what has been happening in the DPD for the last few years." 37-JA-61. Coppedge said that during "prior administrations," there was a greater focus on field-force training, but "in recent years," it was difficult to get officers to "receive equivalent training…." 23-JA-76:5-8. The training academy "no longer train[s] on less lethal crowd management tactics or weapons, such as the PepperBall system." 37-JA-63. Thus, officers "overuse[d]" PepperBalls and improperly used them to shoot people. 37-JA-63. Maguire called Coppedge's statements "stunning," 24-JA-136:5-15, and emphasized that other DPD officers expressed the same sentiments. 24-JA-137:8-12.[9]

One of the other DPD officers who expressed similar sentiments was Captain Sylvia Sich, who was also interviewed by Mitchell. 37-JA-69-72. Sich described a "rudderless," "chaotic environment" in the Command Post with command staff who were "paralyzed" in decision-

---

[9] Coppedge was cross-examined on his statements during his testimony. 27-JA-23:18-33:7.

making. 37-JA-69-70; 23-JA-82:1-17. Sich stated that field-force training is a perishable skill, and it includes "how to move forward in a disciplined line, using batons and command presence to successfully move protesters without using force." 37-JA-69; 23-JA-82:21-22. Sich faulted DPD for not addressing problems "proactively." 37-JA-69; 23-JA-83:1-7. As a result of the failure to supervise, many officers and protesters were injured. 23-JA-83:13-22; 37-JA-70; 18-JA-148:2-15. Sich also said, "criticism of officers on the ground was 'non-stop'" in the Command Post, and "she kept thinking, 'what are they supposed to do without training or supervision?'" 37-JA-70; 23-JA-83:21-84:4. Sich was not the only officer who expressed this sentiment to Mitchell. 23-JA-84:5-9. Sich and other DPD witnesses told Mitchell that "officers did not have a clear sense of their tactical objectives when they were on skirmish lines." 23-JA-84:10-85:3; 37-JA-71.

Mitchell also interviewed Knutson, DPD's primary crowd-control trainer. 37-JA-65-68; 23-JA-86:14-87:9. Knutson developed a three-day field-force operations class in 2015, which DPD scrapped in 2016. 37-JA-65; 23-JA-87:10-88:12. Knutson admitted to Mitchell that there was too much reliance on PepperBalls and an absence of command (i.e.,

supervision). 37-JA-66; 23-JA-88:25-89:4; 24-JA-143:8-11; 26-JA-65:25-68:5, 111:2-116:3, 120:6-121:8.

As Maguire explained, the problem with police leaders not supporting training is that officers must be trained on perishable skills, and those skills need to be refreshed routinely to ensure that they are prepared. 24-JA-136:20-137:2, 137:13-20.

OIM expressly told DPD in 2012, following Occupy Denver protests where officers used less-lethal weapons on protesters, that its methods were deficient. 23-JA-59:18-60:7, 126:1-3, 165:20-166:25, 167:1-168:2. OIM reported that there were significant risks to officer and civilian safety created by the incident. 23-JA-168:3-6. OIM recommended that DPD conduct a comprehensive review of the tactics used to determine whether similar confrontations in the future could be prevented with different tactics, 23-JA-168:7-25, and Mitchell thought this "provided a good opportunity" for DPD to learn, 23-JA-169:18-170:2. However, the DPD declined to conduct any review. 23-JA-169:1-3. Mitchell called this a "missed opportunity." 23-JA-67:6-13.

Evidence of failure to train and deliberate indifference came from many other DPD sources. For example, Lieutenant Matthew Canino

admitted that Metro/SWAT officers were not trained in the use of PepperBalls in crowd-control situations. 27-JA-182:13-17. Canino admitted that he had not attended a crowd-control training course since 2015. 27-JA-183:15-19. Grothe admitted that officers who were not certified to use PepperBalls used those weapons. 26-JA-231:13-16; 23-JA-96:25-97:10 (same testimony from Mitchell). Deputy Chief Barbara Archer admitted to Mitchell that there was a lack of training on PepperBall and gas use. 23-JA-91:19-22. Phelan agreed that field-force training involves perishable skills, and that bad policing can be blamed on failures in supervision, leadership, and training. 21-JA-9:8-10:3.

The jury heard that Denver officers viewed their own training as deficient. Officers told OIM that "they felt a need for greater emphasis on training in crowd management and field force operations." 23-JA-76:22-77:6. Mitchell testified, "a theme that arose in multiple interviews" with DPD officers was that they had not received crowd-control or field-force training for several years before the protest. 23-JA-99:5-10. As Commander Hans Levens (a Rule 30(b)(6) witness), testified, an officer told Internal Affairs that his training was "nowhere near sufficient," did not "prepare" him, and "[m]ost of our training revolved around how to

don our gear and gas masks." 19-JA-206:4-11; 42-JA-134. Lack of training was considered a mitigating factor in that officer's discipline. 19-JA-205:13-16, 206:13-19.

### 4. Failure to Prepare

Stamper and Maguire testified that Denver failed to adequately prepare for the protests. 17-JA-102:25-103:12; 18-JA-41:20-43:11; 24-JA-131:22-132:23, 133:7-135:18. Denver police supervisors admitted as much. 23-JA-89:19-90:15 (Lieutenant Kim Lovato said DPD was "caught with their pants down," and as a result, "chaos ensued."); 24-JA-133:2-6. Phelan had been involved in hundreds of prior protests, 21-JA-110:13-17, an obviously recurring event in Denver.

Even after Floyd's murder and before protests began in Denver three days later, Denver could have taken simple steps to train and prepare its officers, but it did not. 18-JA-45:11-46:11. Before Floyd's death, there were many other similar events of police violence that would have put DPD on notice of the likelihood of "civil unrest" due to "catalytic events" and the need to be prepared with adequate policies, procedures, and training. Denver should not have been surprised by the scale of protests. 18-JA-43:12-45:10. Nor did Denver make any effort to reflect on

the events of each day's protest to implement lessons for the next day. The operations planning was "boilerplate"; DPD leadership "doubled down" on mistakes from the one night to the next. 18-JA-46:12-48:7.

### E. Official Policies

#### 1. Unlimited Discretion Policy

Policies guide officer behavior and help them understand what is permissible. 24-JA-130:24-131:8. Official DPD policy (and practice and custom) gave officers unlimited discretion in what less-lethal weapons to use and when to use them. 17-JA-101:17-102:1; 18-JA-4:6-15, 35:14-16; 20-JA-192:1-15; 24-JA-131:9-16. This was problematic. *See* 18-JA-4:16-9:24, 32:10-15; Ex.658, 4:00-4:20min.[10]

Denver's two relevant written policies are the Crowd Management Manual and the use-of-force policy in the Operations Manual. 20-JA-194:4-195:6; 43-JA-13; 30-JA-139-182; 33-JA-129-143.

Although the Crowd Management Manual lists specific instances when officers may use PepperBalls, as Commander Michael O'Donnell (a

---

[10] Denver did not object to this or any of the other videos it now calls "inflammatory." D.Br.9; 17-JA-141:20-142:6, 152:12-16, 176:13-18. The *only* video Denver objected to at trial was Ex.42, but merely on foundation grounds. 17-JA-135:9-137:6.

Rule 30(b)(6) witness) testified, the policy allowed officers to use PepperBalls as they deemed fit. 43-JA-16-18, 22. For example, policy allowed officers to PepperBall a person standing still with their hands up, 43-JA-23-24, and to use PepperBalls on mostly peaceful crowds, 43-JA-20.

Likewise, the Crowd Management Manual lists instances when officers may use chemical munitions, but it allows officers unlimited discretion in their use. 30-JA-160-161; 43-JA-28-29. In 2017, OIM expressed concerns about this vague and ambiguous policy and recommended that DPD revise it to provide more specific guidance. 23-JA-173:1-25. Denver ignored this recommendation.

Denver's official policy giving officers unchecked discretion to use their less-lethal weapons as they saw fit during protests had dire consequences. Contrary to accepted police practices, officers improperly used weapons against peaceful protesters without dispersal orders or separating individuals who were engaged in violence. 17-JA-100:11-101:13, 108:24-116:6, 128:4-18, 130:12-131:19, 153:22-156:11, 212:11-15; 18-JA-71:9-16, 108:6-15, 148:16-20; Ex.644, 00:56:00-34min.; Ex.656, 9:14-10:54min.; 24-JA-166:7-13.

In executing DPD's policy, officers used PepperBalls inappropriately, including on retreating protesters. 17-JA-132:17-24, 140:2-6, 144:6-146:10, 158:12-21; Ex.656, 12:28-13:35min.; 18-JA-112:24-113:23.

Denver used less-lethal explosives during the protest. 21-JA-18:6-19. Predictably, untrained and unconstrained officers improperly used less-lethal explosives, including throwing grenades at retreating protesters. 20-JA-115:9-124:18; 17-JA-160:2-166:16; Ex.710, 11:12-11:26min.; Ex.1190, 5:57-6:10min.; Ex.626, 20:11-20:31min.; Ex.687, 5:00-5:28min.; Ex.542, 5:57:48-5:58:00pm.

Denver also inappropriately and excessively gassed peaceful protesters, which was contrary to accepted police practices. 17-JA-166:19-169:24; 18-JA-110:17-112:13. O'Donnell admitted that CS gas is a "riot control agent"; yet, DPD consistently used it even when there was no "riot." 25-JA-81:3-11. Officer Joseph Stadler told Mitchell that there was a lack of communication and strategy regarding less-lethal deployment; teams were pushing people out of public spaces and throwing gas just to deploy gas instead of making tactical decisions; and DPD used too many munitions on the first night. 23-JA-94:12-95:9.

Officers and supervisors repeatedly affirmed that their own uses of force and other officers' uses of force were consistent with DPD policies, practices, and training. 20-JA-53:2-54:16; 43-JA-21; 22-JA-131:4-10; 25-JA-194:9-198:8, 201:6-18; 26-JA-28:23-29:6, 202:7-19; 27-JA-112:22-113:3, 180:20-25.

### 2. BWC Policy

Denver adopted BWC in 2015. 18-JA-120:1-5. Policy required officers to activate BWC for arrests but not protests. 19-JA-164:21-165:8; 24-JA-172:11-14. Policy did not require Metro/SWAT officers or lieutenants to wear BWC during protests at all. 26-JA-27:6-12; *see* 23-JA-115:23-25, 170:17-24; 26-JA-28:7-11, 154:15-22.

Denver police witnesses agreed that activating BWC is beneficial because it provides objective evidence. 19-JA-166:3-10; 26-JA-26:19-27:5, 192:3-17. Denver's BWC policy meant officers could not be held accountable for their misconduct. 18-JA-35:9-13, 38:18-39:22, 121:11-19; 19-JA-232:19-24, 166:11-167:15; *see* 19-JA-169:21-170:22; 25-JA-23:7-21.

Police leaders had notice of concerns with BWC activation. 18-JA-121:25-122:7, 123:4-13. When DPD first adopted BWCs, the OIM reviewed DPD's policy and informed DPD that it was important for both

Metro/SWAT and patrol officers to have BWC. 23-JA-115:14-22, 144:13-145:2, 145:15-24, 146:5-7. Denver rejected OIM's recommendation.

Because of the BWC policy, officers knew that they would not be held accountable for their uses of force. 18-JA-124:21-25; 23-JA-175:17-20. BWC has a deescalating effect on officer behavior, reducing incidents of excessive force. 23-JA-114:23-115:13, 148:5-8.

Mitchell reported that there was a footage gap, meaning that there was less BWC footage than expected based on the number of officers who policed the protest. 23-JA-112:10-114:14. Officers also admitted BWC was missing. 20-JA-68:13-69:18, 27-JA-118:1-25.

### 3. Use-of-Force Reporting Policy

As Denver admits, its policy did not require officers to fill out use-of-force reports for protests. 25-JA-145:9-146:3; 33-JA-145 (§105.03(2).a.9); 23-JA-85:16-22; 26-JA-28:12-22. At the time of the protest, officers knew they were not required to complete reports. 26-JA-28:16-18. Denver knew that reporting was important for accountability; its policy led to a lack of accountability. 18-JA-37:24-38:17, 123:20-22; 26-JA-194:14-18. As Stamper testified, "knowledge of a use-of-force reporting requirement affects behavior." 18-JA-126:8-12; *see also* 23-JA-

142:21-143:23 (the reporting requirement has a de-escalation effect on use of force), 174:18-175:16. Timely and accurate use-of-force reporting was important "if you want to be an accountable public agency." 18-JA-129:11-13.

In 2014, OIM expressed concerns over the inadequacies in DPD's use-of-force reporting and made recommendations for improvement. 23-JA-172:3-21. Denver did nothing.

Instead, DPD leadership required use-of-force reports for the protest only after DPD was enjoined for excessive use of force against protesters.[11] After the injunction, DPD leadership requested that officers retroactively complete reports. 35-JA-2-11; 17-JA-36:5-43:20; 20-JA-70:24-71:3; 26-JA-194:1-13, 195:20-196:5. Officers were instructed to "review our Use of Force policy and training materials….to ensure that the officers are using correct terms to avoid inconsistency and problematic language," 35-JA-5, which meant language that could be used against the department in a lawsuit, 17-JA-39:25-40:2; *see also* 17-JA-50:5-7; 35-JA-2.

---

[11] In *Abay v. City and Cnty. of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020), plaintiffs sought and received an injunction against DPD.

Denver closed many citizen complaints, including the one Parkins submitted, because they could not identify officers due to lack of BWC and reports. 19-JA-128:24-129:11, 130:2-12, 138:23-139:25; 141:16-146:15, 153:5-12, 154:15-22, 160:6-14, 162:5-163:3; 41-JA-150; 23-JA-37:8-38:5; 25-JA-23:7-21.

### 4. Mutual-Aid Officers

Denver established the "rules of engagement" for mutual-aid officers, who deployed under Phelan's direction. 17-JA-108:7-23; 21-JA-13:1-3, 13:23-14:5, 57:19-25, 58:4-16; 27-JA-186:13-20. In prior sworn testimony (which was read at trial), Phelan admitted that Denver takes responsibility for the actions of other jurisdictions because they were working as DPD's "agents." 21-JA-14:6-18. At closing, the jury was reminded they could consider Phelan's prior inconsistent statement under oath as substantive evidence. 29-JA-40:7-41:15; 11-JA-148.

Each mutual-aid unit was also assigned a DPD sergeant, who communicated directions from the Command Post. 21-JA-12:21-25; 22-JA-30:11-32:6; 43-JA-2; 27-JA-74:9-12. Denver's policy was that mutual-aid officers would follow their own policies and use their own weapons. 21-JA-14:25-15:22. DPD policy allowed the use of less-lethal shotguns

only with the approval of the Incident Commander. 43-JA-24-26, 30; 21-JA-16:13-16. Phelan approved the use of less-lethal shotguns and verified that Jefferson County's use-of-force guidelines were in line with DPD's policy, 21-JA-26:4-28:13, although Jefferson County SWAT had little training on using those weapons during protests, 27-JA-67:1-13.

## F. Ratification

Phelan, who watched and managed the entire police response to the protest via HALO, testified that DPD officers acted within policy and training. 21-JA-45:15-46:9.

Moreover, on May 29, Chief Pazen and Mayor Hancock gave a press conference. They were asked questions about the propriety of officers' response to the protest on May 28. Hancock responded:

> I watched just about every minute of the protest yesterday from video feed and I watched as the officers responded; they showed tremendous restraint, they showed tremendous discipline and that's greatly, greatly appreciated.

Ex.39, 37:29-37:50min. Hancock also said that officers acted "according to the policies" and "at the direction of their leadership." Ex.39, 23:30-23:47min.; 21-JA-51:10-17. Similarly, Pazen commended officers for demonstrating "extreme restraint" and acting in an "exemplary manner."

Ex.39, 12:17-12:44min. Phelan agreed that the Chief and Mayor set examples for officers. 21-JA-47:21-48:3.

Denver did not discipline officers for acts of misconduct against protesters, showing that its officers' actions were consistent with policy and training. 17-JA-102:12-24, 159:2-160:1, 177:14-181:2; 18-JA-9:25-10:2, 34:8-15, 39:23-41:5, 144:23-145:12; 43-JA-12, 23.

### G. Verdict

After careful deliberation, the jury found that Denver violated Fitouri Plaintiffs' First and Fourth Amendment rights, and that Denver was liable for violating those rights due to its official policies, practices, and customs, failure to train, and final policymaker's ratification. The jury also found that a mutual-aid officer violated Deras's constitutional rights while acting pursuant to an official policy, practice or custom of Denver. 11-JA-163, 173. The jury awarded the Fitouri Plaintiffs compensatory damages of $1,000,000 each. 11-JA-169, 171, 173-175.

## II.     Post-Trial Motions

Denver filed a Rule 50(b)/Rule 59(a) motion. 11-JA-182-197. Except for remitting a punitive damages award, the district court denied the motion. A32-55.

## SUMMARY OF ARGUMENT

This Court should affirm in all respects.

At its core, this case is about Denver's use of excessive force on peaceful protesters and Denver's responsibility for those injuries due to its official policies, practices and customs, and failure to train. The jury found for Plaintiffs on their Fourth Amendment claim, which Denver does not contest on appeal.

The jury also heard voluminous evidence of Denver's flawed policies, customs, and failure to train. They heard this evidence from multiple witnesses, including Plaintiffs' two experts, a parade of DPD witnesses (including those designated to give testimony on Denver's behalf), and DPD supervisors and officers. The evidence was beyond sufficient to support the verdict on each *Monell* theory. Jury findings on conflicting evidence are conclusively binding on appeal—a principle that Denver ignores. Not only did Denver waive many of its arguments for judgment as a matter of law, but its request is premised on construing evidence in its favor and against the verdict, and violating the operative legal standards.

Because the failure-to-train, ratification, and Fourth Amendment findings are sufficient to sustain the entire verdict, the Court need not reach Denver's arguments on the official policy and First Amendment instructions. Regardless, Denver's challenges fail on the merits. Not only did Denver waive certain arguments, but the instructions were proper. Any imperfection was harmless because the instructions correctly stated the law and Plaintiffs won on multiple alternate theories of liability that require affirmance.

Moreover, the district court did not abuse its discretion in admitting clearly admissible, fact-based testimony from Nicholas Mitchell. Mitchell testified to facts within his personal knowledge concerning his investigation, none of it concerned subsequent remedial measures, it did not violate Rule 403, and any purported error was harmless because Mitchell's testimony merely echoed that of many other witnesses.

Finally, the district court did not abuse its discretion in refusing to second guess the jury's damages assessment. This Court must defer to the jury, and then to the district court's front-row view of the trial. The verdict must stand.

ARGUMENT

## I. The Verdict Was Amply Supported By The Evidence

"When a jury verdict is challenged on appeal," this Court's "review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Comcoa, Inc. v. NEC Telephones, Inc.*, 931 F.2d 655, 663 (10th Cir. 1991). "Jury findings on sharply conflicting evidence are conclusively binding on appeal inasmuch as jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given to their testimony." *Zuchel v. City and Cnty. of Denver*, 997 F.2d 730, 737 (10th Cir. 1993) (cleaned up). Judgment as a matter of law may be entered "only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in [the moving party]'s favor." *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) (cleaned up). Denver's arguments contradict these standards.

### A. Denver Waived Many of Its Arguments

A party who fails to raise an argument in a Rule 50(a) motion and then in a Rule 50(b) motion waives it on appeal. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006); *Mountain Dudes v.*

*Split Rock Holdings, Inc.*, 946 F.3d 1122, 1131 (10th Cir. 2019) ("Compliance with Rule 50 is 'mandatory.'…Otherwise, an appellate court is 'without power' to grant relief under Rule 50."). Whether judgment should be entered under Rule 50(b) "calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Unitherm*, 546 U.S. at 401 (cleaned up). Denver cannot pursue on appeal "a particular avenue of relief available under Rule 50(b)" unless it has "request[ed] that particular relief below." *Id.* at 402; *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1269 (10th Cir. 2016); Fed. R. Civ. P. 50.

Denver has waived its arguments regarding the policy of unlimited discretion, BWC and use-of-force reporting policies, and Phelan's unconstitutional acts. D.Br.36-38,41-44. Denver did not raise *any* of these arguments in its Rule 50(a) motion. 25-JA-39:15-49:18. The only official policy Denver mentioned was its policy allowing encirclement, which resulted in the violations of Plaintiffs' rights during the Basilica kettling. 25-JA-39:15-40:12. Denver did not even acknowledge, much less raise, any other argument about official policies. With respect to Phelan's acts,

Denver admitted that there was evidence Phelan directly ordered officers' actions at the Basilica kettling and the gassing at 14th and Sherman, but it argued only that there was insufficient evidence of causation linking Phelan's actions with other injuries alleged by Plaintiffs, without discussing specifics. 25-JA-42:23-43:12. Denver did not argue that "evidence of a discretionary policy" "cannot itself give rise to *Monell* liability," D.Br.36, or that it was not Phelan's acts that caused injury but the acts of officers, D.Br.42-43.

Nor did Denver raise these arguments in its Rule 50(b) motion. 11-JA-183-87. Instead, Denver chose to pretend that Plaintiffs had not presented any evidence of formal policies. 11-JA-184. Because Denver failed to raise these arguments under Rule 50, this Court is unable to grant relief. Even if, contrary to the law, the Court were to consider these arguments forfeited rather than waived, the party who urges reversal on a forfeited issue must argue plain error on appeal. *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019). Denver has not done so. This "surely marks the end of the road for an argument for reversal not first presented to the district court." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

## B. Phelan Directly Violated Plaintiffs' Rights

Even if the Court were to consider Denver's waived argument about Phelan's actions, it lacks merit. First, Denver ignores the evidence that Phelan expressly authorized the use of gas and less-lethal weapons to disperse crowds every day during the protest, even if the crowds were mostly peaceful. Plaintiffs were in these crowds. Because the officers were merely carrying out orders of the undisputed final policymaker, Denver is directly responsible. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 485 (1986) ("[i]n ordering the deputy sheriffs to enter petitioner's clinic the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under §1983."); *see Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) ("Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations. He was in his headquarters throughout the...demonstration, not only monitoring it but also approving the decisions of his subordinates...The superintendent *was* the City, so far as the demonstration and arrests were concerned.").

Phelan also gave specific orders to gas protesters on May 28 at 14th and Sherman; to use force on protesters on May 30 at Lincoln and Colfax;

to "shoot up" the crowd on May 31 on Colfax and Washington; and to kettle and gas protesters on May 31. *Supra*, Statement of the Case ("SC")_I.A.4., I.A.8., I.A.10., I.A.11. Denver ignores this evidence. Phelan was "responsible for an unconstitutional act." *Whitson v. Bd. of Cnty. Commr's of Cnty. of Sedgwick*, 106 F.4th 1063, 1067 (10th Cir. 2024); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997) ("[P]roof that a municipality's…authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.").

Phelan's acts directly ordering the use of force on Plaintiffs violated their rights and caused their injuries. *Pembaur*, 475 U.S. at 483. Causation is a fact question for the jury. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue…."). There is more than sufficient evidence supporting the verdict.

**C.  Denver's Failure to Train and Deliberate Indifference Caused the Violations of Plaintiffs' Rights and Their Injuries**

Municipal liability for a failure to train may be proven "'[where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023) (quoting *Brown*, 520 U.S. at 409). This Court has repeatedly affirmed jury verdicts and reversed summary judgment in analogous failure-to-train cases, including several involving Denver. *Id.* at 818-23; *Brown v. Gray*, 227 F.3d 1278, 1286-91 (10th Cir. 2000); *Zuchel*, 997 F.2d at 738-41; *Williams v. City and Cnty. of Denver*, 99 F.3d 1009, 1017-18 (10th Cir. 1996); *Lance v. Morris*, 985 F.3d 787, 801-03 (10th Cir. 2021); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1320 (10th Cir. 2002); *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997).

Here, the evidence of failure to train in relevant respects—crowd-control/crowd-management and use of less-lethal weapons, especially at protests—was overwhelming. Denver does not argue otherwise.

Instead, Denver argues only that there was insufficient evidence of deliberate indifference. D.Br.46-49. Deliberate indifference requires proving that "the municipality has actual or constructive notice that its

action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1988), or "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction," *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "The high degree of predictability may also support an inference of causation—that the municipality's indifference led to the very consequence that was so predictable." *Brown*, 520 U.S. at 409-10.

Here, Plaintiffs' extensive evidence of deliberate indifference—which the jury credited—included, among other things, DPD refusing to review its tactics for using less-lethal weapons at protests despite being given notice in 2012 that its tactics were causing unnecessary injuries; declining to give organizational support to training and reducing the amount of training officers received in field-force tactics (*literally*, deliberate indifference to training); allowing uncertified officers to use PepperBalls; allowing officers to throw grenades despite lack of training and knowledge that they were not supposed to be used for crowd control.

*Supra*, SC_I.D.1-3. There was also plenty of evidence that large protests were recurring events for which Denver should have been prepared. *Supra*, SC_I.D.4.

Viewing the evidence most favorably to the verdict, Plaintiffs proved deliberate indifference: Denver knew "to a moral certainty" that their officers would confront protests or crowd-management situations; these situations presented officers "with a difficult choice of the sort that training or supervision will make less difficult"; and the "wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Valdez*, 66 F.4th at 817 (internal quotation marks omitted). Employees "still need training in circumstances where, 'although the proper course is clear, the employee has powerful incentives to make the wrong choice.'" *Id.* at 820. Here, there were powerful incentives for officers to make the wrong choice when protesters' message was directed at police. Denver failed to train in areas which would have been made less difficult with training or supervision. *Id.* at 817.

Despite all of that, Denver cites to a single sentence of Maguire's testimony, recounts a few contested bits of testimony, and otherwise ignores all contrary evidence. D.Br.48-49. Denver urges this Court to

"credit other evidence more favorable to" it, as it improperly did in *Zuchel*, 997 F.2d at 737 & n.2; *see also Brown*, 227 F.3d at 1286, 1287 n.2. As before, these efforts fail.

### D. Denver's Official Policies Caused the Violations of Plaintiffs' Rights and Their Injuries

Again, Denver's arguments about official policies are waived. Assuming *arguendo* they are considered, the arguments fail.

#### 1. Unlimited Discretion Policy Included Use of Excessive Force

Municipal liability attaches when "execution of [the] policy or custom inflicts the injury." *Monell*, 436 U.S. at 694; *Pembaur*, 475 U.S. at 480 n.8; *see also id.* at 483 (official policy means "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

Here, official DPD policy gave officers a free pass to use less-lethal weapons when, where, and how they saw fit, which caused the excessive use of force. Officers were both unconstrained and inadequately trained. And, they knew they would not be held accountable for their actions because, under DPD policy, they did not have to account for their acts

through either BWC or reports. This resulted in a predictable free-for-all with respect to the use of less-lethal weapons on protesters. *Supra*, SC_I.E.1. If Denver had such a policy with respect to firearms, no one could reasonably argue that such a policy would not be the direct responsibility of Denver and the moving force behind citizen deaths. Execution of Denver's policy inflicted the injuries on Plaintiffs. *Id.*

Denver's contrary argument rests on a misreading of *Pembaur* and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). D.Br.36-37. *Pembaur* stated:

> The fact that a particular official—even a policymaking official— has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

475 U.S. at 481-82 (internal citation omitted). *Praprotnik* reiterated the same point. 485 U.S. at 126. These discussions merely explained when municipal liability can attach to the acts of a decisionmaker or final policymaker (the type of liability about Phelan's decisions, discussed above). *Id.* It has nothing to do with officers carrying out or executing municipal *policy*.

### 2. BWC and Use-of-Force Reporting Policies Caused Use of Excessive Force

Because DPD policies did not require BWC activation or use-of-force reporting for protests, officers knew they would not be held accountable for excessive uses of force. These policies caused officers to use unreasonable force. *Supra*, SC_I.E.2-3. This was sufficient evidence for the jury to find a causal link between the execution of Denver's policies and Plaintiffs' injuries. Denver's argument otherwise ignores the evidence.

### 3. Mutual-Aid Officers Were Denver's Agents Who Followed Denver Policy

During the charging conference, Denver agreed that Plaintiffs could prevail if the jury found that mutual-aid officers acted pursuant to a policy, practice, or custom of Denver. 27-JA-224:4-22. Denver submitted a jury instruction, which the Court gave. 27-JA-231:6-236:14. The verdict form contained a corresponding question asking whether Deras had proven that a mutual-aid officer violated his rights while acting pursuant

to an official policy, practice or custom of Denver. 11-JA-173. The jury answered yes. *Id.*

There was ample evidence supporting this factual finding. Mutual-aid officers acted as Denver's agents and merely carried out orders given by Denver (through Phelan). Allowing mutual-aid officers to follow their own policies and use their own weapons *was* Denver policy. Denver specifically approved the less-lethal shotguns used on Deras by Jefferson County officers and ordered the officers to "shoot up" the crowd at the time and location that Deras was shot. *Supra*, SC_I.A.10, I.E.4. But for Denver policy, Deras would not have suffered the injuries that he did. Denver's arguments otherwise ignore the evidence.

### E. Denver's Final Policymakers Ratified Officers' Use of Excessive Force

Denver attacks the evidence of ratification. But, yet again, it misconstrues the evidence.

"If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127. Here, Denver's final policymakers knew of officers' acts during the protest and approved them.

First, Phelan watched and managed the entire protest using live video from the Command Post and testified that officers acted within policy and training. Phelan's ratification was corroborated by the fact that DPD did not discipline officers for using excessive force during the protest. The DPD also specifically reviewed officers' actions at Lincoln and Colfax on May 30 and deemed them to be within policy. *Supra*, p.16.

Second, as the Mayor stated during the May 29 press conference, he (and the Chief) watched "every minute" of the protests on May 28 and the officers' actions in response. *Supra*, pp. 43-44. They knew of the unconstitutional acts and the bases for them. Viewing the evidence in Plaintiffs' favor, the record contained substantial evidence supporting the verdict.

The cases Denver cites are inapposite. In *Bryson v. City of Oklahoma City*, 627 F.3d 784 (10th Cir. 2010), policymakers did not know of the specific alleged misconduct, unlike here. *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), did not concern ratification; ratification occurs *after* the conduct at issue. Moreover, the Mayor and Chief's comments on May 29 sent a message to officers that their behavior would

be tolerated—causing officers to continue using excessive force on subsequent days of the protest and violating Plaintiffs' rights.

### F. Denver's Widespread Practices and Customs Caused Plaintiffs' Injuries

Whether Denver had a custom or widespread practice of using excessive force on protesters is a question of fact that the jury decided in Plaintiffs' favor. Denver's arguments lack merit. Plaintiffs incorporate by reference the arguments in the Epps Plaintiffs' brief. E.Br._Argument I.B.1.b.

### II. The Jury Instructions Were Correct, And Any Purported Error Was Harmless Because Plaintiffs Prevailed On Alternate Theories Of Liability Sufficient To Sustain The Verdict

This Court evaluates "jury instructions in light of the entire record to determine if they 'fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them.'" *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154-55 (10th Cir. 2012). Denver must show prejudice for reversal. *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 827 (10th Cir. 2019). Error is harmless "when the erroneous instruction could not have changed the result of the case."

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006). Denver's attacks on the instructions fail.

## A.   The Failure-to-Train Instruction Was Correct and Proposed by Denver

Denver argues the failure-to-train instruction was defective because it supposedly did not reference "deliberate indifference" with respect to deficient supervision. D.Br.14,17. This is incorrect, but Denver also waived this argument and invited error because it proposed the allegedly defective instruction, 14-JA-212:12-215:24; SA-31; FED. R. CIV. P. 51; *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 (10th Cir. 1984) (objections to jury instructions waived if not timely made). "Under the invited-error doctrine, this Court will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial." *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012). So, any challenge to this instruction fails.

Regardless, the instruction clearly required deliberate indifference with respect to both deficient training and supervision. The last paragraph states that deliberate indifference:

> requires a showing that Denver's policymakers had actual or constructive notice that the *specific deficiency in training or supervision* identified was substantially certain to result in a constitutional violation, and consciously or deliberately chose to disregard the risk of harm.

11-JA-161 (emphasis added). There can be no "substantial doubt that the jury was fairly guided." *Brothers v. Johnson*, 105 F.4th 1279, 1284 (10th Cir. 2024) (cleaned up).

Finally, the jury found in Plaintiffs' favor on failure to train and ratification (in addition to official policy) under both the First and Fourth Amendments. 11-JA-169, 171, 173-175. This is fatal to Denver's appeal because "a losing party cannot show prejudice due to instructional error on one of two alternate theories of recovery if it also loses on the correctly-instructed claim." *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 503 (8th Cir. 2010); *Bradshaw v. Freightliner Corp.*, 937 F.2d 197, 203 (5th Cir. 1991).

As discussed *supra*, SC_I.D., I.F., evidence of Denver's failure to train and ratification was extensive and largely uncontested. It provides an independent basis for affirming the verdict regardless of whether there was any error in the official policy instruction (which there was not). And, the verdict in the Fitouri Plaintiffs' favor on their Fourth

Amendment claim—which Denver does not challenge—is an independent basis for affirming the verdict regardless of whether there was any error in the First Amendment instruction (which there was not). Thus, Denver cannot show that the jury "might have based its verdict" on an erroneously given instruction when the verdict against Denver can be affirmed on alternate theories of liability, any *one* of which is sufficient to sustain the verdict.

### B. The Ratification Instruction Was Correct and Stipulated to by Denver

Denver argues that the district court should have included a deliberate indifference element in the ratification instruction. D.Br.14. But appellate review of this argument is barred because Denver stipulated to the ratification instruction. SA-35; 27-JA-219:17-223:2. The district court gave the stipulated instruction. 11-JA-16. Any error was invited by Denver.

In any event, the instruction was correct because ratification does not require deliberate indifference. The acts of the final policymaker are directly attributable to the municipality itself. *Praprotnik*, 485 U.S. at 127. The jury was correctly instructed that Plaintiffs had to prove that the policymaker made a deliberate choice: "[a]n individual with final

policymaking authority from Denver ratified the officer's action that deprived the plaintiff of their rights—that is, the final policymaker knew of and specifically made a deliberate choice to approve of the officer's act and the basis for it." 11-JA-162. *See* Ninth Circuit Pattern Civil Jury Instruction No. 9.7.

### C. The Official Policy Instruction Was Correct and Any Error Was Harmless

To establish Denver's liability, Plaintiffs proved: "1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Canton*, 489 U.S. at 385). Only "[w]hen the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of "'deliberate indifference' to the rights of its inhabitants.'" *Id.* (quoting *Canton*, 489 U.S. at 389).

Denver argues that deliberate indifference is a required element of an official policy theory. D.Br.16. This is incorrect. The Supreme Court has never required deliberate indifference as an element of any *Monell* theory besides failure to train. *See Canton*, 489 U.S. at 388-89 (imposing deliberate indifference requirement in failure-to-train cases because

"[t]his rule is most consistent with our admonition in *Monell*…that a municipality can be liable under §1983 only where its policies are the 'moving force [behind] the constitutional violation.'") (citations omitted); *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Accordingly, in *Bryson*, this Court listed the different ways of showing a policy or custom, requiring "deliberate indifference" only for failure to train: "failure to adequately train or supervise employees, *so long as that failure results from deliberate indifference to the injuries that may be caused*." 627 F.3d at 788 (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010); emphasis added). In *Waller*, this Court repeated this passage from *Bryson* and reiterated that deliberate indifference is applicable only to failure to train/supervise: "at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" 932 F.3d at 1284 (quoting *Brown*, 520 U.S. at 407).

This Court's own recent cases reaffirm this point. In *Whitson*, the Court found that a county could be held liable for its sheriff's rape of an

inmate during transport, where the sheriff was the final policymaker for the county with respect to the care of county prisoners, including transportation. 106 F.4th at 1068. No showing of deliberate indifference was required because the act of the sheriff was the act of the county. As the Court explained:

> a municipality is responsible only for (1) actions taken by subordinate employees in conformity with preexisting official policies or customs and (2) actions taken by final policymakers, whose conduct "can be no less described as the official policy of a municipality."

*Id.* at 1066-67.

To the extent a few decisions of this Court,[12] contain language suggesting that deliberate indifference is required for every theory of *Monell* liability, that is inconsistent with this Court's binding prior

---

[12] *Arnold v. City of Olathe*, 35 F.4th 778 (10th Cir. 2022), *Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022), and *George v. Beaver Cnty.*, 32 F.4th 1246 (10th Cir. 2022), post-date the trial. They are also distinguishable because *Finch* and *George* concerned failure to train, and the policy in *Arnold* did not authorize the deprivation of rights. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020), found a strip-search policy facially unconstitutional and its subsequent discussion was dicta. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013), does not hold that an unconstitutional action by a final policymaker requires deliberate indifference. *Schneider* involved failure to discipline/supervise. And, it reiterated that deliberate indifference applies to failure to train. *Id.* at 770.

precedents (e.g., *Bryson* and *Waller*), its more recent precedents (e.g., *Whitson*), and Supreme Court precedent.[13]

Revisiting *Monell* shows why deliberate indifference is only required for failure to train/supervise. *Monell* was "a case about responsibility." *Pembaur*, 475 U.S. at 478-79. *Monell* determined that municipalities cannot be held liable under *respondeat superior*. *Monell*, 436 U.S. at 691. Municipalities can only be liable for their *own* actions—such as their official policies and the acts of final policymakers. *Pembaur*, 475 U.S. at 478-79, 482-83. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of the *employees* of the municipality and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 479. Acts taken pursuant to policies or customs are "acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.*; *Brown*, 520 U.S. at 404.

Here, the jury was instructed:

_____

[13] In the pattern instructions of the Ninth and Third Circuits, deliberate indifference is only an element for failure to train. Ninth Circuit Pattern Civil Jury Instruction Nos. 9.5, 9.6; Third Circuit Pattern Civil Jury Instruction Nos. 4.6.4, 4.6.5.

"Official policy" means a formal policy, such as a rule or regulation adopted by the City, resulting from a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

11-JA-159. This language exactly tracks *Pembaur*, 475 U.S. at 483. Denver's official policy authorizing officers to use less-lethal weapons however they saw fit during protests itself "directed or authorized the deprivation of federal rights." *Brown*, 520 U.S. at 406. This policy reflected a deliberate choice from among alternatives and its execution caused the injuries. *See Monell*, 436 U.S. at 661, 695 (policy requiring pregnant employees to take unpaid leaves of absence before such leaves were medically required "unquestionably involve official policy as the moving force of the constitutional violation"). Under well-established law, the policy is Denver's own action and Denver can be held directly responsible for injuries caused by the execution of its own policy.

Likewise, with respect to final policymaker action, the jury was instructed, "Official policy for Denver also includes any actions Commander Phelan took or instructed others to take during the protests, because Commander Phelan had final policymaking authority from Denver...." 11-JA-159. Phelan was the undisputed final policymaker for

the protests and his unconstitutional actions *are* the actions of Denver for purposes of municipal liability. No additional requirement of deliberate indifference was required. *Pembaur*, 475 U.S. at 479-85; *Whitson*, 106 F.4th at 1071-72.

Finally, any alleged error in this instruction was harmless because the jury separately found Denver liable under Plaintiffs' failure-to-train and ratification theories, on which there was no instructional error and any assertion of error is waived. The verdict must be affirmed.

### D.   First Amendment Instruction Was Correct and Any Error Was Harmless

The jury was instructed that Plaintiffs had to prove their "participation in the protected activity was a substantial or motivating factor in the officer's decision to take an action against the plaintiff." 11-JA-153. This language comports with governing law and gave the jury an "understanding of the issues and its duty to decide those issues." *Lederman*, 685 F.3d at 1155.

The Supreme Court first laid out the principles of First Amendment retaliation claims in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Under *Mt. Healthy*, a plaintiff must show their conduct was constitutionally protected and the protected conduct was "a

'substantial factor' or…that it was a 'motivating factor'" in the adverse decision. *Id.* at 287 (citation omitted). This "substantial or motivating factor" language was used again by the Supreme Court in other retaliation cases, including those involving police, *Nieves v. Bartlett*, 587 U.S. 391, 394 (2019) (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018)), and it has been adopted by this Court. *See, e.g., United States v. P.H.E., Inc.*, 965 F.2d 848, 849 (10th Cir. 1992) ("The First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech."); *see also id.* at 859 (citing *Mt. Healthy* and describing a "but-for" causation test); *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1551 (10th Cir. 1989).[14]

In *Nieves*, the Supreme Court stated, "'The plaintiff must show that retaliation was a substantial or motivating factor behind the [arrest]….'" 587 U.S. at 404 (quoting *Lozman*, 585 U.S. at 97). The Court explained:

> the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

---

[14] *See also* Ninth Circuit Pattern Civil Jury Instruction 9.11; Eleventh Circuit Pattern Civil Jury Instruction 5.1.

*Id.* at 398-99 (citing *Hartman v. Moore*, 547 U.S. 250, 259-60 (2006)). The Supreme Court has consistently applied the *Mt. Healthy* language in non-employment First Amendment retaliation cases. *Id.* at 394; *Lozman*, 585 U.S. at 97; *see NRA v. Vullo*, 602 U.S. 175, 204 (2024) (Jackson, J., concurring).

This language from controlling precedent was the basis for the instruction here. Indeed, the majority of Circuits use *Mt. Healthy*'s "substantial or motivating factor" language in this, or similar, contexts. *See, e.g., Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. 2014); *Ebron v. CTO Huria*, 205 F.3d 1322, 2000 WL 241576, at *1 (2d Cir. 2000); *Harris v. Terhune*, 45 F. App'x 95, 97 (3d Cir. 2002); *Martin v. Duffy*, 977 F.3d 294, 301 (4th Cir. 2020); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Aref v. Lynch*, 833 F.3d 242, 259 (D.C. Cir. 2016).

If that were not enough, in *Hedquist v. Beamer*, 763 F. App'x 705, 712 (10th Cir. 2019), this Court concluded that "there is no meaningful difference in the quantum of motivation required to prove causation in

the two frameworks," referring to the "substantially motivated" test from *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), and the "motivating factor" test from *Garcetti/Pickering*. Thus, there is no basis for Denver's argument that *Worrell* intended to make a meaningful distinction when it used "substantially motivated" instead of "substantial or motivating." *Worrell* could not have, and did not, deviate from the *Mt. Healthy* standard.

Jury instructions need not be "flawless." *Lederman*, 685 F.3d at 1155. Whether the test is "substantially motivated" or a "substantial or motivating factor," it means the same thing—as explained in *Nieves*, the adverse action must have been caused by the protected activity. 587 U.S. at 398-99.

Finally, any purported error was harmless for two reasons. First, Plaintiffs proved but-for causation at trial, which is what the Supreme Court requires (as Denver agrees, D.Br.20). Denver conceded that Plaintiffs peacefully protested and committed no acts of violence or property destruction. Thus, the but-for cause of officers' use of force was Plaintiffs' protected activity. On appeal, Denver points to Taylor's testimony that a person threw a water bottle and inaccurately accuses

*Taylor* of having "participated" in "violent activity." D.Br.20. Denver fails to mention that Taylor testified that the person threw it in response to unprovoked police shooting of PepperBalls. 22-JA-149:20-22. Furthermore, Denver's causation argument at closing was that Plaintiffs could not identify the officers who deployed less-lethal munitions against them. 29-JA-23:18-24:1. In rebuttal, Plaintiffs argued that causation was met because, but-for their peaceful protest, officers would not have used force on them. 29-JA-47:13-48:14. Nothing turned on any distinction between "substantially motivating" and "substantial or motivating."

Second, the Fitouri Plaintiffs won their Fourth Amendment claim, to which there is no challenge whatsoever. This is an alternate theory of liability on which their verdict must be sustained.

## III. Admission Of Nicholas Mitchell's Testimony Does Not Warrant A New Trial

The district court did not err in admitting Mitchell's testimony or denying Denver's Rule 59 motion because: (1) Mitchell gave purely factual testimony within his personal knowledge that did not fall under Rule 701 or 702, *see* 23-JA-65:10-68:12; FED. R. EVID. 602; (2) to the extent Mitchell gave any opinions, it was based on his personal knowledge under Rule 701(a); (3) any "opinions" Mitchell gave were

timely disclosed in his report, 23-JA-54:25-55:1, and Denver never objected to any of the specific testimony it now contests, 23-JA-64:18-65:9, 68:19-22, 96:25-97:10, 109:1-22, 110:9-17, 112:10-113:1, 116:3-18, 117:6-118:8;[15] (4) Mitchell never testified to any "subsequent remedial measures"; (5) to the extent there was any such testimony, *Denver elicited it from its own witnesses*, 25-JA-129:25-130:2; 26-JA-126:20-127:4, 229:9-18; 27-JA-14:2-21; 28-JA-98:12-16, 100:24-101:15; (6) the probative value of Mitchell's testimony was not substantially outweighed by its risk of unfair prejudice under Rule 403; and (7) any error was harmless because the testimony Denver complains about (D.Br.24-26) was admitted through other witnesses. *Supra*, SC_I.D., I.E.; 16-JA-39:5-9, 91:2-9, 99:16-25; 18-JA-6:2-7:9, 35:1-13, 48:8-18, 148:2-15; 21-JA-102:21-103:14; 24-JA-133:2-6, 135:23-137:12, 143:8-11; 26-JA-65:25-68:5, 111:2-116:3, 120:6-121:8, 229:9-18, 230:3-231:16; 27-JA-14:2-21, 23:18-33:7.

For a fuller discussion, Plaintiffs incorporate by reference the arguments made by the Epps Plaintiffs. E.Br._Argument III.

---

[15] Denver discusses the "protections" of Rule 702, but it never objected that Mitchell's opinions were *inadmissible* under Rule 702. *See* 23-JA-54:18-24. Any Rule 702 argument is waived.

## IV. Denial Of Remittitur Was Not An Abuse Of Discretion

A "jury's award is 'inviolate.'" *Prager*, 731 F.3d at 1062 (reversing remittitur). It remains inviolate as long as it does not "shock the judicial conscience." *Id*. The district court decided the award did not shock the judicial conscience. A52. Denver asks this Court to set aside the "considerable deference" it must pay the trial court's decision and determine that the court abused its discretion. *Sheets v. Salt Lake City*, 45 F.3d 1383, 1390 (10th Cir. 1995). But the trial court neither made a "clear error of judgment or exceeded the bounds of permissible choice" in denying remittitur. *Burke*, 935 F.3d at 1026.

Here, the jury was properly instructed to determine "an amount of money, if any, that will fairly compensate the plaintiff for any injury....as a result of the defendants' wrongful conduct." 11-JA-164. The jury was further instructed:

> There is no exact standard for setting the damages to be awarded on account of these factors....Difficulty or uncertainty in determining the precise amount of any damages does not prevent you from deciding an amount. You should use your best judgment based on the evidence.

*Id*. This Court assumes that juries follow instructions. *United States v. Urbano*, 563 F.3d 1150, 1155 (10th Cir. 2009).

To support its utter speculation that the jury's award was based on passion or prejudice instead of dutiful exercise of its best judgment, Denver draws minute distinctions between the testimony of the plaintiffs and then asserts that their injuries "differed greatly." D.Br.56. This argument fails. Plaintiffs testified about largely similar injuries and suffering at the hands of DPD from less-lethal weapons and chemical munitions. They described fear of being trampled in alleys and experiences of being hunted by police. They also testified to lasting psychological trauma. *Supra*, SC_I.A.-I.B. Stamper—who had ordered gassing of protesters when he was Seattle Police Chief—described gas as "cruel" and "punishing." 17-JA-120:18-121:8. Denver's downplaying of Plaintiffs' own testimony about their emotional damages is improper. *Osterhout v. Bd. of Cnty. Comm'rs. of LeFlore Cnty.*, 10 F.4th 978, 997 (10th Cir. 2021).

The jury "took in all of this testimony and weighed it as they saw fit." *Prager*, 731 F.3d at 1063. After hearing this evidence, the jury awarded ten of the twelve plaintiffs $1,000,000. 11-JA-169-177. As in *Prager*, "the jury was presented with—and duly weighed—a large amount of conflicting evidence. Inherent in its decision was a searching

assessment of each witness's credibility." *Prager*, 731 F.3d at 1063.

Where the injuries between plaintiffs were dissimilar, the jury took that

into account and awarded different amounts. 11-JA-171, 174.

Following the verdict, the trial court carefully considered remittitur

and explained:

> The jurors, as judges of the facts, determined that the emotional
> distress suffered by the plaintiffs was significant. More than just
> the words that plaintiffs spoke, the jurors were able to observe the
> demeanor of plaintiffs as they spoke about their distress.

A52. The court found, "[i]t is clear from the verdict that the jury believed

[plaintiffs'] testimony and assessed damages that they believed were

warranted in light of that impact." *Id.* This Court must reject Denver's

invitation to reweigh the evidence based on a cold record and substitute

its own judgment for that of the jury. "Trial judges have the 'unique

opportunity to consider the evidence in the living courtroom

context…while appellate judges see only the 'cold paper record.'"

*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 438 (1996).

The court went on to say that "[t]his was an attentive and

thoughtful jury, and I do not find that its decision was shocking or the

result of passion, prejudice, or impropriety." *Id.* Ultimately, the jury,

"who has the first-handed opportunity to hear the testimony and to

observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages." *Prager*, 731 F.3d at 1063. The trial court issued a "well-reasoned" decision "supported by the record." *Blanke v. Alexander*, 152 F.3d 1224, 1237 (10th Cir. 1998).

Denver offers as single out-of-circuit case, *Bell v. Williams*, 108 F.4th 809 (9th Cir. 2024), but that case is not "similar enough to serve as a meaningful benchmark," *Osterhout*, 10 F.4th at 999, because there was no evidence of lasting psychological injuries, as there is here. Moreover, "'comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations, and detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence.'" *Id.* As discussed above, it was not.

## CONCLUSION

The Court should affirm the judgment.

Respectfully submitted,

s/ Elizabeth Wang

Elizabeth Wang
Counsel of Record for Plaintiffs-
Appellees Sara Fitouri, Jacquelyn
Parkins, Joe Deras, Claire Sannier,
Kelsey Taylor

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

# CERTIFICATE PURSUANT TO CIRCUIT RULE 31.3

Pursuant to 10th Cir. R. 31.3(B), counsel for the Fitouri Plaintiffs certifies that separate briefs for appellees are necessary in this appeal. The Fitouri Plaintiffs (Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor) and the Epps Plaintiffs (Plaintiffs-Appellees Elisabeth Epps, Ashlee Wedgeworth, Zach Packard, Hollis Lyman, Stanford Smith, Maya Rothlein, and Amanda Blasingame) filed separate lawsuits and are represented by different counsel. The events giving rise to each Plaintiff's claims occurred at different dates, times, and locations over several days during the 2020 protests in Denver. The jury's verdict considered each Plaintiff's specific circumstances. Separate briefs are necessary to adequately address the facts and claims of each Plaintiff.

Plaintiffs' counsel have endeavored to coordinate to the greatest extent possible to minimize duplication, including by filing a joint supplemental appendix and incorporating certain arguments by reference.

s/ Elizabeth Wang
Counsel of Record for Plaintiffs-
Appellees Sara Fitouri, Jacquelyn

Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

## CERTIFICATE OF COMPLIANCE UNDER FRAP 32(G)

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), this brief contains 12,998 words.

This brief complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century, 14-point for the body and footnotes.

s/ Elizabeth Wang
Counsel of Record for Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

## CERTIFICATE OF HARD COPY SUBMISSION

The undersigned hereby certifies that, upon the acceptance of this Brief, all hard copies required to be submitted to the Court will be exact copies of the versions filed electronically.

s/ Elizabeth Wang
Counsel of Record for Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

## CERTIFICATE OF PRIVACY REDACTION

The undersigned hereby certifies that all privacy redactions (if any) have been made pursuant to 10th Cir. R. 25.5.

s/ Elizabeth Wang
Counsel of Record for Plaintiffs-Appellees Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor

LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com