# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

ZACH PACKARD, ET AL.

*Plaintiffs-Appellees*,

v.

CITY AND COUNTY OF DENVER, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Colorado
No. 20-cv-1878 (Hon. R. Brooke Jackson)

## BRIEF FOR APPELLEES ZACHARY PACKARD, ELISABETH EPPS, STANFORD SMITH, AMANDA BLASINGAME, MAYA ROTHLEIN, HOLLIS LYMAN, AND ASHLEE WEDGEWORTH

Timothy Macdonald
Sara R. Neel
AMERICAN CIVIL LIBERTIES
  UNION OF COLORADO
303 East 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (303) 777-5482
timothy.macdonald@aclu-co.org

Robert Reeves Anderson
Matthew J. Douglas
Brian M. Williams
Emily M. Sartin
ARNOLD & PORTER
  KAYE SCHOLER LLP
1144 Fifteenth Street, #3100
Denver, CO 80202
T: (303) 863-1000
reeves.anderson@arnoldporter.com

(Additional counsel listed in
signature block)

**Oral Argument Not Requested**

February 21, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................... x

INTRODUCTION ............................................................................. 1

STATEMENT OF THE CASE ............................................................ 4

    A.    Factual Background.................................................................. 4

        1.    Zach Packard...................................................................... 4

        2.    Elisabeth Epps ................................................................... 7

        3.    Stanford Smith ................................................................ 10

        4.    Amanda Blasingame and Maya Rothlein .............................. 12

        5.    Hollis Lyman.................................................................... 14

        6.    Ashlee Wedgeworth .......................................................... 17

    B.    Proceedings Below ................................................................ 19

        1.    Chief Stamper's Expert Testimony....................................... 20

        2.    Dr. Maguire's Expert Testimony ......................................... 24

        3.    Independent Monitor Nicholas Mitchell's Testimony............. 25

SUMMARY OF ARGUMENT ......................................................... 27

STANDARD OF REVIEW .............................................................. 31

ARGUMENT ................................................................................. 31

I.    Overwhelming Evidence Supported the Verdict on Each *Monell* Ground ... 31

    A.    Legal Background ................................................................. 32

    B.    Policy, Practice, or Custom ................................................... 34

        1.    Official policies................................................................ 34

        2.    Practice or custom............................................................ 39

    C.    Failure to Train ................................................................... 42

        1.    The need for training in crowd-control was obvious ............... 44

        2.    Denver consciously disregarded the risk of harm.................... 46

    D.    Ratification ......................................................................... 48

i

II.    The District Court Properly Instructed the Jury ............................................50

    A.    Deliberate Indifference........................................................................50

        1.    The failure-to-train instruction suffices to uphold the entire verdict...............................................................................................50

        2.    Deliberate indifference is not required of other *Monell* claims ...............................................................................................52

    B.    Substantial or Motivating .....................................................................54

        1.    "Substantial or motivating" is correct under Supreme Court precedent ..........................................................................54

        2.    Any instructional error was harmless ......................................56

III.   The District Court Properly Admitted the Independent Monitor's Testimony ........................................................................................................57

    A.    Mitchell's Testimony Was Admissible Under Rules 602 and 701.....58

    B.    Mitchell Did Not Testify About Subsequent Remedial Measures......63

    C.    Mitchell's Testimony Was Probative and Fair...................................65

    D.    Any Error Was Harmless ...................................................................65

IV.    The Jury's Awards Appropriately Compensated Plaintiffs for Their Significant Injuries.............................................................................................66

CONCLUSION ..............................................................................................................68

CERTIFICATE OF COUNSEL ............................................................................70

CERTIFICATE OF COMPLIANCE....................................................................71

CERTIFICATE OF DIGITAL SUBMISSION ....................................................72

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Muskogee*,
119 F.3d 837 (10th Cir. 1997) ...................................................................44, 45

*Arnold v. City of Olathe*,
35 F.4th 778 (10th Cir. 2022) ............................................................................53

*Ashley v. Boayue*,
No. 22-12952023, WL 2910533 (6th Cir. Jan. 10, 2023) ..................................56

*Baca v. Sklar*,
398 F.3d 1210 (10th Cir. 2005) .........................................................................57

*Barney v. Pulsipher*,
143 F.3d 1299 (10th Cir. 1998) .........................................................................53

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997).............................................................................32, 43, 52

*Bell v. Williams*,
108 F.4th 809 (9th Cir. 2024) ............................................................................67

*Bjelland v. City & Cnty. of Denver*,
No. 22-cv-01338, 2024 WL 4165428 (D. Colo. Sept. 12, 2024) ..........41, 42, 46

*Brammer-Hoelter v. Twin Peaks Charter Academy*,
602 F.3d 1175 (10th Cir. 2010) .........................................................................53

*Brown v. Gray*,
227 F.3d 1278 (10th Cir. 2000) .........................................................................48

*Bryson v. City of Oklahoma City*,
627 F.3d 784 (10th Cir. 2010) ...............................................................32, 52, 53

*Burke v. Regalado*,
935 F.3d 960 (10th Cir. 2019) .................................... 31, 34, 35, 42, 43, 66

*Carney v. City & Cnty. of Denver*,
534 F.3d 1269 (10th Cir. 2008) .................................................................40, 41

*Castle v. Appalachian Tech. Coll.*,
    631 F.3d 1194 (11th Cir. 2011) ..........................................................56

*City of Canton v. Harris*,
    489 U.S. 378 (1989)..............................................................................43, 52

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)..............................................................................33, 48

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992) ..............................................................................53

*Connick v. Thompson*,
    563 U.S. 51 (2011) ................................................................................33, 52

*Cordova v. Aragon*,
    569 F.3d 1183 (10th Cir. 2009) ..........................................................49

*Couch v. Bd. of Tr. of Mem'l Hosp. of Carbon Cnty.*,
    587 F.3d 1223 (10th Cir. 2009) ..........................................................57

*Cousik v. City & Cnty. of Denver*,
    No. 22-cv-01213, 2024 WL 896755 (D. Colo. Mar. 1, 2024).....................37, 38

*Deschenie v. Bd. of Educ. of Cent. Consolidated Sch. Dist. No. 22*,
    473 F.3d 1271 (10th Cir. 2007) ..........................................................57

*Dolenz v. United States*,
    443 F.3d 1320 (10th Cir. 2006) ..........................................................68

*Dorsett v. Cnty. of Nassau*,
    732 F.3d 157 (2nd Cir. 2013) ..............................................................55

*Dow Chem. Corp. v. Weevil-Cide Co.*,
    897 F.2d 481 (10th Cir. 1990) ............................................................63

*Finch v. Rapp*,
    38 F.4th 1234 (10th Cir. 2022) ...........................................................53

*Gattineri v. Town of Lynnfield*,
    58 F.4th 512 (1st Cir. 2023)..................................................................55

iv

*George v. Beaver Cnty.*,
32 F.4th 1246 (10th Cir. 2022) ...........................................................53

*Hedquist v. Beamer*,
763 F. App'x 705 (10th Cir. 2019) ....................................................57

*Hill v. J.B. Hunt Transp., Inc.*,
815 F.3d 651 (10th Cir. 2016) ............................................................66

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*,
962 F.3d 1204 (10th Cir. 2020) ....................................................32, 53

*Huffman v. City of Bos.*,
No. 21-cv-10986, 2022 WL 2308937 (D. Mass. June 27, 2022) ......41

*Ibaenez v. Velasco*,
No. 96-CV-05990, 2002 WL 731778 (N.D. Ill. Apr. 25, 2002)........68

*Jackson v. Tellado*,
No. 11-CV-3028, 2018 WL 4043150 (E.D.N.Y. Aug. 24, 2018) .....68

*Jensen v. West Jordan City*,
968 F.3d 1187 (10th Cir. 2020) ....................................................56, 57

*Johnson v. City of San Jose*,
No. 21-cv-01849, 2023 WL 7513670 (N.D. Cal. Nov. 13, 2023).....41

*Jones v. Louisville/Jefferson Cnty. Metro Gov't*,
482 F. Supp. 3d 584 (W.D. Ky. 2020)................................................38

*Keenan v. Tejeda*,
290 F.3d 252 (5th Cir. 2002) ..............................................................56

*Klen v. City of Loveland*,
661 F.3d 498 (10th Cir. 2011) ............................................................55

*Manuel v. Nalley*,
966 F.3d 678 (7th Cir. 2020) ..............................................................56

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ......................................................40, 41

*Miller v. Eby Realty Grp. LLC*,
  396 F.3d 1105 (10th Cir. 2005) ..........................................................31

*Miller v. Metzger*
  No. 21-2223, 2022 WL 4820322 (3rd Cir. Oct. 3, 2022)............................55, 56

*Monell v. Dep't of Soc. Servs. of the City of New York*,
  436 U.S. 658 (1978)..........................................................................32

*Mountain Dudes v. Split Rock Holdings, Inc.*,
  946 F.3d 1122 (10th Cir. 2019) .........................................................31

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)..........................................................................54

*Murphy Oil USA, Inc. v. Wood*,
  438 F.3d 1008 (10th Cir. 2006) ....................................................30, 66

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)..........................................................................55

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)..............................................................54, 55, 56

*Olsen v. Layton Hills Mall*,
  312 F.3d 1304 (10th Cir. 2002) .........................................................42

*Osterhout v. Bd. of Cnty. Cmmn'rs of LeFlore Cnty.*,
  10 F.4th 978 (10th Cir. 2021) ............................................................67

*Porter v. City of Philadelphia*,
  337 F. Supp. 3d 530 (E.D. Pa. 2018)..................................................68

*Prager v. Campbell Cnty. Mem'l Hosp.*,
  731 F.3d 1046 (10th Cir. 2013) .........................................................67

*Prince v. Sheriff of Carter Cnty.*,
  28 F.4th 1033 (10th Cir. 2022) ...........................................33, 40, 52

*Pryor v. Sch. Dist. No. 1*,
  99 F.4th 1243 (10th Cir. 2024) ..........................................................55

*Ratlieff v. City of Fort Lauderdale,*
No. 22-CV-61029, 2024 WL 4039849 (S.D. Fla. Sept. 4, 2024) ...................... 46

*Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron,*
805 F.2d 907 (10th Cir. 1986) ....................................................................... 63, 64

*Rose v. Baltimore Cnty.,*
No. 1:23-cv-02078, 2024 WL 3924595 (D. Md. Aug. 23, 2024) ..................... 38

*Sanderlin v. Dwyer,*
116 F.4th 905 (9th Cir. 2024) ............................................................................ 56

*Shaw v. Foreman,*
59 F.4th 121 (4th Cir. 2023) .............................................................................. 56

*Simmons v. Uintah Health Care Special Serv. Dist.,*
506 F.3d 1281 (10th Cir. 2007) ......................................................................... 34

*Spencer v. Jackson Cnty.,*
738 F.3d 907 (8th Cir. 2013) ............................................................................. 56

*Stroup v. United Airlines, Inc.,*
26 F.4th 1147 (10th Cir. 2022) .......................................................................... 31

*Tirado v. City of Minneapolis,*
521 F. Supp. 3d 833 (D. Minn. 2021) ................................................................ 41

*United States v. Archuleta,*
737 F.3d 1287 (10th Cir. 2013) ......................................................................... 65

*United States v. Bush,*
405 F.3d 909 (10th Cir. 2005) ........................................................................... 61

*United States v. Cooper,*
375 F.3d 1041 (10th Cir. 2004) ......................................................................... 62

*United States v. Gallegos,*
111 F.4th 1068 (10th Cir. 2024) ........................................................................ 65

*United States v. Garcia,*
994 F.2d 1499 (10th Cir. 1993) ......................................................................... 61

*United States v. Gutierrez de Lopez*,
   761 F.3d 1123 (10th Cir. 2014) ..........................................................58

*United States v. Johnson*,
   617 F.3d 286 (4th Cir. 2010) ..............................................................62

*United States v. Joseph*,
   108 F.4th 1273 (10th Cir. 2024) ...................................................65, 66

*United States v. Marquez*,
   898 F.3d 1036 (10th Cir. 2018) ..........................................................61

*United States v. Peoples*,
   250 F.3d 630 (8th Cir. 2001) ..............................................................62

*United States v. Perrault*,
   995 F.3d 748 (10th Cir. 2021) ............................................................51

*United States v. Zepeda-Lopez*,
   478 F.3d 1213 (10th Cir. 2007) .....................................................58, 61

*Valdez v. Macdonald*,
   66 F.4th 796 (10th Cir. 2023) ........................................33, 36, 42, 45

*Vincent v. Nelson*,
   51 F.4th 1200 (10th Cir. 2022) .....................................................30, 61

*Waller v. City and Cnty. of Denver*,
   932 F.3d 1277 (10th Cir. 2019) ..........................................................52

*Weeks v. Angelone*,
   528 U.S. 225 (2000)............................................................................52

*White v. Jackson*,
   No. 4:14CV1490, 2015 WL 1189963 (E.D. Mo. Mar. 16, 2015) .....................41

*Whitson v. Bd. of Cnty. Comm'rs of Cnty. of Sedgwick*,
   106 F.4th 1063 (10th Cir. 2024) .........................................................33

*Worrell v. Henry*,
   219 F.3d 1197 (10th Cir. 2000) .....................................................54, 55

## Federal Rules and Other Authorities

Fed. R. Evid. 407 ............................................................................63, 64

Fed. R. Evid. 602 .......................................................................58, 59, 61

Fed. R. Evid. 701(a) ...........................................................................58, 61

Ninth Circuit Model Civil Instruction 9.11 .............................................56

3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* (Mark S. Brodin, ed., Matthew Bender 2d ed. 2024) .........................63

## STATEMENT OF RELATED CASES

This Court recently decided the related appeal of *Packard v. Budaj*, 86 F.4th 859 (10th Cir. 2023). That appeal involved the claims of Zach Packard, a Plaintiff-Appellee here, against the City of Aurora and two of its officers related to injuries the officers caused Mr. Packard while he was peacefully protesting at the George Floyd protests. *Id.* at 862. The officers sought interlocutory review of the same district court's denial of qualified immunity, *id.* at 863, and Aurora challenged the district court's denial of summary judgment on Mr. Packard's municipal-liability claims, *id.* at 870.

This Court affirmed. *Id.* The Court held that qualified immunity was properly denied because it is clearly established law that "the deployment of less-lethal munitions on an unthreatening protester who is neither committing a serious offense nor seeking to flee is unconstitutionally excessive force." *Id.* Having concluded that the officers were not entitled to qualified immunity, the Court declined to exercise pendant jurisdiction over Aurora's appeal. *Id.*

The other related case has been partially consolidated with this appeal: *Epps v. Christian*, No. 24-1371 (10th Cir.).

**INTRODUCTION**

Following the murder of George Floyd in May 2020, Plaintiffs-Appellees Zach Packard, Elisabeth Epps, Stanford Smith, Amanda Blasingame, Maya Rothlein, and Ashlee Wedgeworth joined thousands of others in Denver to protest against police brutality. In response, they were shot, pepper-sprayed, and gassed with chemical munitions by officers of the Denver Police Department (DPD) and its agents. Plaintiffs sued the City and County of Denver under 42 U.S.C. § 1983 for violations of their First and Fourth Amendment rights.

During a three-week trial, Plaintiffs introduced—in the district court's words—a "mountain of video evidence" and testimony establishing that DPD officers repeatedly used unconstitutional excessive force on Plaintiffs and other peaceful protesters, and that Denver's policies or customs, failure to train, and ratification of officers' conduct caused Plaintiffs' injuries. Denver's strategy at trial was to declare that every act of every officer during the protests—no matter how egregious—was within policy. It argued to the jury the same defenses it raises on appeal, claiming that Denver should not be held accountable for its policing failures because the protests involved "unprecedented violence and destruction." But in over three thousand pages of trial transcripts, hours of Plaintiff testimony, and more than 100 video exhibits, Denver adduced no evidence that any Plaintiff committed a single act of violence or property destruction.

In denying Denver's pre-verdict motion for judgment as a matter of law, Judge Jackson, a 27-year veteran of the bench, emphasized, "I can't think of a case that I've had or that I'm even aware of in this court that more deserves the pulse of the people, the pulse of the community as reflected in the eight jurors that have heard the case." App.Vol.25_59:19-22. The jury found for Plaintiffs on most, but not all, of their claims, and assessed damages based on each Plaintiff's claims and injuries.

Denver offers no compelling reason for this Court to substitute its judgment for the pulse of the people.

*First*, the jury's verdict is supported by a massive evidentiary record. Denver's senior police officers, including the commander who oversaw Denver's response to the protests, testified that all officers' conduct was within policy. Plaintiffs also introduced unrebutted testimony from two policing experts who testified that Denver had a policy or custom of using indiscriminate and excessive force on protesters. Their testimony was confirmed by Denver's former Independent Monitor Nicholas Mitchell, who testified that DPD officers deployed less-lethal weapons in "extremely troubling" ways. App.Vol.23_68:19-22. That included deploying less-lethal weapons at protesters "who were only verbally" protesting; shooting projectiles at protesters' heads, faces, and groins; throwing "explosive devices … extremely close to" protesters; and "continuing to deploy chemicals, gas,

impact, or explosive munitions after their initial deployments" already caused protesters to leave. App.Vol.23_68:18-69:12.

*Second*, the district court properly instructed the jury. Plaintiffs were required to prove deliberate indifference only on their failure-to-train claims, which the jury found they did. That aspect of the verdict is sufficient to sustain the entire judgment. Regardless, the failure-to-train instruction was proposed by Denver, so any newfound objection to the wording is invited error. The instruction on Plaintiffs' First Amendment claim was also correct: Binding Supreme Court precedent requires a showing that the protected activity was a "substantial or motivating" factor for the government officials' unconstitutional conduct.

*Third*, the district court correctly admitted Mitchell's testimony. Mitchell provided factual testimony based on his personal investigation of the protests, which included reviewing thousands of hours of video footage and interviewing dozens of DPD officers. His lay opinion testimony would also have been permitted under this Court's precedents. Any error in admitting his testimony, moreover, would be harmless: His testimony supplemented the overwhelming evidence confirming that Denver's policies caused Plaintiffs' injuries.

*Fourth*, the jury's award properly compensated Plaintiffs for their extensive physical and psychological injuries.

## STATEMENT OF THE CASE

### A.    Factual Background

On May 25, 2020, George Floyd died after a Minneapolis police officer placed his knee on Mr. Floyd's neck for eight minutes and forty-six seconds. Within days, millions of people worldwide mobilized to mourn Mr. Floyd's death and protest against police brutality. In Denver, the protests began on Thursday, May 28, and continued through June 2, 2020.

Packard, Epps, Smith, Blasingame, Rothlein, Lyman, and Wedgeworth (the "Epps Plaintiffs") joined the overwhelmingly peaceful crowds to lend their voices against police brutality. They were met with the very violence they were protesting. Even though they never engaged in violence or property destruction, each Plaintiff was unconstitutionally assaulted and injured by officers using so-called "less-lethal" weapons. Because of the violence inflicted by Denver, each Plaintiff suffered excruciating physical pain and lingering emotional scars.

### 1.    Zach Packard

Zach Packard joined the protests in Denver on May 30 around 7:00pm. App.Vol.16_186:4-188:9. He marched peacefully until, "out of nowhere," police officers deployed tear gas and PepperBalls. App.Vol.16_188:23-191:2. He saw a woman fall, and officers continued to shoot her with PepperBalls while she was down. App.Vol.16_191:4-7. When Mr. Packard screamed at the officers to stop, one

turned and shot a PepperBall at him. App.Vol.16_191:7-10. Mr. Packard deflected it with his skateboard, but felt the "burning" effects. App.Vol.16_191:11-192:1.

Mr. Packard rejoined the protests the next night around 9:00pm. App.Vol.16_192:9-11, 193:6-8, 193:18-20. Shortly after he arrived, a police officer launched a tear-gas canister—without warning or provocation—toward a crowd of protesters, including Mr. Packard. App.Vol.16_196:3-8. He instinctively kicked the canister into the street away from himself and other protesters. App.Vol.16_196:3-8.

Immediately after Mr. Packard kicked the canister, he was shot in the head by a lead-filled Kevlar bag fired from a police shotgun. App.Vol.16_206:19-207:1; App.Vol.17_150:14-152:4-6. Mr. Packard was instantly rendered unconscious and fell to the concrete with a fractured skull and broken neck. App.Vol.16_198:24-199:2; App.Vol.16_208:7-8.



App.Vol.30_55-58 (Exs. 247, 248, 249, 251). While Mr. Packard was lying motionless in the gutter, an officer shot another round that hit his right shoulder. App.Vol.16_214:10-22. Bystanders dragged Mr. Packard's body away. App.Vol.16_207:2-9. Officers took no action to assist him. App.Vol.16_214:10-12.

Mr. Packard suffered significant injuries. The shotgun round fractured his skull, broke two discs in his neck, and caused brain bleeding. App.Vol.16_208:5-8. Mr. Packard spent four days recovering in the hospital. App.Vol.16_212:20-23.



App.Vol.30_35 (Ex. 76); App.Vol.39_30 (Ex. 1098).

Mr. Packard incurred $181,000 in medical expenses. App.Vol.16_212:24-213:3; App.Vol.39_131, 136 (Exs. 1099, 1100). His career was interrupted. App.Vol.16_213:9-22. He also lost his ability to enjoy a favorite hobby—elite-level skateboarding. App.Vol.16_213:23-214:7. Because of the violence he experienced, Mr. Packard no longer feels safe around police officers. App.Vol.16_214:25-215:2.

### 2. Elisabeth Epps

Elisabeth Epps joined the protests on May 28. App.Vol.23_186:17-19. While she was protesting and livestreaming, officers began throwing tear-gas cannisters and shooting PepperBalls into the peaceful crowd, without warning. App.Vol.23_187:24-188:5, 189:9-190:1. Ms. Epps experienced painful effects from the tear gas, including coughing, eye irritation, and disorientation. App.Vol.23_192:1-14, 195:13-15; App.Vol.30_28 (Ex. 106) at 0:06:00-0:07:30.

Later that evening, officers deployed more gas and PepperBalls into the crowd, causing Ms. Epps additional pain and injuries. App.Vol.23_196:2-198:5.

Ms. Epps rejoined the protests the next day. App.Vol.23_198:14-19, 199:1-16. She walked along 14th Street, filming a line of officers on the Capitol lawn. App.Vol.23_199:17-200:9. As she crossed 14th Street, DPD officer Jonathan Christian "dropped, took a knee, and shot something into [her] leg." App.Vol.23_200:10-18. The PepperBall struck Ms. Epps on her calf, leaving a large welt. App.Vol.23_201:21-25, 218:21-25.



App.Vol.30_30 (Ex. 66); App.Vol.42_158 (Ex. 1250).

Being shot by Officer Christian left Ms. Epps traumatized each time she encountered a police officer, which she did frequently in her work and during trial. App.Vol.23_202:7-20. She experienced nightmares. App.Vol.23_202:21-22.

After being shot by Officer Christian, Ms. Epps went to the Capitol Building, where she was shot with more PepperBalls. App.Vol.23_203:6-17. A short while later, near the intersection of 14th and Lincoln, she observed a line of officers marching towards protesters. App.Vol.23_204:2-204:6. Ms. Epps stood in between to protest and film the scene. App.Vol.23_205:1-4. While her back was turned, officers shot projectiles at her back and legs without warning and also shot her phone out of her hand, destroying it. App.Vol.23_205:5-14; App.Vol.24_4:12-16. Ms. Epps, who has asthma, experienced intense physical pain from the assault. App.Vol.23_215:10-215:22. She had difficulty breathing and was reduced to crawling on all fours, spitting and gargling to try to dispel the chemicals. App.Vol.23_215:10-215:22. The impact of the PepperBalls left lasting bruises on her body:

 

App.Vol.30_27, 29 (Exs. 62, 64). Two years after the protests, Ms. Epps still had a PepperBall scar on her back. App.Vol.23_219:1-7.

Ms. Epps returned to the protests the next evening, May 30. App.Vol.24_6:22-7:4. As she protested and filmed officers in the area, she was struck by more projectiles and subjected to tear gas without warning. App.Vol.24_7:5-8:2, 9:7-10, 9:15-21. One PepperBall struck Ms. Epps in the face, leaving a contusion and chemical residue on her face. App.Vol.24_11:12-20, 12:14-14:3.

 

App.Vol.30_28, 32 (Exs. 63, 68).

### 3. Stanford Smith

Dr. Stanford Smith attended the protests on May 30. App.Vol.16_142:3-10. When he arrived, he followed a crowd of protesters to the intersection of Colfax and Washington. App.Vol.16_143:7-144:2, 144:19-25, 149:8-9. He observed a line of officers, who without warning began firing PepperBalls, tear gas, and grenades into the crowd. App.Vol.16_145:23-146:3, 147:4-19. Dr. Smith, panicked and

disoriented, ran from the officers; he inhaled tear gas, which made it difficult to breathe, and felt PepperBalls hit his legs and neck. App.Vol.16_147:19-148:7.

Dr. Smith later joined a group of peaceful protesters near the Capitol. App.Vol.16_149:13-150:2. Soon after, a line of officers pushed him and other protesters south. App.Vol.16_152:11-22. Frightened for his and others' safety, Dr. Smith walked with his hands up in between the protesters and the line of officers, asking both groups to be peaceful and engaging in friendly conversation with some officers. App.Vol.16_152:21-153:25. Without warning, an officer shot OC spray into Dr. Smith's face, drenching him in the chemical. App.Vol.16_155:21-156:6. He could not see or breathe; fearing for his life, he ran from the police line and tripped onto the ground. App.Vol.16_157:9-16. Dr. Smith rubbed his face into the grass and dirt to try to get the OC spray off of him. App.Vol.16_157:18-22. He experienced "agonizing pain." App.Vol.16_158:24.



App.Vol.30_43-46 (Exs. 132-35).

Dr. Smith was in pain for the rest of the night, and experienced painful physical effects from his face being dry, peeling, and "like alligator skin" for a week afterwards. App.Vol.16_160:20-161:3. His experiences at the protests left him fearful of police officers and scared to protest for fear of encountering further police brutality. App.Vol.16_161:11-16, 162:10-17.

### 4. Amanda Blasingame and Maya Rothlein

Amanda Blasingame and Maya Rothlein joined a protest march on May 28, which culminated at the police station at the intersection of Colfax and Washington. App.Vol.19_7:9-25. Without warning, a group of officers shot PepperBalls and threw tear gas at the crowd. App.Vol.19_9:22-10:9. They became engulfed in clouds

of the gas, which stung their eyes and burned their throats. App.Vol.19_9:22-10:9, 63:22-64:11. Later that night, they protested and chanted near the Capitol and were again subjected to tear gas and PepperBalls. App.Vol.19_14:14-15:17; 65:2-13.

On May 30, Ms. Blasingame joined a group of protesters near the Capitol. App.Vol.19_68:14-20, 70:24-71:11. As officers advanced down the street, many protesters, including Ms. Blasingame, knelt on the ground with their hands up and chanted, "Hands up. Don't shoot." App.Vol.19_73:1-13. The officers responded by shooting PepperBalls and tear gas, driving the crowd back towards the Capitol. App.Vol.19_73:15. Ms. Blasingame again experienced pain and disorientation and was forced to run across live traffic into the Capitol lawn to escape. App.Vol.19_75:1-18. Horrified, she returned home. App.Vol.19_81:21-82:8, 82:12-19.

That night, Ms. Blasingame and Ms. Rothlein protested with friends inside the fenced yard of their apartment building. App.Vol.19_21:22-22:10; 87:6-88:1. An officer exited his car and approached the yard, held a cannister of OC spray close to Ms. Blasingame's face, and yelled at the group to get back inside. App.Vol.19_22:10-25:18; 84:18-85:23. Later, another convoy of police vehicles drove down the street, and officers on a moving truck shot PepperBalls at the building. App.Vol.19_27:1-28:1; 89:16-90:8. The PepperBalls struck the building and someone trying to enter the front door. App.Vol.19_29:25-31:18; 90:9-91:2.

  

App.Vol.10_2, 85, 117 (Exs. 53, 58, 60). The PepperBalls released chemicals into the building's mailroom, into which Ms. Rothlein and Ms. Blasingame had run to escape the assault. App.Vol.19_28:412-16. They once again experienced the strong, painful effects of the chemicals. App.Vol.19_29:4-6; 90:23-91:6, 93:3-12. The drive-by shooting compelled Ms. Rothlein and Ms. Blasingame to end their protests. App.Vol.19_29:6-10.

Ms. Rothlein and Ms. Blasingame now fear the police, are unable to call them if they need help, experience anxiety from loud noises, and find it difficult to exercise their right to protest. App.Vol.19_33:23-34:18; 93:13-94:19.

### 5. Hollis Lyman

Hollis Lyman joined the protests on the evening of May 28. App.Vol.24_63:9-11, 64:18-20. When she arrived at the Capitol, clouds of tear gas permeated the air. App.Vol.24_64:23-65:4. She joined protesters who were "distraught" and "confused" due to the gas; shortly after, Ms. Lyman and the group were gassed again,

without provocation or warning. App.Vol.24_65:19-23; 66:14-19. Ms. Lyman experienced the "awful" effects of the tear gas and left the protest due to pain. App.Vol.24_66:23-67:7.

She resolved to rejoin the protests the next day. App.Vol.24_67:8-68:4. Ms. Lyman brought a handmade sign, writing "Black Lives Matter" on one side and the names of people of color who had been killed by police on the other. App.Vol.24_69:4-11, 69:21-70:2. Without warning, officers deployed pepper spray on the peaceful crowd. App.Vol.24_70:17-71:25. Ms. Lyman experienced the painful physical effects, including coughing, gagging, and tearing up. App.Vol.24_72:7-12. She was "drowned [] in milk" to offset the symptoms. App.Vol.24_73:3-5.

Later, Ms. Lyman again found herself in a peaceful group facing a line of officers, who began to push the crowd back. App.Vol.24_73:9-11. Ms. Lyman protested by standing on the corner, holding her sign in the air:



App.Vol.43_6 (Ex. 1264) at 12:17:00-12:17:59; App.Vol.24_73:6-19. The officers fired PepperBalls at Ms. Lyman and the crowd; she ducked for cover behind her sign, but a PepperBall shot through the sign and struck her forearm. App.Vol.24_74:12-75:19. After that, Ms. Lyman no longer felt safe and left the protests. App.Vol.24_75:22-76:6, 78:23. After she arrived home, she vomited from the effects of the chemicals. App.Vol.24_79:13-14.



App.Vol.30_33 (Ex. 70).

The next day, Ms. Lyman rejoined protesters near the Capitol. App.Vol.24_79:15-23. Shortly after 8:00pm, a flashbang exploded over the heads of Ms. Lyman and her friend. App.Vol.24_85:2-86:25. The flashbang terrified Ms. Lyman and impacted her ability to hear for the rest of the night. App.Vol.24_85:2-86:25. Later, officers directed Ms. Lyman across the street; as she followed the order and walked with her back turned to the police line, officers shot three PepperBalls into her back. App.Vol.24_91:5-20, 92:1-9.

Ms. Lyman experienced physical and emotional pain from these assaults. She had previously held a positive view of the police, having worked with law enforcement; after the protests, she no longer felt safe interacting with police. App.Vol.24_93:18-94:21. At trial, she still suffered nightmares from the police violence she experienced. App.Vol.24_93:18-94:21.

### 6. Ashlee Wedgeworth

Ashlee Wedgeworth joined the protests each day from May 28 to June 2; every day, she was assaulted with less-lethal weapons. App.Vol.22_213:23-214:5. On May 29, Ms. Wedgeworth attempted to join protests near the Capitol, but the thick pepper spray and airborne tear gas made it hard to breathe and deterred protestors from getting there. App.Vol.22_214:18-215:12. Instead, they gathered with a crowd blocks away. App.Vol.22_214:18-215:12. Responding to a different

group of protesters, officers in a nearby parking lot shot PepperBalls and threw tear gas indiscriminately into the crowd. App.Vol.22_215:12-216:15. Ms. Wedgeworth inhaled the gas, which caused difficulty breathing, watering eyes, burning chest and lungs, and disorientation. App.Vol.22_216:16-217:4. Beyond the physical effects, which included "lots of chest pain," Ms. Wedgeworth was terrified from her assault. App.Vol.22_217:5-11.

On May 31, Ms. Wedgeworth joined protesters chanting and holding signs near Colfax and Ogden. App.Vol.22_217:22-219:14. Officers lined up across the next intersection, blocking the road and preventing protesters from moving. App.Vol.22_217:22-219:14. Without provocation or warning, the officers fired less-lethal munitions into the crowd:



App.Vol.30_19 (Ex. 45) at 1:24:42. Ms. Wedgeworth could not breathe and was blinded and disoriented by tear gas. App.Vol.22_222:16-223:4. She experienced

chest pain, watering eyes, and burning in her throat and lungs. App.Vol.22_222:16-223:4.

After the protests, Ms. Wedgeworth suffered insomnia and anxiety. She became more cautious about protesting and fearful of police officers. App.Vol.22_227:22-228:6.

### B. Proceedings Below

On June 25, 2020, the Epps Plaintiffs sued Denver and unidentified police officers under 42 U.S.C. § 1983 for violating their First, Fourth, and Fourteenth Amendment rights. App.Vol.1_87-137. The case was consolidated with claims brought by other protesters, including the other Plaintiffs-Appellees in this appeal (the "Fitouri Plaintiffs"). App.Vol.1_142. The *Epps* and *Fitouri* claims against Denver were tried before a jury from March 7-25, 2022. App.Vol.1_65-67.

Over the three-week trial, Plaintiffs introduced extensive evidence. Jurors heard testimony from 32 witnesses, including eight hours of testimony over three days from two unrebutted Plaintiffs' experts that detailed Denver's policies and customs and how those policies caused Plaintiffs' injuries. Plaintiffs introduced 278 exhibits, 123 of which were videos totaling over 200 hours of protest footage. While Plaintiffs cannot sufficiently describe the dozens of hours of video evidence shown to the jury, Plaintiffs encourage the Court to review the following representative video evidence:

- App.Vol.34_69 (Ex. 623) at 03:56:23-03:56:48 (protester sprayed in face and sent into traffic)[1]

- App.Vol.34_81 (Ex. 648) at 23:47:16-23:48:13 (officer pointing 40mm at protesters and pushing/insulting protester)

- App.Vol.34_82 (Ex. 656) at 23:49:20-23:50:30 (protester getting pushed by PepperBalls into live traffic)

- App.Vol.34_83 (Ex. 658) at 00:56:17-00:56:33 (officer wielding both PepperBall and OC spray simultaneously)

- App.Vol.34_85 (Ex. 662) at 01:08:31-01:08:59 (protesters blasted in face and body with PepperBalls)

- App.Vol.34_89 (Ex. 670) at 02:20:20-02:20:52 (officer pulls sign and pepper-sprays protester in face)

- App.Vol.34_90 (Ex. 672) at 2:19:32-2:21:17 (protesters backing up pepper-sprayed in face)

- App.Vol.40_197 (Ex. 1120) at 02:41:23-02:42:03 (officer "learning" to unpin a grenade and launching it across traffic at a car)

- App.Vol.43_7 (Ex. 1265) at 3:00:15-3:01:45 (protester filming gets pushed down and tackled, screaming "I can't breathe!")

Additional relevant trial testimony is summarized below.

### 1. Chief Stamper's Expert Testimony

Chief Norman Stamper, PhD, provided unrebutted expert testimony regarding Denver's police and crowd-management practices. App.Vol.17_98:23-99:3. He began his law-enforcement career in 1966, eventually ascending to Chief of Police for Seattle. App.Vol.17_93:5-11, 95:14-96:3. Chief Stamper testified about 29

---

[1] Citations to video exhibits reflect the timestamp marked in the top right corner.

videos that showed officers improperly deploying less-lethal munitions against protesters in Denver.

He also testified about the types of less-lethal weapons Denver and its agents deployed during the protests:

- PepperBall launchers: kinetic weapons that use compressed gas to shoot capsules filled with CS powder:

 

App.Vol.17_152:9-153:8; App.Vol.37_104 (Ex. 964) at 33; App.Vol.34_83 (Ex. 658) at 00:53:59.

- 40-milimeter launchers, which shoot hard plastic projectiles capped with hard foam intended to hurt and repel people:

 

App.Vol.17_147:1-148:6; App.Vol.34_78 (Ex. 638) at 01:03:15; App.Vol.38_61
(Ex. 1039) at 16.

- 12-gauge conventional shotguns loaded with bags of Kevlar filled with
  lead shot:

 

App.Vol.17_151:5-152:8; App.Vol.38_61 (Ex. 1039) at 15; App.Vol.41_179
(Ex. 1235).

- Blast grenades: explosive weapons that release light, sound, and chemical agent:



App.Vol.17_160:2-166:16; App.Vol.34_97 (Ex. 710) at 03:09:33; *see, e.g.*,

App.Vol.41_142 (Ex. 1190) at 03:19:15-03:19:46; App.Vol.34_71 (Ex. 626) at

22:02:08-22:02:29.

- Tear gas (a/k/a CS gas) and pepper spray (a/k/a OC spray): chemical agents used to cause extreme pain to disorient or disperse people:

 

App.Vol.17_166:17-176:7;     App.Vol.38_26     (Ex. 1015);     App.Vol.41_184 (Ex. 1242) at 47; App.Vol.41_123 (Ex. 1176) at 1; *see, e.g.*, App.Vol.30_38 (Ex. 106) at 6:14-31; App.Vol.34_113 (Ex. 741) at 02:25:08-02:25:25.

Chief Stamper also testified to officers' failures to give dispersal orders, to use body-worn cameras, and to complete timely use-of-force reports. *See generally* App.Vol.17_100:5-App.Vol.18_49:15; *see* App.Vol.41_184 (Ex. 1242). During his six-hour testimony, Chief Stamper walked the jury through his expert opinions regarding Denver's response to the protests:

- Denver had a policy, practice, or custom of indiscriminately and improperly using force against protesters;

- Denver had a policy, practice, or custom of failing to give effective dispersal orders before using force against protesters;

- Denver's policy, practice, or custom gave officers nearly unlimited discretion to use less-lethal weapons as they saw fit;

- Denver had a policy, practice, or custom of failing to hold officers who engaged in misconduct accountable;

- Denver had a policy, practice, or custom of failing to train for proper response to protests; and

- Denver failed to properly prepare before and during the George Floyd protests.

App.Vol.17_100:5-App.Vol.18_49:15.

## 2.    Dr. Maguire's Expert Testimony

Dr. Edward Maguire provided unrebutted expert testimony regarding police training, policies, and practice for crowd events and protests. App.Vol.24_129:13-

17. He is a professor of criminology and criminal justice with over two decades' experience in the study, teaching, and training of police forces. *See* App.Vol.24_124:19-126:3. He has conducted research and authored numerous publications regarding policing protests and crowd events. App.Vol.24_126:8-129:11. During his two-hour testimony, Dr. Maguire explained his expert opinions that:

- Denver knew it had a responsibility to manage crowds by de-escalating and protecting peaceful protesters;

- Denver failed to implement sufficient training or policies to manage crowds and de-escalate;

- Denver supervisors failed to lead, resulting in the reckless deployment of potentially deadly munitions by less experienced, poorly trained officers;

- Denver failed to discipline or condemn excessive use of force; and

- Denver quashed lawful assembly, escalated violence, and caused injuries.

App.Vol.24_129:18-175:17.

### 3. Independent Monitor Nicholas Mitchell's Testimony

Denver's Independent Monitor—Nicholas Mitchell, who was represented by Denver at trial, App.Vol.23_56:21-24—supplemented and corroborated the experts' testimony by explaining his office's investigation and findings regarding Denver's actions during the protests. Mr. Mitchell testified that:

- Denver was aware of problems with inappropriate use of less-lethal weapons on protesters, body worn camera (BWC) use, and use-of-force reporting for years prior to the protests, but did nothing to fix these problems. App.Vol.23_167:1-172:21.

25

- Officers knew of longstanding policies that they were not required to activate BWC or timely complete use-of-force reports for protests, and were therefore aware they were unlikely to be held accountable for their uses of force. *See* App.Vol.23_112:10-116:2, 148:5-8, 174:18-175:20.

- Denver provided inadequate crowd control, crowd management, and less-lethal weapons training. *See* App.Vol.23_73:19-93:3, 99:5-10.

*   *   *

The jury rendered a unanimous verdict in favor of all 12 plaintiffs, awarding $14 million. App.Vol.11_169-177. The jury awarded $3 million to Mr. Packard, $750,000 to Ms. Wedgeworth, and $1 million each to Ms. Epps, Dr. Smith, Ms. Blasingame, Ms. Rothlein, and Ms. Lyman. App.Vol.11_170-72, 174-77.

Denver moved for judgment as a matter of law or a new trial. App.Vol.11_182-197. In a thorough decision, the district court denied Denver's motion. App.Vol.12_102. The court noted that "plaintiffs pursued three theories of liability against Denver: (1) policy, custom, or practice, (2) failure to train, and (3) ratification" and that "[a]ny of these theories on their own would be sufficient to support liability against Denver." App.Vol.12_83. The court emphasized "the mountain of video evidence" showing that DPD policy "gave command officers virtually limitless discretion to authorize officers to use less-lethal weapons in protest situations." App.Vol.12_84. The court denied Denver's request for remittitur. App.Vol.12_99-101.

# SUMMARY OF ARGUMENT

**I.** The district court correctly denied Denver's motion for judgment as a matter of law because overwhelming evidence supports the jury's verdict. The jury heard hours of witness testimony and saw more than 100 videos depicting officers' unconstitutionally excessive use of force against peaceful protesters, including Plaintiffs, who were exercising their First Amendment rights. The jury also heard Denver's defense that, however ugly it looked—and by Denver's own account, it was ugly—everything its officers did was within policy. Denver argued that it should not be held accountable for its policing (and policy) failures, given the scale of protests and "bad apples" among the protesters.

The jury credited Plaintiffs' version of the facts, almost entirely. The jury concluded that Denver violated Plaintiffs' First Amendment rights to free speech and peaceful protest and, for all but one plaintiff, their Fourth Amendment right to be free from excessive force. And the jury found that the *cause* of those constitutional injuries was Denver's policies. Denver attacks each of the *Monell* theories under which the jury found Denver liable. But because the jury's verdict can stand independently on any of those grounds, Denver must run the table in showing that *none* of the theories was supported by sufficient evidence. That Denver cannot do.

**A.** As to policies, Plaintiffs introduced unrebutted testimony from two experts that Denver had a policy or custom of indiscriminately and improperly using unconstitutional force against peaceful protesters; of permitting officers to use whatever less-lethal weapons they wanted and however they wanted; and of failing to require officers to activate BWCs or timely complete use-of-force reports. Denver does not dispute any of that. It instead argues that Plaintiffs failed to introduce sufficient evidence of causation. But causation is a quintessential jury issue. Denver offers no persuasive reason to overturn the jury's considered judgment when the evidence established that Denver's policies or customs caused Plaintiffs' constitutional injuries.

**B.** Plaintiffs also established that Denver's failure to train its officers caused Plaintiffs' injuries. Denver does not contest that finding. Rather, Denver argues that Plaintiffs offered insufficient evidence that Denver's training failures were made with deliberate indifference. Denver is again incorrect. Plaintiffs showed both (1) that Denver consciously disregarded the risk of harm of failing to train its officers in crowd-control techniques and (2) that the need for training was "so obvious" in a recurring situation that Denver can reasonably be said to have been deliberately indifferent to the need. Voluminous evidence supports both findings. In addition to expert testimony, the jury heard from Denver's own officers that the then-Chief of Police believed training was unimportant and that field-force training was largely

abandoned because of his lack of support. The jury also heard testimony that the Office of the Independent Monitor (OIM) recommended in 2012 that the DPD reassess its protest procedures after the "Occupy" protests resulted in injuries to protesters and officers. Denver declined. Deliberate indifference is a jury question, and sufficient evidence supports the jury's conclusion that Denver was deliberately indifferent to its training deficiencies.

**C.** Plaintiffs introduced substantial evidence that Denver ratified its officers' unconstitutional conduct and the basis for it. Commander Phelan and other senior officers testified that all of Denver officers' uses of less-lethal weapons on protesters were consistent with its policies or customs. Two days into the protest, after officers had repeatedly violated protesters' constitutional rights, Chief Pazen praised officers for the "extreme restraint" they had exercised. That pronouncement—coupled with Denver's failure to discipline hardly any officers—supplied sufficient evidence to support the jury's verdict on Plaintiffs' ratification theory.

**II.** The district court properly instructed the jury.

**A.** On the *Monell* theories, the jury instructions correctly limited the "deliberate indifference" element to Plaintiffs' failure-to-train claims. Denver's contrary arguments are either waived, wrong, or both. Supreme Court precedent only requires plaintiffs to establish deliberate indifference on *Monell* claims alleging a municipality's failure to act, such as its failure to train. Denver's newfound objection

to its own proposed instruction on failure-to-train—which the district court adopted—is invited error.

**B.** The jury instructions were correct on the "substantial or motivating" language for Plaintiffs' First Amendment claims. The Supreme Court has never cabined the "substantial or motivating" test to employment disputes; indeed, the Court applied the test in 2019 to a claim for retaliatory arrest. Regardless, Denver's argument that the jury would have reached a different result had the instructions included its preferred language is incorrect, rendering any error harmless.

**III.** The district court properly exercised its discretion in admitting Nicholas Mitchell's testimony. Mitchell's testimony was limited to facts within his personal knowledge, gleaned from the thousands of hours of video footage he reviewed and dozens of witness interviews. Insofar as his testimony included lay opinions, such evidence is admissible when based on information gathered through "interviews," photographs, and electronic "data." *Vincent v. Nelson*, 51 F.4th 1200, 1205, 1215 (10th Cir. 2022). Mitchell's testimony did not touch on subsequent remedial measures, and it was substantially more probative than prejudicial.

**IV.** Remittitur is unwarranted. The jury carefully awarded each Plaintiff damages based on their individual testimony and claims, and Denver cannot show that the jury awards "shock the judicial conscience." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006).

## STANDARDS OF REVIEW

The applicable standards of review are addressed below.

## ARGUMENT

## I.     Overwhelming Evidence Supported the Verdict on Each *Monell* Ground

This Court reviews *de novo* the denial of a Rule 50 motion for judgment as a matter of law. *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1156 (10th Cir. 2022). The Court "consider[s] the record in its entirety and draw[s] all reasonable inferences in favor of the nonmoving party." *Id.* The Court does not "weigh the evidence, pass on the credibility of witnesses, or substitute [its] conclusions for that of the jury." *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1110-11 (10th Cir. 2005).

This Court is "general[ly] reticen[t] to grant JMOL motions." *Stroup*, 26 F.4th at 1157. "[J]ustifying the grant of a JMOL motion is difficult in practice" because the "quantum of evidence necessary to defeat a JMOL is slight." *Id.* at 1156-57. "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019). Because of the high bar to take factual determinations away from the jury, "judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable people could not arrive at a contrary verdict." *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1130 (10th Cir. 2019) (cleaned up).

## A.    Legal Background

Under § 1983, a government official that deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694-95 (1978), the Supreme Court held that municipalities are liable under § 1983 only when the constitutional violation is caused by the municipality's policies or customs. To prevail on that claim, a plaintiff must establish two elements: (1) "the existence of a municipal policy or custom"; and (2) "a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). To satisfy causation, a plaintiff must show that "the challenged policy or practice [is] closely related to the violation of the plaintiff's federally protected right." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1241 (10th Cir. 2020). That requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiffs can establish *Monell* liability in multiple ways. Three are relevant here.

First, Plaintiffs can establish that their injury was caused by an "official municipal policy," which includes "the decisions of a government's lawmakers, the

acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Whitson v. Bd. of Cnty. Comm'rs of Cnty. of Sedgwick*, 106 F.4th 1063, 1066-67 (10th Cir. 2024). Custom can also "trigger municipal liability if the practice is so permanent and well settled as to constitute a custom or usage with the force of law .... The actions must be persistent and widespread practices of city officials." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048-49 (10th Cir. 2022) (cleaned up).

Second, a municipality may be liable for failure to train. *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023). "[W]here a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality," the municipality can "be liable for such a failure under § 1983." *Id.*

Third, a municipality may be liable when it ratifies its employees' unconstitutional conduct. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Denver does not dispute that Plaintiffs introduced sufficient evidence that DPD officers used unconstitutionally excessive force against Plaintiffs. Instead, Denver wrongly argues that certain of its policies are categorically incapable of leading to municipal liability. Alternatively, Denver contends that Plaintiffs failed to adduce sufficient evidence that Denver's policies, practices or customs *caused*

Plaintiffs' injuries. But the jury found otherwise, and Denver fails to meet its high burden to show that the evidence points only its way.

## B.    Policy, Practice, or Custom

### 1.    Official policies

***Final-policymaker decisions.*** Denver acknowledges (at 42) its responsibility for "actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). And Denver further concedes (at 42) that Commander Phelan—the "incident commander" who oversaw Denver's police response to the protests—is a final policymaker. Any actions by Commander Phelan thus constitute Denver's official policy.

Plaintiffs introduced extensive evidence that Commander Phelan authorized use of less-lethal weapons that caused DPD officers to violate Plaintiffs' constitutional rights. For instance, Commander Phelan testified that he authorized use of chemical agents at each of the daily supervisor briefings and allowed the use of less-lethal weapons to move protesters. App.Vol.21_1200-05. Denver argues (at 42-43) that those policies did not cause Plaintiffs' constitutional injuries; rather, it was the "officers on the ground."

Denver's argument is wrong legally and factually. Legally, "constitutional violations" caused by "subordinates" can "be the basis for … municipal liability."

*Burke*, 935 F.3d at 996-97. The question is not whose finger was on the trigger but whether Denver's policies *caused* the constitutional violations. Factually, Commander Phelan's directives—and thus Denver's official policies—were the moving force behind DPD officers assaulting Plaintiffs as they peacefully protested: Absent his orders, officers would not have been permitted to employ less-lethal weapons as they did. Denver glosses over Commander Phelan's specific authorizations of uses of force against Plaintiffs. App.Vol.16_149:13-158:3; App.Vol.19_14:14-15:17, 71:23-77:2; App.Vol.21_58:25-59:11, 89:4-91:3; App.Vol.23_187:18-193:1, 196:14-198:5. Denver likewise ignores that Commander Phelan approved the use of weapons not intended for protests—including 12-gauge shotguns and flashbang grenades—despite the fact that officers were not trained on them. App.Vol.16_ 85:2-86:25; App.Vol.17_52:4-6; App.Vol.21_16:8-18:19; App.Vol.23_96:25-99:10, 101:24-107:14, 108:24-110:2; App.Vol.24_81:6-82:11, 85:2-86:25. Officers' use of these weapons caused some of Plaintiffs' injuries. *Supra* pp. 5, 17 (Packard and Lyman). Commander Phelan's authorization of these less-lethal weapons was also a moving force behind Plaintiffs' injuries.

**Use of less-lethal weapons.** The jury also heard testimony from both Commander Phelan and Commander Michael O'Donnell—Denver's 30(b)(6) designee—that Denver policy permitted officers to deploy less-lethal weapons as they saw fit, including firing chemical munitions, PepperBalls, and 40mm rounds at

peaceful protesters. *See, e.g.*, App.Vol.21_23-25, App.Vol.43_28-29. That policy was the moving force behind Plaintiffs' constitutional injuries, all of whom were gassed or shot with less-lethal weapons while peacefully protesting. *See supra* pp. 4-19.

Denver contends (at 36) that its policy of unfettered discretion to deploy unconstitutional force "cannot itself give rise to *Monell* liability." That argument fails twice over.

***First***, Denver forfeited that argument by failing to raise it at summary judgment or in either of its Rule 50 motions, App.Vol.5_114-138; App.Vol.25_38:20-4:18; App.Vol.11_182-196—none of which even mentions the word "discretion." *Valdez*, 66 F.4th at 819. And "[b]ecause Denver does not argue plain error on appeal, it has waived consideration of this argument." *Id.*

***Second***, even if the Court considers the merits, Denver conflates claims challenging discretionary *acts* versus challenges based on a *policy* of discretion. The former constitute impermissible *respondeat superior* claims, while the latter are heartland *Monell* claims. Here, while individual officers improperly wielded the less-lethal weapons, the unconstitutional acts were *caused* by the policy of unfettered discretion. That policy of limitless discretion included the use of unconstitutional force. That some officers may choose to exercise their discretion in a way that *does not* violate the Constitution does not insulate the policy from scrutiny. Both of

Plaintiffs' experts testified that Denver's use-of-force policy caused officers to use improper force against protesters. *See* App.Vol.18_6:6-23 (because officers were "allowed the discretion to select whatever … weapon they choose, firing indiscriminately … over and over, I saw … indiscriminate use of pepper ball"); App.Vol.24_138:10-139:3. In any event, Denver's concern that the jury would impose *respondeat superior* liability is obviated by the jury instructions, which required the jury to find that it was Denver's "official policy, practice, or custom [that] caused the deprivation of the plaintiff's rights"—not an individual officer's discretionary act. App.Vol.11_159.

**Body-worn cameras and use-of-force reports**. Denver concedes (at 43) that its "policy did not require the use of body-worn cameras during protest activity." Denver also acknowledges (at 44) that officers were not required to complete use-of-force reports until long after the protests—and were instructed to avoid "problematic language" in their reports. App.Vol.35_18 (Ex. 787). Chief Stamper testified that Denver's policies on BWC and use-of-force reports "gut[ted] accountability" and prevented Denver from effectively reviewing officers' conduct. App.Vol.18_37:24-39:16.

Denver wrongly argues (at 43-44) that these policies "cannot have been the moving force behind any violation of Plaintiffs' constitutional rights." As numerous courts have recognized, failure to require officers to use BWC could "cause[] their

injuries because the officers using force … felt comfortable doing so." *Cousik v. City & Cnty. of Denver*, 2024 WL 896755, at *16 (D. Colo. Mar. 1, 2024); *see also Rose v. Baltimore Cnty.*, 2024 WL 3924595, at *13 (D. Md. Aug. 23, 2024) ("the County's body worn camera policy … reduced accountability of Officer Defendants … allowing them to act with impunity in their use of excessive force"); *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 598 (W.D. Ky. 2020) ("[I]t is plausible to infer that un-filmed officers may act differently than those who are under surveillance.").[2]

*Mutual-aid agencies.* Denver concedes (at 44) that its "policy was to allow mutual-aid agencies to use their own policies and weapons" during the protests. That policy caused Mr. Packard's fractured skull, broken discs in his neck, and brain bleeding. Mr. Packard's head was fractured by a lead-filled Kevlar bag fired from a shotgun—a weapon that Denver considered too dangerous for its own officers, but

---

[2] Denver (at 44) is "aware of no authority requiring completion of use-of-force reports or holding that the failure to require their 'timely' completion is unconstitutional." Denver appears to confuse municipal liability with qualified immunity. Plaintiffs are not required to identify precedent holding Denver's actions unconstitutional. They must show a policy or custom that caused Plaintiffs' constitutional harms. *Cousik*, 2024 WL 896755, at *17 (jury could conclude that Denver's "policy of not requiring its off[ic]ers to write use-of-force reports during protests caused the officers to feel more comfortable using force on protesters and, in turn, caused Plaintiffs' injuries").

that it allowed its mutual-aid agencies to use during the protests.[3] App.Vol.21_14:25-16:16. Denver's policy of uncritically allowing mutual-aid agencies to use whatever weapons they pleased was thus the "moving force" behind Mr. Packard's injuries.[4]

## 2. Practice or custom

Besides Denver's official policies, Plaintiffs proved that Denver had a practice or custom of using indiscriminate and excessive force against protesters. Chief Stamper testified: "My conclusion … is that the [DPD] had a policy, practice, or custom of indiscriminately and improperly using force against protesters." App.Vol.17_100:11-13. That testimony was supported by what the district court described as a "mountain of video evidence." App.Vol.12_84. Plaintiffs introduced over 100 video exhibits at trial documenting DPD officers' excessive force against

---

[3] Denver's footnote argument (at 45 n.6) that Plaintiffs "introduced insufficient evidence to establish an agency relationship" between Denver and its mutual-aid partners simply ignores the evidence: "Commander Phelan, does the City of Denver take responsibility for the actions of other jurisdictions at the downtown Denver demonstrations? … [Y]es, they're working as an agent for the Denver Police Department. We ask them for help, and they come to help us." App.Vol.21_14:6-18 (emphasis added).

[4] The jury also found Denver liable under Mr. Packard's failure-to-train and ratification theories. App.Vol.11_170.

Plaintiffs and other peaceful protesters.[5] Denver itself describes (at 9) Plaintiffs' evidence as "voluminous."

Unable to defend its officers' conduct, Denver argues (at 38-39) that "[p]roof of a custom requires a history of *prior* constitutional violations." Denver's argument fails for three reasons.

***First***, whether a municipality "had unofficial policies or customs" that caused a plaintiff's injuries is a question of fact. *Prince*, 28 F.4th at 1049. Denver does not dispute the evidence establishing that its officers' unconstitutionally excessive use of less-lethal weapons was "continuing, persistent and widespread." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008); App.Vol.17_100:5-13, 160:6-171:13; App.Vol.18_6:2-23; App.Vol.24_168:18-22. If anything, Denver argues (at 3, 9, 39) there was *too much* of that evidence. Denver's contention that it had no custom or practice of using unconstitutionally excessive force against protesters was made to the jury. The jury rejected Denver's position.

***Second***, custom can be established by conduct over the course of several days—or even a single day. *E.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1147-48

---

[5] Denver implies (at 3, 9, 39)—but does not argue—that it was somehow improper for Plaintiffs to introduce evidence of officers' excessive use of less-lethal weapons on other protesters. Yet Denver acknowledges (at 38-39) that, to establish a "custom," Plaintiffs must show that "the actions of the municipal employees [are] continuing, persistent and widespread," which usually means relying on past misconduct toward *non-plaintiffs*. *E.g.*, *Prince*, 28 F.4th at 1041-42.

(9th Cir. 2005) (officers' conduct during a single day could establish a "policy or custom"); *Johnson v. City of San Jose*, 2023 WL 7513670, at *14 (N.D. Cal. Nov. 13, 2023) (officers' improper use of less-lethal weapons over two days during George Floyd protests could establish "an unwritten custom or practice of engaging in excessive and/or retaliatory force against the demonstrators protesting police brutality"); *Huffman v. City of Bos.*, 2022 WL 2308937, at *7 (D. Mass. June 27, 2022) (similar); *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 842 (D. Minn. 2021) (similar); *White v. Jackson*, 2015 WL 1189963, at *3 (E.D. Mo. Mar. 16, 2015) ("pattern of unconstitutional acts" by officers established over three days of protests). Plaintiffs' "voluminous" evidence showed—and the jury found—that over the course of six days, DPD officers' unlawful uses of force were "continuing, persistent and widespread"—*i.e.*, a custom or practice. *Carney*, 534 F.3d at 1274.

*Third*, as Denver concedes (at 40), Plaintiffs introduced evidence that Denver's custom of using excessive force against protesters stretched back nearly a decade. Mitchell testified about a report he authored in 2012 regarding DPD officers' indiscriminate use of "OC spray and PepperBalls" in response to the "Occupy" protests that "injured" "several civilians." App.Vol.23_167:20-24. Another court considering this issue concluded that Denver's "policies and customs" regarding excessive force toward protesters "date back many years." *Bjelland v. City & Cnty.*

*of Denver*, 2024 WL 4165428, at *7 (D. Colo. Sept. 12, 2024). Denver thus cannot show that "the evidence points but one way" in its direction. *Burke*, 935 F.3d at 991.

### C.    Failure to Train

The jury also found that Denver's failure to train its officers in proper crowd-control techniques and less-lethal weapons caused Plaintiffs' First and Fourth Amendment injuries. App.Vol.11_169-177. The jury found four things: (1) an officer's act deprived Plaintiffs of a constitutional right; (2) Denver had insufficient training related to the constitutional violations; (3) deficient training caused the deprivation of Plaintiffs' rights; and (4) Denver adopted its policy of deficient training with deliberate indifference. App.Vol.11_161. Denver does not dispute that it had a policy of deficient training, nor that its failure caused Plaintiffs' constitutional injuries. Denver instead argues (at 46-49) that Plaintiffs failed to prove deliberate indifference. Denver is incorrect.

One way a plaintiff can establish deliberate indifference is to show that "the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). That often entails showing a "pattern of similar constitutional violations by untrained employees." *Valdez*, 66 F.4th at 816 .

Another way to establish deliberate indifference is to show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 815 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Thus, Plaintiffs can show deliberate indifference when "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Brown*, 520 U.S. at 409). This Court has affirmed the denial of summary judgment in "several" *Monell* cases where the failure to train was "so obvious" that it established deliberate indifference. *Id.* at 816. Whether a municipality was deliberately indifferent "present[s] [a] factual question[] that should be decided by a jury." *Id.*

Here, the jury found that Denver adopted its policy of deficient training with deliberate indifference. Denver is thus entitled to judgment as a matter of law only if it can establish that "the evidence points but one way and is susceptible to no reasonable inferences which may support [Plaintiffs'] position." *Burke*, 935 F.3d at 991. Plaintiffs introduced substantial evidence showing both that the need for training in large protest situations was "so obvious" that Denver's failure was deliberately indifferent and that Denver had actual or constructive notice that failure to train was "substantially certain" to result in constitutional violations.

43

### 1. The need for training in crowd-control was obvious

Chief Stamper testified that it was "utterly predictable" that the DPD would need to be prepared for "large-scale civil justice protest[s]." App.Vol.18_42:9-15. Chief Stamper concluded that "there was woefully inadequate training" of DPD officers; officers were "undisciplined and using techniques and methods that … no other police department would permit." App.Vol.17_102:2-11. Dr. Maguire likewise testified that Denver had "routinely fail[ed] to train its officers in the several years before the protests about how to not use excessive amounts of force during protests" and that those "repeated failure[s]" to train officers presented "an obvious potential for excessive use of force" and "an obvious potential for violation of First amendment rights of protesters." App.Vol.24_175:5-15.

Denver suggests (at 48) that this is the "only" evidence showing the obvious need for training in crowd-control situations. Even if that were true (and it is not), expert testimony would be enough. This Court has routinely cited expert testimony to establish a failure-to-train claim. In *Allen v. Muskogee*, for instance, the Court relied almost exclusively on the expert's testimony to conclude that "[t]he evidence is sufficient to support an inference that the need for different training was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the City could reasonably be said to have been deliberately

indifferent to the need." 119 F.3d 837, 843-44 (10th Cir. 1997); *see also Valdez*, 66 F.4th at 822 n.28 (citing expert testimony).

But there was much more: Denver's own officers' statements and video evidence supported the jury's conclusion that the need for training was obvious. Captain Sich—a senior officer who was in the command post during the protests— recounted that "[i]n the Command Post, criticism of officers on the ground was 'non-stop.'" App.Vol.37_70. It was obvious to her why officers "weren't disciplined"— "she kept thinking, 'what are they supposed to do without training or supervision?'" App.Vol.37_70.

The obvious need for training in crowd-control situations was also evident from the egregiously inappropriate uses of force throughout the protests. One video showed an officer learning how to use a stinger grenade on the fly, struggling to figure out how to pull the pin, and then launching it into traffic, striking a bystander's moving car. App.Vol.40 (Ex. 1120). Consider, too, the egregious misconduct catalogued in Denver's own brief. Br. 9. This evidence supports the jury's conclusion that the need for training "was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the City could reasonably be said to have been deliberately indifferent to the need." *Allen*, 119 F.3d at 843-44.

Denver counters (at 48-49) that the scale of the protests was "unprecedented," and so these protests did not constitute a "recurring situation." But Plaintiffs introduced evidence that Denver "saw significantly larger crowds and protests" during the 2008 Democratic National Convention than during the George Floyd protests. App.Vol.37_62. The jury heard Denver's defense that it should not be held accountable given the scale of the protests, but the jury nevertheless found that Denver acted with deliberate indifference.

Denver's argument also defies common sense—large protests *are* a recurring situation, particularly in large metropolitan areas, and the size of the protest makes it no less obvious that failure to train officers on crowd-control techniques will result in violations of protesters' constitutional rights. Courts repeatedly reject arguments like Denver's that the size of a protest means the need for training was not obvious. *See, e.g.*, *Bjelland*, 2024 WL 4165428, at *7; *Ratlieff v. City of Fort Lauderdale*, 2024 WL 4039849, at *44 (S.D. Fla. Sept. 4, 2024).

## 2. Denver consciously disregarded the risk of harm

Denver ignores evidence showing that it knew about the need for crowd-control training but consciously declined to invest in it. Recall Mitchell's testimony about his 2012 report after the "Occupy" protests, discussed above. App.Vol.23_167:20-24. Mitchell testified that the "clash" created "significant risks both to officer safety and civilian safety." App.Vol.23_168:3-6. But while Mitchell

recommended that the DPD "assess the tactics used in that clash to determine if different policies [or] procedures would better protect officer … and protester safety," the DPD "declined to accept that recommendation," in part due to concern over "resources." App.Vol.23_168:21-169:3. Mitchell labeled Denver's failure to reassess its crowd-control policies and procedures a "missed opportunity." App.Vol.23_167:11-13.

But there's more. Lt. John Coppedge—the DPD Training Academy Lieutenant—explained that the DPD's troubling response to the George Floyd protests was "a symptom of what has been happening in the DPD for the last few years." App.Vol.37_61. Lt. Coppedge "characterized [Chief Pazen's] attitude as being that *training was not important*." App.Vol.23_77:14-19 (emphasis added). In the years "leading up to the George Floyd protests," training "on crowd control" was "less of a priority." App.Vol.23_77:7-13. That was particularly problematic for field-force training, which Commander Phelan testified was a "perishable" skill. App.Vol.21_9:8-14.

Denver's then-chief of police Paul Pazen—who "had final policymaking authority," App.Vol.11_162—consciously disregarded the importance of crowd-control training. Eric Knutson, "the DPD's primary crowd control trainer," App.Vol.37_65, testified that he developed a "three-day field force training course" in 2014 that he conducted for officers monthly from 2014 to early 2016,

App.Vol.26_111:11-112:1. But in 2016, DPD commanders told Sgt. Knutson "they would no longer send officers to the training because it was too time-intensive and caused manpower issues." App.Vol.26_112:2-5. Lt. Coppedge stated that trainings "received no organizational support," and that because there was "no mandate from the top ordering that training classes be filled," classes did not get filled. App.Vol.26_112:2-5. In 2019, Sgt. Knutson developed a one-day field-force training for leadership. App.Vol.26_113:8-14. Out of "hundreds of supervisors," just seven attended. App.Vol.26_113:15-23.

The evidence amply supports the jury's conclusion that Denver consciously disregarded the risk of harm from failing to train its officers in crowd-control techniques. *Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000).

### D. Ratification

"If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127. Denver argues (at 49-53) that the jury's verdict is unsupported by sufficient evidence that a Denver policymaker knew of its officers' unconstitutional acts or the basis for them. The evidence shows otherwise.

Commander Phelan testified that he was "not aware of *any* use of force that was outside of policy" during the protests. App.Vol.21_45:15-22 (emphasis added).

This included uses of force that "shocked" him but that he described as "still in policy." App.Vol.21_47:1-16. Given Commander Phalen's testimony that all officers' uses of force during the protest were consistent with their training and Denver's policies, the jury could properly infer that Commander Phelan approved all officers' conduct, including the excessive force used against Plaintiffs.

Denver nonetheless argues (at 52) that there was no evidence that Commander Phelan "knew the reasons for that conduct." That argument beggars belief and seeks to erase the jury's contrary conclusion. Commander Phelan indisputably knew that officers deployed less-lethal munitions against peaceful protesters without regard to Fourth Amendment constraints and/or in retaliation for protected First Amendment activity. App.Vol.21_25:4-30:10.

Denver does not dispute (at 52) that almost no officers were disciplined for their excessive uses of force. Relying on out-of-circuit precedent, it instead argues (at 52) that a failure to discipline "cannot amount to ratification." This Court has already rejected that position, explaining that a failure to discipline could "cause a future violation by sending a message to officers that such behavior is tolerated." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009). That is precisely what happened here. On just the second day of protests, officers were *commended* for excessive uses of force, not disciplined. At a press conference, Chief Pazen praised officers for "demonstrat[ing] extreme restraint." App.Vol.30_17 (Ex. 39) at 12:17-

12:33. That sent the message that officers' excessive uses of force were tolerated (indeed, celebrated) and thereby caused "future violations" over the next several days of the protest.

## II.   The District Court Properly Instructed the Jury

### A.   Deliberate Indifference

#### 1.   The failure-to-train instruction suffices to uphold the entire verdict

While Denver's brief leads (at 13) with a purported failure to instruct the jury correctly on deliberate indifference, this issue is (at best) a red herring. That is because, to rule for Plaintiffs on their *Monell* theory based on failure to train, the jury *was* instructed that they must find that "Denver adopted its policy of deficient training with deliberate indifference." App.Vol.11_161. The instruction continued to define "deliberate indifference," App.Vol.11_161—and Denver does not object to that definition on appeal.

The jury found for each Plaintiff on the failure-to-train theory. App.Vol.11_169-77. As the district court correctly noted, that determination is sufficient to sustain the entire liability verdict, regardless of any purported instructional error on other theories of liability. App.Vol.12_83.

Perhaps realizing its predicament, Denver challenges this jury instruction, too, contending (at 17) that the jury *might* have rendered a verdict based on failure to

*supervise* and that the jury *might* have concluded that it need not find "deliberate indifference" in that circumstance.

Denver is foreclosed by the invited-error doctrine from challenging either (1) the jury instruction on failure to train or (2) the verdict form's alleged failure to distinguish between failure to train and failure to supervise theories. Under that doctrine, this Court "will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial." *United States v. Perrault*, 995 F.3d 748, 772 (10th Cir. 2021). Denver itself proposed the instruction on failure to train; the district court chose it over Plaintiffs' proposed instruction, subject to minimal alterations, to which Denver agreed. App.Vol.14_215:17-24; S.A. 33-34. Similarly, the verdict form that Denver now faults for not distinguishing between a failure-to-train and a failure-to-supervise theory was jointly submitted. *See* App.Vol.28_66:19-67:9. Denver "agreed on all" of the changes to the verdict form, calling the form "ready to go." *See* App.Vol.28_67:6-8. Because Denver itself wrote the challenged instruction and approved the verdict form, any purported error was "invited" by Denver and cannot be "set aside on appeal." *Perrault*, 995 F.3d at 772.

Regardless, Denver's objection to its own instruction is meritless. The instruction specifically states that Plaintiffs "must prove *each*" of the listed elements, including element four: "Denver adopted its policy of deficient training with

deliberate indifference." App.Vol.11_161 (emphasis added). Juries are presumed to follow instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and this instruction required the jury to find deliberate indifference before rendering a verdict in Plaintiffs' favor on the failure-to-train theory. Denver has offered nothing beyond speculation that the jury ignored the fourth element that required a finding of deliberate indifference.

## 2. Deliberate indifference is not required of other *Monell* claims

Because the failure-to-train finding is sufficient to sustain the entire verdict, the Court need not reach Denver's alternative objections to other instructions. But they are wrong in any event: Deliberate indifference is not required to prove *every* theory of liability under *Monell*. A plaintiff need establish only two elements: (1) "the existence of a municipal policy or custom;" and (2) "that there is a direct causal link between the policy or custom and the injury alleged." *Bryson*, 627 F.3d at 788. Deliberate indifference is required only when liability is predicated on a municipality's inadequate training, *City of Canton*, 489 U.S. at 388; *Connick*, 563 U.S. at 61, or inadequate hiring, *Brown*, 520 U.S. at 407.

Following Supreme Court precedent, this Court requires "deliberate indifference" for an allegedly inadequate training, supervision, or hiring program to constitute a "policy" under § 1983. *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019); *see also Prince*, 28 F.4th at 1049 ("*For claims*

*involving inadequate hiring or training*, … the plaintiff must demonstrate that the municipality acted with deliberate indifference to the consequences of its actions." (emphasis added)); *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998). In cases involving multiple theories of municipal liability, this Court has required "deliberate indifference" only with regard to failure to train, failure to supervise, or inadequate hiring theories. *See, e.g.*, *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189-90 (10th Cir. 2010); *Bryson*, 627 F.3d at 788-91.

*George v. Beaver County*, 32 F.4th 1246 (10th Cir. 2022), did not hold otherwise. *Contra* Br. 15. That case involved a failure-to-train theory, and so appropriately required proof of deliberate indifference. The passage cited by Denver that nods to a broader application of the "deliberate indifference" standard was not germane to the outcome, and thus constitutes dicta. Defendants' other authorities likewise rely on *Canton*, *Brown, Barney*, and *Schneider*, or cases brought under the Eighth Amendment, which apply a different "deliberate indifference" standard.[6] *See Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir. 2022) (citing *Schneider*); *Hinkle*, 962 F.3d at 1239  (citing *Schneider* and an Eighth Amendment case); *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022) (citing *Brown*, *Barney*, and an Eighth Amendment case).

---

[6] *See Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992) ("deliberate indifference" as used in Eighth Amendment cases differs from *Monell* cases).

The district court properly instructed the jury that deliberate indifference is not required to establish liability under Plaintiff's policy, practice, custom, or ratification theories. Denver's contrary argument cannot be squared with the Supreme Court's precedents following *Monell*.

## B. Substantial or Motivating

### 1. "Substantial or motivating" is correct under Supreme Court precedent

The jury was correctly instructed on the First Amendment claim to consider whether "participation in the protected activity was a *substantial or motivating factor* in the officer's decision" to take action against Plaintiffs. App.Vol.11_153 (emphasis added). In *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019), the Supreme Court held that a retaliatory-arrest claim should be evaluated according to the *Mt. Healthy* test, which requires plaintiffs to "show that the retaliation was a substantial or motivating factor behind the arrest." *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (holding in an employment case that it was plaintiff's burden to demonstrate that his protected First Amendment conduct was a substantial or motivating factor in the defendant's decision not to rehire him). *Nieves*, decided in 2019, supersedes the portion of this Court's decision in *Worrell v. Henry* cited by Denver, which purports to require the "substantially

motivated" standard for First Amendment retaliation claims against a defendant other than an employer. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).[7]

Denver argues (at 19) that *Nieves* "does not control" because the Supreme Court did not explicitly address whether the "substantial or motivating" test applies to claims outside of the retaliatory-arrest and employment contexts. The decision in *Nieves*, however, directly contradicts Denver's position (at 19) that the *Mt. Healthy* standard ("substantial or motivating") is limited to employment cases. Indeed, Justice Jackson's concurring opinion in *National Rifle Association of America v. Vullo* confirms that the *Mt. Healthy* test is not limited to employment or retaliatory-arrest cases. 602 U.S. 175, 204 (2024) (explaining that "'substantial' or 'motivating factor'" standard likely applied in case concerning coercion of regulated entities).

Of the seven courts of appeals that have considered the issue, six have applied a "substantial or motivating" test rather than Denver's "substantially motivating" standard in First Amendment claims outside the employment or retaliatory arrest contexts. *See Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (regulatory powers); *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2nd Cir. 2013) (legislative action to delay approval of settlement agreement); *Miller v. Metzger*

---

[7] *Pryor v. Sch. Dist. No. 1* discussed the "substantially motivated" test only in a footnote, relying on a pre-*Nieves* case for the premise that the "substantially motivated" test applied to non-employee plaintiffs. 99 F.4th 1243, 1250 n.2 (10th Cir. 2024) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011)).

2022 WL 4820322, at *1 (3rd Cir. Oct. 3, 2022) (disciplinary hearing); *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (inmate transfer); *Ashley v. Boayue*, 2023 WL 2910533, at *6 (6th Cir. Jan. 10, 2023) (prison cell "shakedown"); *Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir. 2024) (protester injured in George Floyd protests); *see also* Ninth Circuit Model Civil Instruction 9.11 (plaintiff's protected activity was "substantial or motivating factor behind the defendant's conduct"). Three other courts of appeals require only that the plaintiff establish that their protected activity was a "motivating" factor. *See Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020); *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013); *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197-99 (11th Cir. 2011). The Fifth Circuit's adoption of "substantially motivated" in *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002), misreads "settled law from other circuits"— specifically, Sixth and Eighth Circuit precedents—and predates *Nieves* by two decades.

The district court's use of the "substantial or motivating" instruction is thus consistent with the Supreme Court's decision in *Nieves* and the weight of authority from other circuits.

### 2. Any instructional error was harmless

In any event, the semantic difference between Denver's proposed instruction (substantially motivated) and the instruction given (substantial or motivating) does

not merit reversal. "[J]ury instructions 'need not be flawless.'" *Jensen v. West Jordan City*, 968 F.3d 1187, 1197 (10th Cir. 2020). Reversal is warranted only where there is "a substantial doubt whether the jury was fairly guided in its deliberations." *Id.*

As this Court has already held, "there is no meaningful difference in the quantum of motivation required to prove causation" under the "substantial or motivating" test compared to the "substantially motivated" test. *Hedquist v. Beamer*, 763 F. App'x 705, 712 (10th Cir. 2019). This Court's decisions in employment cases illustrate the interchangeability of the substantially motivated formulation: using the phrases "substantial or motivating factor," "substantial motivating factor," and "substantially motivated" as equivalents. *See Deschenie v. Bd. of Educ. of Cent. Consolidated Sch. Dist. No. 22*, 473 F.3d 1271, 1276-78 (10th Cir. 2007); *Couch v. Bd. of Tr. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1235, 1240-42 (10th Cir. 2009); *Baca v. Sklar*, 398 F.3d 1210, 1218-22 (10th Cir. 2005). Since there is no risk that the use of interchangeable standards could have infected the verdict, any instructional error was harmless.

## III. The District Court Properly Admitted the Independent Monitor's Testimony

Plaintiffs offered the testimony of former Denver Independent Monitor Nicholas Mitchell to discuss OIM's investigation of Denver's police response to the protests. The district court ruled that Mitchell's testimony was admissible,

concluding that Denver's challenges to Mitchell's "personal knowledge" were "a matter for cross examination." App.Vol.23_11:24-12:5. That evidentiary ruling is reviewed for "abuse of discretion," a standard transgressed only if the court is left with "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Zepeda-Lopez*, 478 F.3d 1213, 1219 (10th Cir. 2007). Mitchell offered routine lay witness testimony within his personal knowledge, and the district court properly admitted it.

### A. Mitchell's Testimony Was Admissible Under Rules 602 and 701

A lay witness may testify to matters that are within the witness's "personal knowledge." Fed. R. Evid. 602; *see* Fed. R. Evid. 701(a). Mitchell testified to matters of fact within his personal knowledge under Rule 602, and in any event, any opinions he offered based on those facts are admissible lay opinions under Rule 701.

The Rule 602 "standard is not difficult to meet." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014). "A court should exclude testimony for lack of personal knowledge" under Rule 602 "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *Id*.

Plaintiffs offered at trial both the OIM report and Mitchell's testimony as evidence of DPD's policies and customs during the protests. App.Vol.23_8:24-9:7.

The district court excluded the report itself, guarding against the risk that OIM's recommendations could be perceived as subsequent remedial measures. The court instead permitted Mitchell to testify to the conclusions in the report, subject to the limitation that Mitchell omit OIM's recommendations and any new opinions. *See* App.Vol.23_8:7-13, 54:1-14. The district court's ruling cabined Mitchell's testimony to "[w]hat he did" as Independent Monitor, which "is a matter of fact," and textbook lay witness testimony under Rule 602. App.Vol.23_54:1-7. Defense counsel "agree[d]" that Mitchell was entitled to discuss OIM's investigation and report as a factual matter, and did not specifically object to a word of Mitchell's testimony as opinion rather than factual testimony. App.Vol.23_54:13-17.

For good reason. Mitchell testified only about what he personally "observed" during OIM's investigation and "concluded" at the culmination of the inquiry—all matters of fact. App.Vol.23_54:1-8. Mitchell testified that OIM was asked by the City to undertake an investigation into DPD's use of force during the George Floyd protests. App.Vol.23_60:13-61:21. He catalogued the "voluminous information" that OIM obtained in preparing the report, which included DPD "documents and records," "all of the body-worn camera footage recorded by Denver police officers during the protests," 15,000 hours of "stationary video camera" footage, information from mutual-aid partners, and "[s]everal dozen" interviews. App.Vol. 23_65:12-68:8. OIM's review of this evidence culminated in a public report detailing its

findings. App.Vol.23_62:3-8. That overview of the investigation was entirely factual.

Mitchell then described interviews he conducted during the investigation. Mitchell interviewed Lieutenant Coppedge "about the training that had been provided to Denver police officers on crowd control and field force operations." App.Vol.23_70:23-25, 74:18-21. He interviewed Captain Sich about DPD's leadership, use-of-force policies, and coordination with outside agencies. App.Vol.23_81:1-86:13. He interviewed Officer Joseph Stadler about the "lack of communication and strategy on the use of less-lethal force" during the protests. App.Vol.23_94:2-15. And he recounted another half-dozen interviews that he personally conducted, App.Vol.23_86:17-94:3, 96:2-101:16; *see also* App.Vol.23_84:5-24; described information in DPD and mutual-aid partner reports and documents he personally reviewed, App.Vol.23_109:5-114:4; and discussed the contents of videos he personally watched, App.Vol.23_80:11-25. This factual account of the investigation was entirely within Mitchell's personal knowledge.

Mitchell then shared his findings. The OIM report found that during the protests, DPD's policies had "deficient internal controls on officer use of force" and leveraged "mutual aid partnerships" in "deficient … ways." App.Vol.23_65:5-9, 116:3-6. Mitchell's testimony restated as a matter of fact the conclusions that were

issued in the OIM report as a matter of public record. Mitchell's testimony easily meets Rule 602.

To the extent Mitchell offered opinion testimony, that testimony was admissible under Rule 701. Rule 701 permits a lay witness to testify "in the form of an opinion" when the opinion is "rationally based on the witness's perception." Fed. R. Evid. 701(a). As with Rule 602, a witness may base his personal knowledge under Rule 701 on out-of-court statements, unless it "is excluded under the hearsay rules." *United States v. Garcia*, 994 F.2d 1499, 1506-07 (10th Cir. 1993). A district court's discretion to admit lay witness testimony is especially broad under Rule 701(a), where courts are "liberal" in admitting evidence, leaving "to juries any assessment of the weight to be given to such testimony." *United States v. Bush*, 405 F.3d 909, 916 & n.2 (10th Cir. 2005).

Lay witnesses may provide opinions based on "factual information gathered during their [] investigations," including information gathered through "interviews," photographs, and electronic "data." *Vincent*, 51 F.4th at 1205, 1215. Accordingly, lay opinion testimony based on post-incident investigations is routinely admitted, including opinions based on reviewing video footage, *Zepeda-Lopez*, 478 F.3d at 1221, audio recordings, *United States v. Marquez*, 898 F.3d 1036, 1049 (10th Cir. 2018), photographs, *Vincent*, 51 F.4th at 1206, and documentary records, *United*

*States v. Cooper*, 375 F.3d 1041, 1045-47 (10th Cir. 2004). Mitchell's investigation likewise relied on witness interviews, video evidence, and record review.

Denver's argument (at 28) that Mitchell's testimony was not based on "first-hand knowledge" because it was the product of a "post-incident investigation[]" is wrong for all the reasons just discussed. Denver resists this conclusion based on two out-of-circuit criminal cases. Both are distinguishable.

In *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010), the Fourth Circuit excluded an officer's testimony interpreting coded words in wiretapped calls because it was based on the officer's "credentials and training, *not his observations* from the surveillance employed in this case," which the officer did not "directly observ[e]." That says nothing about this case, which involves surveillance footage Mitchell *did* review. And in *United States v. Peoples*, 250 F.3d 630, 640-41 (8th Cir. 2001), the court excluded certain opinions based on post-incident investigations, but primarily because it was admitted as "snippets of early argument from the witness stand and not as evidence." That description cannot apply to Mitchell's anodyne discussion of the investigation he conducted. Regardless, neither case overrides Tenth Circuit precedent permitting lay opinion based on knowledge gained in post-incident investigations.

## B. Mitchell Did Not Testify About Subsequent Remedial Measures

Denver alternatively contends (at 30-31) that Mitchell's testimony is inadmissible under Rule 407 as evidence of subsequent remedial measures. Denver is wrong.

Rule 407 bars a party from proving liability based on remedial measures "taken that would have made an earlier injury or harm less likely to occur." Fed. R. Evid. 407. The prohibition does not apply here because Mitchell testified only to Denver's deficient policies when the protests took place—not to any of the measures Denver implemented in response to his report.

Evidence of a post-incident investigation does not itself reduce the likelihood of harm, in contrast to measures implemented as the result of an investigation. *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 918 (10th Cir. 1986); *Dow Chem. Corp. v. Weevil-Cide Co.*, 897 F.2d 481, 487-88 (10th Cir. 1990). As one leading treatise puts it: "Post-event tests or reports are generally outside the scope of Rule 407, and thus admissible, on the basis that they are conducted or prepared for the purpose of investigating the cause of the accident, and can rarely be characterized as 'measures' which, if conducted previously, would have reduced the likelihood of the accident." *Weinstein's Federal Evidence* § 407.06.

*Rocky Mountain Helicopters* illustrates the distinction. That case involved a helicopter crash attributed to a faulty aircraft component. 805 F.2d at 910. The

district court admitted in evidence a study conducted after the incident to test the capabilities of the part and assess whether it should be redesigned. *Id.* at 918. It excluded evidence of the corresponding "redesign" itself. *Id.* This Court held that the judge appropriately distinguished between admissible evidence of post-incident investigations to "discover what might have gone wrong," and inadmissible evidence of actual "action[] taken to remedy any flaws or failures indicated by the test." *Id.* "It would strain the spirit of the remedial measure prohibition in Rule 407," the Court explained, "to extend its shield to evidence contained in post-event tests or reports." *Id.*

Denver proposes (at 30-31) a special "procedure" for admitting evidence of post-incident investigations—requiring omission of any reference to the investigation's "post-event time frame." Denver does not explain how the typical post-incident investigation could ever comply with this rule from a practical perspective. Denver instead insists (at 30) that this procedure was established in a single sentence of *Rocky Mountain Helicopters*. But the Court there simply restated black-letter law that a post-incident investigation is inadmissible only when it is *itself* a remedial measure; it did not announce a novel procedure for complying with Rule 407. Denver nowhere contends that the OIM investigation itself had an inherently remedial effect, and Mitchell's testimony is thus consistent with Rule 407.

## C. Mitchell's Testimony Was Probative and Fair

Finally, Denver objects (at 32) that Mitchell's testimony should have been excluded under Rule 403. Excluding "evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *United States v. Gallegos*, 111 F.4th 1068, 1092 (10th Cir. 2024). "Rule 403 does not protect a party from all prejudice, only unfair prejudice." *Id.* "The district court is clearly in a superior position to perform this analysis, and thus is accorded broad discretion in making such decisions." *Id.*

Mitchell's testimony was highly probative. He testified to the policies and customs Denver used during the protests, as well as to DPD's training regimens, all of which goes to the heart of Plaintiffs' *Monell* claims. While Mitchell's testimony described Denver's policing failures, unflattering evidence is not unfairly prejudicial. *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013). The district court did not abuse its "considerable discretion in performing the Rule 403 balancing" by admitting Mitchell's dispassionate assessment as *independent* monitor of Denver's policies and customs at the center of this case. *Id.* at 1292.

## D. Any Error Was Harmless

An "erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Joseph*, 108 F.4th 1273, 1283 (10th Cir. 2024). "Prejudice

is unlikely to arise when the record already contains evidence encapsulating the erroneous admission." *Id.*

Plaintiffs introduced overwhelming evidence of liability at trial, rendering Mitchell's testimony unnecessary to sustain the verdict. *See supra* Part I. The district court agreed, concluding there "was substantial evidence supporting the verdict, including the testimony of plaintiffs, plaintiffs' expert witnesses, Commander Phelan, and numerous videos and pictures," which would have carried the verdict without Mitchell's testimony. App.Vol.12_91. Because exclusion of Mitchell's testimony would not have affected the outcome, any error was harmless.

## IV.  The Jury's Awards Appropriately Compensated Plaintiffs for Their Significant Injuries

Remittitur is appropriate only when the jury award is so excessive that it shocks the conscience. *Wood*, 438 F.3d at 1021. Juries have considerable latitude in choosing an award based on the evidence, and courts afford "wide discretion … to juries to fix the amount of noneconomic compensatory damages." *Burke*, 935 F.3d at 1036. Because establishing damages is a quintessential jury function, a jury's damages award is generally considered "inviolate." *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016).

Here, the jury's award falls comfortably within its discretion to establish Plaintiffs' damages. Each Plaintiff testified to experiencing significant physical pain and long-term emotional and psychological harm. *Supra* pp. 4-19. Denver argues

(at 54-57) that the jury's award must nonetheless be remitted because (1) the jury awarded several Plaintiffs the same amount despite different injuries, and (2) the awards are just too big. Both arguments are meritless.

As Denver acknowledges (at 56), the jury *did* distinguish between Plaintiffs' injuries. Ms. Wedgeworth received a smaller award because the jury found only her First Amendment rights were violated, while Mr. Packard received a higher award of $3 million due to the jury's assessment of his substantial physical injuries. App.Vol.11_169-177. As for the other Plaintiffs, Denver's recitation (at 54-55) of Plaintiffs' injuries underscores that they all suffered similarly egregious attacks that left them physically and mentally scarred. The jury was free to conclude that similarly situated Plaintiffs merited similar awards.

Nor can Denver establish (at 56-57) that Plaintiffs were overcompensated. First, plaintiffs routinely rely on their own testimony to substantiate an award for emotional injury. *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1063-64 (10th Cir. 2013) (reversing remittitur of $2 million award based on plaintiff's testimony of emotional distress). Second, this Court regularly rejects losing parties' attempts to compare the award to other cases, because "comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations." *Osterhout v. Bd. of Cnty. Cmmn'rs of LeFlore Cnty.*, 10 F.4th 978, 999 (10th Cir. 2021). Denver tries anyway, citing *Bell v. Williams*, 108 F.4th 809

(9th Cir. 2024). But that case supports this jury's award, as all Plaintiffs testified to "lasting physical or emotional damage," *see supra* pp. 4-19—what the *Bell* court found lacking.

Regardless, the jury's award here was in line with comparable cases. *See Dolenz v. United States*, 443 F.3d 1320, 1322-23 (10th Cir. 2006) (upholding $4 million in noneconomic damages); *Ibaenez v. Velasco*, 2002 WL 731778, at *10-12 (N.D. Ill. Apr. 25, 2002) (declining to remit $2.5 million award even though plaintiff's physical injuries "were not severe"); *Porter v. City of Philadelphia*, 337 F. Supp. 3d 530, 552-55 (E.D. Pa. 2018) (upholding $750,000 award where plaintiff had been tackled and placed in brief chokehold); *Jackson v. Tellado*, 2018 WL 4043150, at *5-7 (E.D.N.Y. Aug. 24, 2018) (remitting $12.5 million award to $2.75 million where plaintiff was pepper-sprayed by police and struck with batons).

## CONCLUSION

Plaintiffs respectfully ask this Court to affirm the judgment below.


Dated: February 21, 2025       Respectfully submitted,

/s/ *R. Reeves Anderson*
Robert Reeves Anderson
Matthew J. Douglas
Brian M. Williams
Emily M. Sartin
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, #3100
Denver, CO 80202

(303) 863-1000
reeves.anderson@arnoldporter.com
matthew.douglas@arnoldporter.com
brian.williams@arnoldporter.com

Orion de Nevers
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-5000
orion.denevers@arnoldporter.com

Mindy Gorin
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-7832
mindy.gorin@arnoldporter.com

Timothy Macdonald
Sara R. Neel
AMERICAN CIVIL LIBERTIES UNION OF
  COLORADO
303 East 17th Avenue, Suite 350
Denver, CO 80203
T: (303) 777-5482
timothy.macdonald@aclu-co.org
sneel@aclu-co.org

*Counsel for Epps Plaintiffs-Appellees*

## CERTIFICATE OF COUNSEL

Pursuant to 10th Cir. R. 31.3(B), counsel for the Epps Plaintiffs certifies that separate briefs for appellees are necessary in this appeal. The Epps and Fitouri Plaintiffs filed separate lawsuits and are represented by separate counsel. The events giving rise to each Plaintiff's claims involved different officers, different locations, and different circumstances that occurred at different times. The jury's verdict considered the specific circumstances applicable to each plaintiff. Separate briefs are necessary to adequately address the legal standards as they applied to the particular circumstances involving each Plaintiff's injuries and claims.

Both sets of Plaintiffs' counsel have endeavored to coordinate to the greatest extent possible to minimize duplication, including by filing a joint supplemental appendix and incorporating intersecting arguments by reference.

Respectfully submitted,

/s/ *R. Reeves Anderson*
Robert Reeves Anderson

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,970 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word 365.

/s/ *R. Reeves Anderson*
Robert Reeves Anderson

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing **BRIEF FOR APPELLEES ZACHARY PACKARD, ELISABETH EPPS, STANFORD SMITH, AMANDA BLASINGAME, MAYA ROTHLEIN, HOLLIS LYMAN, AND ASHLEE WEDGEWORTH**:

     a)     All required privacy redactions have been made;

     b)     The ECF submission is an exact copy of the hard copy document that is being filed with the Court;

     c)     The ECF submission has been scanned for viruses with the most recent version of the commercial virus scanning program Checkpoint Endpoint Security (Version 80.86.0169, most recently updated July 27, 2022), and, according to the program, is free of viruses.

/s/ *R. Reeves Anderson*
Robert Reeves Anderson